UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CATHERINE KASSENOFF,

       Plaintiff,                        Case No. 7:22-cv-02162-KMK

       v.

ALLAN KASSENOFF,
CONSTANTINE G. DIMOPOULOS, and
DIMOPOULOS BRUGGEMANNN P.C.,

       Defendants.

---

**AFFIDAVIT OF CATHERINE KASSENOFF**

Pursuant to 28 U.S.C. § 1746, I, Catherine Kassenoff, declare the following to be true and correct under penalty of perjury:

I am over the age of eighteen years and believe in the obligation of an oath. I am the Plaintiff in this action and submit this Affidavit in opposition to Defendants' Motion to Dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6).

1. This is the story of an abuser, Allan Kassenoff ("Defendant Kassenoff") and his self-described "hired gun", attorney Gus Dimopoulos ("Defendant Dimopoulos"), to whom he has paid approximately $2 million in an effort to "win" against the wife he so desperately wants to punish for standing up for their three young Children against his physical and emotional abuse and torment during the 13 years of our marriage.

2. Defendant Kassenoff seeks to create an absurdly implausible narrative that I, the former primary caregiver of the Children, a former Assistant U.S. Attorney in the Eastern District of New York, and Special Counsel to the Governor of New York for the past seven years – with no history of mental illness, no criminal record, no abuse of alcohol, children or drugs, and

having obtained "top secret" clearance with the Department of Justice during my service – am unfit to parent the Children I parented practically alone until the filing of his divorce action in May 2019.

3.  As many abusers do, Defendant Kassenoff and his attorney have relied on the junk science theory of "gaslighting", in order to bury the credible and verifiable allegations of physical violence and emotional coercion for which he was twice-indicted by Child Protective Services ("CPS"), to take away custody of the Children, my property, my home, and even my liberty.  *See, e.g.,* Gender Bias in Cross-Allegation Domestic Violence-Parental Alienation Custody Cases:  Can States Legislate the Fix?, *Columbia Journal of Gender and Law* (Vol. 42, Issue 1, Winter 2021, by: Nina Jaffe-Geffner). Using his stature as a shareholder at Greenberg Traurig, his power, connections and money, Defendant Kassenoff lied to the court ("the Divorce Court") overseeing the divorce case he filed, *Kassenoff v. Kassenoff,* 58217/19 ("the Matrimonial Action"), over and over again, and repeatedly used *ex parte* procedures to achieve what he could not otherwise obtain lawfully in a court of law.

*Defendant Kassenoff's Coercive Control Goes Back Years*

4.  Defendant Kassenoff, declaring in 2016 that he was unilaterally instituting an "open marriage" because he had tired of my affliction with breast cancer, needed to go beyond what the law allowed to get what he wanted.  For that reason, he illegally, secretly, and sociopathically monitored my electronic communications – for many years.  Under the false pretense of helping me find my iPhone, Defendant Kassenoff instead used the occasion to synchronize my password-protected iPhone with his laptop username, so that he could "real time" see and monitor each and every text message I received or sent from the comfort of his computer.  Defendant Kassenoff even knowingly invaded my attorney/client privilege by intercepting and accessing my communications with my then-attorney, Cynthia Monaco, Esq.

5.  Defendant Kassenoff's misconduct during the marriage was well-documented in the form of medical reports, police reports, therapist reports, third party letters and affidavits and as he can be seen in horrific audio/videos verbally attacking me and the Children, as well as physically assaulting me, including those provided here:

https://drive.google.com/drive/folders/1o74Z2RgcLGAqSIATs4Njyb0eA9UsPvAH?usp=sharing

6.  It is known, and becoming more widely so, that domestic abuse is far more than physical. As it did in my marriage, it includes "coercive control" by the more powerful spouse: the use of financial control, emotional intimidation, litigation, threats, manipulation, isolation, and – as directly related to this case –surveillance and eavesdropping. *See e.g*. The Validation of the Checklist of Controlling Behaviors (CCB): Assessing Coercive Control in Abusive Relationships, *Violence Against Women* (2012) (18(8) 913-933, by: Lehman, Simmons and Pillai). There are too many examples of these forms of control from my marriage to cover here; nor is the place to detail them, but they exist in spades.

*Defendants' Retaliatory Divorce Filing And My Electronic Communications*

7.  Ironically, in May 2019, the ultimate controller, Defendant Kassenoff, lost control. In the presence of our daughter, he assaulted me in the yard, causing bruising and laceration to my face and eye – something he has admitted in a sworn affidavit (Def. Exh. 6 at 3) and which the Divorce Court credited as follows in an August 18, 2020 interim order:

> "the husband admitted the incident in May 2019 wherein he threw a weed/dirt clump at the wife. He says the wife first threw a weed at him. *The Court finds the wife's version of the May 2019 incident more credible than the husband's version*".

(Emphasis added) (Def. Exh. 1). He went on that same week to assault that same daughter, by kicking her. She (and, later, her sister) reported this and other assaults at school, prompting an investigation that resulted in his being "indicated" for physical and emotional abuse by CPS.

These reports enraged Defendant Kassenoff, who then threatened to file a retaliatory divorce action, saying "Why did you report me to CPS? Now I am going to have to hire a lawyer and file for divorce." (*See* **Exhibit "A"**).

8. Realizing that I had to protect the Children or face losing them to a "removal" petition–a very real and specific threat that was made by CPS to me (*see* **Exhibit "B"** at 28) – I, accompanied by CPS, obtained a Temporary Order of Protection ("TOP") from the Family Court in May 2019 requiring Defendant Kassenoff to leave the marital home and stay away from me and the Children. But on May 24, 2019, Defendant Kassenoff followed through on his threat by serving me with a summons and notice for divorce, in front of the Children. At the time, he had been evicted from the marital home by police and subjected to the TOP.

9. Unable to admit his wrongdoing and get the anger management and mental health help and medication he desperately needed, and that he had refused to continue a few years before, Defendant Kassenoff and Defendant Dimopoulos brought an *ex parte* motion on June 4, 2019 to vacate the TOP, evict me from the marital home and take custody of the Children, by falsely labeling me a liar and mentally ill. Despite never having a mental condition and being gainfully employed most of my adult life, I was portrayed by Defendants as a sufferer of "borderline personality disorder" to the Court – a convenient and utterly false narrative -- to discredit me. As part of that *ex parte* motion, which was granted by Judge David Everett on Defendant Kassenoff's say-so without so much as a conference with me, Defendants included the very electronic communications that are at issue in this case. They did so to create a misimpression that I was "divorce planning", even though it was Defendant Kassenoff who brought the Matrimonial Action that I have been defending all this time.

10. In his sworn "emergency" *ex parte* affidavit dated June 4, 2019 (Def. Exhibit 6), Defendant Kassenoff said only that "because Catherine's Apple ID was associated with our laptop for year", he was able to "see" my text messages. Similarly, Defendant Dimopoulos'

sworn *ex parte* affirmation provided no additional detail, just that: "Mr. Kassenoff intercepted text messages between the mother and her friend." *See* NYSCEF Doc. No. 4. At that time, and not until March 2020, no other detail about the access and interception of my electronic communications was provided by Defendants.

11.     On June 7, 2019, the return date of the *ex parte* motion, Detective (now Sargeant) Lisa Pompilio from the Larchmont Police Department testified extensively about Defendant Kassenoff's abuse. Specifically, she testified that one of the Children:

> "is afraid of her father because he said 'you should all go to hell.' She watched him kick her sister XXXX [sic]. After he kicked her, he kept yelling and I ran upstairs and hid in my mom's room while she was napping and [he] hit her mother so hard in the eye that she needed to see a doctor. She further stated that her sister had to sit in the front seat of the car with their mother and help her see the street and lights because her eye was so swollen she couldn't see. Number three, AAAA then told the reporting detective she was very scared for her mom. Number four, she hides in the bathroom or closet when she hears the sound of her father's flip flops or shoes on the floor. Number five, she stated her father needs to be taking medicine but he has not been. He yells and curses at us. Number six, her father was yelling at her and grabbed her left arm so hard she had marks and bruises. Reporting detective looked at the left upper arm and saw a slight small circular bruise which appeared to have been several days old. Number six, when her father was yelling at YYYY and kicked her, XXXX was very upset and left the house to walk to school. She, meaning AAAA, further stated that she and her sisters were hiding in the bathroom with their mother Catherine Kassenoff, and YYYY told her that their father had kicked her quote 'at first mommy didn't want to believe it, but then I told her I was there and I saw it and that I was scared' end of quote. Number seven, AAAA asked the reporting detective 'do you think my daddy is going to kill her or hurt us real bad?' When asked why she would think such a thing, AAAA responded quote 'because he said we should all go to hell' end of quote. Number eight, AAAA stated several times that she did not want to go home with her father or with the babysitter if her father was going to be there."

(*See* **Exhibit "B"** at 16).

12.    In the midst of Detective Pompilio's testimony, a colloquy occurred in which my counsel, Mitch Lieberman, made crystal clear that the text messages Defendants had included in Defendant Kassenoff's affidavit were wrongfully accessed, intercepted and published. *Id.* at

39. Counsel's later requests for explanation of how they were obtained went unanswered by Defendant Dimopoulos. The Divorce Court did not decide how to handle the issue; it restored my custody and occupancy of the marital home on a 50/50 basis (Def. Exh. 7).

*Disclosure of the Electronic Communications to the Now-Disgraced Forensic Evaluator*

13. Thereafter, Defendants continued to publish and use my illegally-obtained electronic communications in the Divorce Action. For instance, in the Fall of 2019, Defendants published the electronic communications to the "neutral" forensic custody evaluator appointed to the case, Dr. Marc Abrams. Abrams was later removed from the Panel of Forensic Custody Evaluators for the First and Second Judicial Departments ("the Panel") by the Mental Health Professionals Certification Committee on August 24, 2021 for gross impropriety in this case, including based on my complaint of his minimization of domestic abuse and misuse of junk science "gaslighting" theory to recommend my loss of custody.[1] (*See* **Exhibit "C"**).

14. Further, as it turns out, during the pendency of the all-important forensic evaluation, Defendants had *de facto* bought Dr. Abrams' so-called "neutral" forensic report. This was another basis of my complaint, credited by the Panel. In December 2019, while the forensic evaluation was pending with Dr. Abrams, Defendant Dimopoulos secretly offered Dr. Abrams a lucrative position as a parent coordinator in another pending divorce action, *Davidoff v. Davidoff*, 61571/18 (*See* **Exhibit "D"**). But even before that, and more shockingly, in a letter to his client dated October 3, 2019, Defendant Dimopoulos threatened his own client – who sought to complain about Dr. Abrams for sexual harassment and related improprieties – that he would not continue as her attorney if she reported him and sought to remove him from her case. (*See* **Exhibit "E"**). As that letter clearly shows, Defendant Dimopoulos unethically compromised his representation of his client in order to protect Abrams from a serious

---

[1] For a long-standing and "respected" forensic evaluator to be disgraced in this manner is unheard of. He has since been replaced as the forensic evaluator in the Divorce Action. Moreover, my complaint about Dr. Adler, a long-time colleague of Dr. Abrams, is grounded in similarly concerning behavior. Dr. Adler has since stepped down from the Divorce Action.

complaint - to please his multi-million dollar "cash cow" client, Defendant Kassenoff, in the still-pending *Kassenoff* Matrimonial Action. *Id*. Below is the excerpt from Defendant Dimopoulos' disturbing October 3, 2019 letter to his client:

> "You will not ask me to move the court to have Dr. Abrams removed as the forensic evaluator in this case. . . . You agree to immediately pay the court-ordered retainer to Dr. Abrams and schedule your first appointment and continue with the evaluation as required by him."

*Id*.

15. On March 25, 2020, the unfit Dr. Marc Abrams issued his flawed forensic report in which he recommended custody to Defendant Kassenoff, primarily because he found I was "gaslighting" the Children. He buried and minimized the domestic abuse undertaken by Defendant Kassenoff, which in part caused his removal from the Forensic Custody Panel. On March 26, 2020, Defendant Kassenoff filed an *ex parte* "emergency" application based on that report, which resulted in my immediate eviction from the marital home in the midst of the COVID pandemic and (temporary) loss of custody.

16. On July 13, 2020, Judge Koba commenced an interim custody hearing at which Dr. Abrams was the "star" witness, called and paid for by Defendants, and at which my electronic communications were introduced into evidence.[2] Relying heavily upon the disgraced Dr. Abrams, Judge Koba granted Defendant Kassenoff interim sole custody of the Children. Although she credited my account of the May 2019 domestic abuse incident, she also credited Dr. Abrams' bizarre "gaslighting" theory. She went on to say:

> "The mother loves her children and they love her and need to spend time with her. Since March 2020, the mother's action detailed herein have resulted in increasingly restricted access with the children. It is essential that the mother's access to the children become consistent and

---

[2] Defendants, who had covered the expense of Dr. Abrams' report at an 80% rate, entirely shouldered the cost of his testimony for several days at a rate of $400/hour. Oddly Judge Koba excluded testimony from all of the treating therapists for the Children and utterly discounted the testimony of the police. She also refused to hear from the Children themselves.

>stable so that she and the children can maintain their bond and the children can benefit from her positive parenting skills."

She imposed supervision almost completely based on the now-discredited word of Dr. Abrams.

*The Divorce Court's Decision & Order Based on the Affidavits*

17. Shortly before Dr. Abrams completed the forensic process, I filed a motion in the Divorce Action, on March 9, 2020, to request various forms of relief as follows: (1) directing Defendants and any third parties to return and/or destroy the illegally-accessed, intercepted and privileged electronic communications (at issue in this case), (2) directing Dr. Abrams to ignore same and draw a negative inference against Defendant Kassenoff, (3) precluding further dissemination of same and (4) the withdrawal/redaction of said communications that had been published and (5) "[a]ny such other and further relief as this Court may deem just and proper" (such as a hearing/*in camera* review (*see* footnote 3) of all the electronic communications that had been accessed and intercepted by Defendant Kassenoff). (Def. Exh. 2).

18. I did not seek monetary damages, as I did not believe those would be available to me, particularly against Defendant Dimopoulos, who was not a party to the Matrimonial Action. Indeed at conference before the Court on December 18, 2020, my belief was confirmed when Judge Koba said upon request by Defendant Dimopoulos to consolidate a tort action for conversion pending in Kings County: "I can tell you that I'm not consolidating the lawsuit in Brooklyn. I would suggest your client make a – respond to it whichever way they deem appropriate."

19. In opposition to my motion, on March 16, 2020, Defendants republished the electronic communications they had published throughout the case and provided the details – for the first time - about how they were obtained. In his sworn affidavit also dated March 16, 2020, Defendant Kassenoff stated that he "was provided [my] Apple ID *and password*" (emphasis added) as follows:

> A few years ago, I don't recall exactly when, [Ms. Kassenoff] said she lost her iPhone. She asked me to log into her Apple iCloud account in order to located her phone using the Apple feature, "find my iPhone." I did so using the Apple laptop we had at home that we both used. In order to log in to her iCloud account, I needed her Apple ID (username and password) which she provided. It worked, and [Ms. Kassenoff] found the location of her phone. Thereafter, she never disassociated her Apple ID with the home computer for a number of years. This means that Apple iMessages were automatically being sent both to her iPhone and the home computer for several years. The iMessages that I filed with the Court and sent to Dr. Abrams were obtained by simply opening the laptop at various times in 2018-2019 and taking photos of the iMessages with my iPhone.

NYSCEF Doc. No. 328 at ¶¶ 9-12.

20.     On July 12, 2020, without holding a hearing, despite a request to do so (Pl. Exh. 2), and without any discovery, the newly-appointed Judge Nancy Quinn Koba denied all relief requested. (Pl. Exh. 3). She also found that the communications in question were not protected by the attorney/client privilege, despite my counsel's submission of an affidavit saying otherwise. In relevant part, Ms. Monaco's October 15, 2019 affidavit specified that she had reviewed Defendant Kassenoff's affidavit dated June 4, 2019, the electronic communications published therein, and those republished by him and Defendant Dimopoulos in a letter to the Divorce Court dated September 5, 2019, and was informed of those submitted by Defendant Kassenoff to CPS in defense of the allegations of abuse against him, as follows:

> "I can confirm that these intercepted electronic communications published in these three instances were among electronic between me and Catherine and that I believe Catherine was seeking confidential legal advice from me."
>
> "On or about July 21, 2014 while I was still engaged in the private practice of law, I represented Catherine publicly . . ."
>
> "Over the many years Catherine sought legal counsel from me, I believe it was objectively reasonable for her to believe that the electronic communications Allan intercepted and published concerning the assault by Allan while they were gardening and her visit to seek medical attention were protected by the attorney-client privilege."

(*See* **Exhibit "F"**).

21. Shockingly, the Divorce Court credited Defendant Kassenoff's self-serving affidavit, in which he claimed Ms. Monaco and I were "just friends," over my affidavit and that of the highly-credentialed lawyer herself.[3]

22. Similarly, without discovery, a forensic examination of the computer(s) or other electronic devices in question (e.g. iPhone), holding a hearing or *in camera* inspection, or appointing a forensic expert, the Divorce Court determined on the sole basis of Defendant Kassenoff's say-so that "there is no evidence the subject text messages were contemporaneously intercepted during transmission. The husband says he accessed the text messages by opening the family's shared laptop and taking a photograph of the messages." (Pl. Exh. 3). There was no fact-finding whatsoever as to whether the Wiretap or Store Communications Act was applicable, in violation of basic due process guarantees.

23. There was also no legal or factual analysis by the Divorce Court under the Stored Communications Act: no consideration of the scope of consent and whether it had been exceeded, no discussion of how the electronic communications were transmitted and/or whether they were in "electronic storage."

24. More disturbingly, the Divorce Court reasoned that, despite being aware of the "open marriage" declared by Defendant Kassenoff and the voluminous evidence of domestic abuse presented to the Divorce Court, I had given my Apple ID and password to Defendant Kassenoff "some years before this action" and "did not change [my] password or stop [my] text messages from being sent to the shared laptop" (Pl. Exh. 3). Therefore, the Divorce Court improperly put the burden on me for "failing to stop" the text messages from going to the computer when there was no evidence I had ever consented to or even known about the syncing to begin with.

---

[3] Ms. Monaco is a Harvard Law School graduate, former Assistant U.S. Attorney and currently a Tax Commissioner. She has been in private law practice at various prestigious law firms as well over the course of her long career.

The Divorce Court also did not even probe the question of whether the syncing of the iPhone and computer occurred with Defendant Kassenoff's affirmative step or otherwise.

25. Seemingly, but without explanation or factual support, the Divorce Court found that I had somehow initiated a connection between my iPhone and laptop (and specifically, Defendant Kassenoff's user account), or had authorized Defendant Kassenoff to do so, which he himself did not even claim in his March 16, 2020 affidavit. Nowhere did the Divorce Court examine the question of the scope of my consent for Defendant Kassenoff to use my credentials during a hostile marriage, which consent was admittedly narrow and limited to a music purchase (or finding my iPhone, as Defendant Kassenoff says). Either way, the consent did not last in perpetuity, as Judge Koba seemed to find.

26. Nowhere did the Divorce Court allow evidence to show the contemporaneity of the transmissions and access of them, through forensic evidence or otherwise. The Divorce Court even drew conclusions based on Defendants' self-selection of the text messages, which they presented to advance a false argument that Ms. Monaco and I were "just friends"; none of the communications that could have been produced to demonstrate the existence of an attorney/client relationship were compelled for production by the Divorce Court.

27. The Divorce Court made substantive, fact-intensive findings based merely on affidavits by the parties and counsel. Judge Koba failed to conduct a minimal factual inquiry pursuant to the requirements of due process and the rules that govern her, <u>Uniform Civil Rules for the Supreme Court and the County Court § 202.20-i</u>. *Direct Testimony by Affidavit*. Instead, she made a significant finding in the case based merely on "trial by affidavit."[4]

---

[4] Chief Judge Janet DiFiore and Chief Administrative Judge Marks have been recently criticized by the New York Civil Liberties Union for issuing "administrative" instructions to judges in the wake of *Crawford v. Ally*, 197 A.D.3d 27 (1st Dept. 2021),which clarified the importance of prompt and meaningful evidentiary hearings to comply with minimal due process concerns. *See* NYCLU Letter dated September 30, 2021, annexed herein as **Exhibit "G"**.

28.     Thereafter, on July 29, 2020, I took an immediate appeal of Judge Koba's Decision & Order, perfecting such on or about September 23, 2020.  That appeal, *Kassenoff v. Kassenoff,* 2020-06187, is pending before the Appellate Division – Second Department and expected to be argued in September 2022.  I also filed a grievance against Defendant Kassenoff, which remains subject to further investigation, not "dismissed" as Defendants falsely state.

*Defendants' Abusive Litigation Tactics Continued*

29.     After being homeless from March 2020 to August 2020, and then living in my investment property in New Rochelle until August 2021, I moved back to Larchmont in order to co-parent the Children with Defendant Kassenoff.  But he had other goals.  Rather than co-parent with me, he relentlessly pursued *ex parte* applications for TOPs against me in May 2021, July 2021 and September 2021.  In each, he lied to the Divorce Court and each one was dismissed.  Defendants also moved for numerous orders of contempt against me in the Fall of 2021, all of which were dismissed – *with prejudice* - as well.

30.     In August 2021, Judge Lewis Lubell began presiding over the case and, on September 15, 2021, issued a "one mile stay away" order, with an expiration date of January 6, 2022, that again rendered me homeless ("One Mile Order").  That Order was issued on an *ex parte* application by Defendants and included the very apartment I had just begun to lease in Larchmont.  As it turns out, Judge Lubell had just weeks before presided over the wedding of Dr. Abrams (and, in 2019, his divorce).  Photos of Judge Lubell at the wedding with Abrams were sent anonymously to me.  *See, e.g.,* **Exhibit "H".**  Thereafter, Judge Lubell recused himself from the case, saying there is "strong support for his recusal", and declared a mistrial as to all the contempt allegations brought by Defendants against me.

31.     In September 2021 shortly after Abrams' removal from the Panel, I testified publicly about my ordeal with Dr. Abrams, before the New York State Blue Ribbon Commission, at great personal risk to myself.

32. On September 23, 2021, Judge Lubell oddly "corrected" the One Mile Order by extending the expiration date to February 16, 2022 -- without conference with or any notice to the parties. He simply uploaded a "corrected" One Mile Order to the NYSCEF system. Importantly, to be valid, the "corrected" One Mile Order specifically required service by the police, which was never accomplished.

33. Between October 2021 and January 2022, Defendants repeatedly and relentlessly attempted to have me arrested. Fortunately, Defendant Kassenoff's frivolous allegations did not even result in a phone call by police to me. But on January 26, 2022, Defendant Kassenoff was finally able to get his way. After pressuring and misleading the Larchmont Police Department ("the "LPD") into thinking there was a valid TOP in effect, when he knew there was not, he orchestrated my false arrest. On January 25, 2022, he called and then visited the LPD to demand an arrest of me on what he knew to be an unserved and therefore invalid TOP, claiming it to be otherwise. I was arrested and charged on Defendant Kassenoff's "say so."

34. However, on March 16, 2022, all charges Defendants initiated against me were dismissed outright. *See* **Exhibit "I"**. The scheme Defendants had perpetrated for so long to commandeer custody of the Children, remove me from my home, withhold my personal property and then deprive me of my liberty - with deceit, money, illegally-obtained electronic communications, and influence - had finally begun to unravel.[5] Dr. Abrams has now been removed from the case and a new judge, Justice Susan Capeci, is presiding.

35. On July 11, 2022, Judge Capeci herself stated in exasperation with Defendant Dimopoulos' false assertion that a TOP had been violated:

---

[5] Mr. Dimopoulos is currently facing cases against him in Westchester County Supreme Court and New York County Supreme Court, involving very similar misconduct: *Jonathan Davidoff v. Constantine "Gus" Dimopoulos,* 59938/2022 and *A.D. et al. v. Constantine "Gus" Dimopoulos*, 153659/2022. These actions allege violations of the Judiciary Law § 487 (collusion among attorneys for the purpose of defrauding the court) and false imprisonment of a child, collectively seeking damages in excess of $1,000,000.

"That's not the point. You're an attorney and this is a legal issue, and you keep referring, and you've done it before, how it's indisputable she violated an order on some weird technicality for which you blamed Judge Lubell, I might point out, interestingly enough,  She was not served. ***I've sat in this part 13 years. I've never seen the District Attorney's Office dismiss a case and they did in this case because there's no service.***"  (Emphasis added).

36. I continue to worry that Defendants will misuse my electronic communications in the Matrimonial Action and in other ways.

37. Defendants view the Divorce Action as a game they want to "win."  How they win is irrelevant to them.  In choosing to violate my rights by accessing, intercepting, publishing and misusing my electronic communications, Defendants went too far in their game-playing.  They crossed the line into criminality and should be held accountable.

38. I respectfully ask this Court to deny their motion to dismiss my complaint, so that I may finally have my day in Court to fully and meaningfully adjudicate their wrongdoing.

Dated August 19, 2022

                                                        _____
                                                        Catherine Kassenoff