1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF WESTCHESTER
2   -----------------------------------------x
     ALLAN KASSENOFF,
3                    Plaintiff,

4       -against-                Index No. 58217/2019

5   CATHERINE KASSENOFF,
                   Defendant.
6   -----------------------------------------x

7

                    June 2, 2021
8                 Microsoft Teams Virtual Meeting
     B E F O R E:
9           HONORABLE NANCY QUINN KOBA,
                             Justice
10
     A P P E A R A N C E S:
11

     DIMOPOULOS BRUGGEMANN P.C.
12   Attorneys for the Plaintiff
     73 Main Street, 2nd Floor
13   Tuckahoe, New York 10707
     BY:  GUS DIMOPOULOS, ESQ.
14

     THE WIEDERKEHR LAW GROUP, P.C.
15   Attorneys for the Defendant
     One North Lexington Avenue, 11th Floor
16   White Plains, New York 10601
     BY:  EVAN WIEDERKEHR, ESQ.
17
     MOST & SCHNEID, P.C.
18   Attorneys for
     222 Bloomingdale Road, Suite 302
19   White Plains, New York 10605
     BY:  CAROL W. MOST, ESQ.
20

21   ALSO PRESENT: Blake Marlowe Burke

22

23

24

25                         JACQUELINE NISHI-BROACH
                         Senior Court Reporter

Proceedings

1          COURT ATTORNEY REFEREE:  Appearances, please.

2          MR. DIMOPOULOS:  Good morning, Your Honor.

3     Dimopoulos Bruggemann, by Gus Dimopoulos, on behalf of

4     plaintiff, Allan Kassenoff, who is here with me.  Good

5     morning.

6          MR. WIEDERKEHR:  Evan Wiederkehr, The Wiederkehr

7     Law Group, for Ms. Kassenoff.  Good morning, Referee

8     Ratner.

9          COURT ATTORNEY REFEREE:  I see your client is

10    present.

11         MR. WIEDERKEHR:  I believe that is the case.

12         MS. KASSENOFF:  I want to mention I have a

13    friend who would like to attend this conference as well.

14         COURT ATTORNEY REFEREE:  I would have to ask

15    Judge Koba.  Who is the friend?

16         MS. KASSENOFF:  A friend of mine.  Her name is

17    Marlowe Burke.

18         COURT ATTORNEY REFEREE:  Mr. Wiederkehr, do you

19    know who this is and why she is attending?

20         MR. WIEDERKEHR:  I do not know Ms. Burke

21    personally.  My understanding is she is attending to

22    provide support to Ms. Kassenoff during these difficult

23    times.

24         COURT ATTORNEY REFEREE:  Okay.  Ms. Most?

25         MS. MOST:  Good morning, everybody.  Carol Most,

Proceedings

1          attorney for the children.

2                    COURT ATTORNEY REFEREE:  I see Chava White is

3          present.

4                    MS. WHITE:  Hi.  My name is Chava White.  I work

5          for Comprehensive Family Services, from the Bronx office,

6          located at 2825 Third Avenue in Bronx, New York.

7                    COURT ATTORNEY REFEREE:  Thank you.  Hold on,

8          let me speak to the judge.

9                    (Pause.)

10                   COURT ATTORNEY REFEREE:  I have been advised

11         that Judge Koba will join us shortly.  She is just going

12         into the courtroom.

13                   (Pause.)

14                   COURT ATTORNEY REFEREE:  Did all of you receive

15         the prior report of Ms. White?

16                   MS. MOST:  It just came through this morning.

17                   COURT ATTORNEY REFEREE:  Mr. Wiederkehr, did you

18         get it?

19                   MR. WIEDERKEHR:  Yes, two or three minutes ago.

20                   COURT ATTORNEY REFEREE:  And Mr. Dimopoulos, did

21         you receive it?

22                   MS. MOST:  It came through at 9:32.

23                   COURT ATTORNEY REFEREE:  Gus, can you hear?

24                   MR. DIMOPOULOS:  Yes.  I just forgot -- can you

25         hear me?

Proceedings

1               MS. MOST:  Now we can.

2               COURT ATTORNEY REFEREE:  Did you receive the

3       report?

4               MR. DIMOPOULOS:  I did.  Thank you.

5               THE COURT:  Good morning, everyone.

6               MR. DIMOPOULOS:  Good morning, Your Honor.

7               MS. MOST:  Good morning, Your Honor.

8               THE COURT:  Let's go on the record.

9               COURT ATTORNEY REFEREE:  I have had them already

10      put their appearances on the record.

11              THE COURT:  Very good.  I called this conference

12      because of a letter that I received from Ms. Most.

13              Ms. Kassenoff, is your camera working?  Can

14      everybody see her?  It might just be my screen.

15              COURT ATTORNEY REFEREE:  There is one issue.

16      Ms. Kassenoff has a friend who is apparently with her,

17      Marlowe Burke.  She wants this friend to be present during

18      the conference.  I said that would await your

19      determination.

20              MS. KASSENOFF:  She is not with me.  She would

21      appear by zoom from her own location.

22              THE COURT:  Ms. Kassenoff, do you have a camera?

23      Because I can't see you.

24              MS. KASSENOFF:  It's not working, Judge.  But

25      I'm here, and I would like my friend to attend.  This is a

Proceedings

1        very, very difficult set of circumstances, and I would ask

2        that the Court allow me to have some emotional support.

3        It's very hard to lose your children and to go through a

4        process like this.

5                  THE COURT:  I need you to have a camera, because

6        I need to see you.  I haven't seen you at the last several

7        conferences that we have had.  Do you have a phone or

8        something where you have a working camera?

9                  MS. KASSENOFF:  I don't, Judge.  May I include

10       my friend?

11                 THE COURT:  I'm thinking about it.  I'm

12       concerned, and I'm unable to see you.  I might just move

13       this to in person.  There is no camera where you are at

14       work, in the house, on the phone?

15                 MS. KASSENOFF:  Judge, I don't even have wifi.

16                 THE COURT:  Okay.

17                 MS. KASSENOFF:  And we have done conferences

18       without the camera many, many times, so I wasn't aware

19       that you needed the camera.

20                 THE COURT:  Yeah.  On a conference like this,

21       yes, I would prefer the camera.

22                 Ms. White, is your camera working?

23                 MS. WHITE:  I believe so.

24                 THE COURT:  Can everybody see her?

25                 MR. WIEDERKEHR:  Yes.

Proceedings

```
 1              MR. DIMOPOULOS:  Yes.
 2              THE COURT:  I will sign out and sign in again.
 3              (Pause.)
 4              THE COURT:  Ms. White, do you have any other
 5    time today?
 6              MS. WHITE:  After 12:30, no, but before then,
 7    yes.
 8              THE COURT:  Ms. Kassenoff, are you located in
 9    Westchester County?
10              MS. KASSENOFF:  Yes, Judge, I am, but I'm
11    working today.  I mean, I have a full-time job.
12              THE COURT:  Right, which I thought you typically
13    worked at from home.
14              MS. KASSENOFF:  I work at home, and sometimes I
15    work from the office, or from the city.
16              THE COURT:  So I need to see you for the
17    purposes of this conference.  Are you in a situation
18    where -- Mr. Wiederkehr, do you have a place in your
19    office where she can use the camera?
20              MR. WIEDERKEHR:  I don't have a laptop for her.
21    I could theoretically put her in front of a computer in
22    somebody else's office, yes, if Your Honor would like.  I
23    would do whatever it is to be accommodating, Your Honor.
24              THE COURT:  Fine.  How far is it from your
25    office to Ms. Kassenoff?  Are you in New Rochelle or in
```

Proceedings

1      White Plains at your office?

2             MS. KASSENOFF:  I'm currently in New Rochelle,

3      Judge.  My issue is that I have important meetings today

4      with my boss.  I just -- I'm not sure that I can easily

5      accommodate a new change in the schedule.  These are

6      last-minute changes that are really starting to interfere

7      with my employment.

8             THE COURT:  Unfortunately, when I get a letter

9      about the safety of children, I make that a priority.

10     This is also something that I didn't have scheduled on my

11     calendar, and I had to shuffle other prior cases in order

12     to do this and also to make sure Ms. White was available.

13     But very well, we will continue this way.

14            Who is 1(646)472-4520?  Does anybody know that

15     telephone number?

16            MS. KASSENOFF:  Judge, I think that's Ms. Burke.

17            THE COURT:  Does she have a camera?  Because I'm

18     not having her in here where I can't observe what's going

19     on.

20            MS. KASSENOFF:  I will ask her now.

21            THE COURT:  Okay.

22            COURT ATTORNEY REFEREE:  That's a call-in

23     number, Judge.  It would not be with a video.

24            THE COURT:  Okay.  Ms. Kassenoff, nevermind.

25            MS. KASSENOFF:  Okay, Judge.

Proceedings

1           THE COURT:  Okay, the individual whom I just

2       admitted to the proceeding, could you please state your

3       full name and address for the record?

4           MS. BURKE:  My name is Blake Marlowe Burke.

5       231 Carrollwood Drive, Tarrytown, New York 10591.

6           THE COURT:  Okay.  Ms. Burke, I'm allowing you

7       to observe the proceedings as a member of the public.

8       Please understand the following rules apply to your

9       observation here and to everyone else on this virtual

10      conference:

11          There is no recording or streaming of this court

12      appearance.  This is a virtual courtroom.  All rules of

13      decorum apply, as do the Administrative Judge's rules that

14      there is no recording or streaming.  Do you understand

15      these rules?

16          MS. BURKE:  Yes, ma'am, I understand.

17          THE COURT:  And you will adhere to them?

18          MS. BURKE:  Yes.

19          THE COURT:  So you need to mute.  You may

20      observe.

21          Ms. Most, this conference was scheduled as a

22      result of the correspondence you received from the Court.

23      Could you please quickly state your concerns?  And then

24      I'm going to swear in Ms. White, and she can advise what

25      transpired at the recent visit.

Proceedings

1          MS. MOST:  Yes, Your Honor.  Thank you.  Good

2     morning, Your Honor.  The girls have been very open, and

3     have been open, and have been finding their own voices.

4     They have begun to tell me how unhappy they have been.

5     They have given me some history, which I put into my

6     letter to the Court.  But in sum and substance, the

7     visitations have been going very poorly, from their

8     perspective.  The -- not just the in-person visitation,

9     but also the telephonic visitations, which are currently

10    not happening because the services were discontinued.

11          However, the in-person visits have been very

12    upsetting to the girls.  They do not want to return.  They

13    actually did not want to return to the visit they had this

14    past Sunday, but they were -- it was discussed with

15    Ms. White, and they agreed to all come.  And the

16    visitation was a disaster from their perspective.  And

17    after about an hour, they asked to be -- have the visit

18    terminated.  The visit prior to that was also a disaster.

19    And I would say that the visit prior to that was not a

20    good visit.

21          The girls believe that their mother has been

22    dishonest with them.  She has been contacting them despite

23    there being a Court order for that not to happen.  There

24    have been multiple WhatsApp calls.  There have been

25    multiple e-mails.  There have been multiple phonecalls

Proceedings

 1      now.  And this past weekend, after the visit, there was

 2      actually an e-mail to all three girls, and ███████ sent that

 3      to me.  And she told me -- after receiving it, she

 4      actually called me to tell me they were all very, very

 5      upset about the e-mail they received.  They feel it was

 6      dishonest, and they're just upset.

 7              They're upset about the crying; there is

 8      constant crying on the visits.  They are very upset about

 9      that.  They feel the crying is a manipulation.  Whenever

10      the mom doesn't get what she wants, she gets hysterical

11      and starts to cry.  It's something we have seen on the

12      Zoom video calls.  And the girls, all three girls, cannot

13      handle the crying.  They're not willing to go back.  They

14      don't want to have visits at this time.

15              I just want to tell you that I did speak to

16      Dr. Susan Adler.  She met with both girls this week.

17      ██████████ was extremely upset.  ██████ was as well.  They

18      don't want to have visits.  And she thinks the visits

19      should be terminated, at least for a while, because it's

20      just bad for the girls.

21              I didn't have a chance to speak to Dr. McGuffog,

22      but ██████ is very -- really very clear that she does not

23      want to have visits right now.  She feels she has been

24      manipulated by her mother.  She feels her mother

25      manipulates them constantly.  You did hear the information

Proceedings

1    in my letter about the times she ran away.  I'm sure the

2    Court was very disturbed about that, because that was

3    information that ███ -- she has talked about it with me

4    before, but now she even told me her mother insisted she

5    run away to the police station, and actually followed her

6    there.  ███ just feels that she has been manipulated by

7    her mother for a very long time.  She can't handle it

8    anymore.

9          So from the three girls' point of view, they

10   don't want access.  ███ would like access, but only if

11   her sisters will be there; otherwise she is afraid to be

12   alone with her mother.  I can't disclose to the Court what

13   she told me because I didn't get permission to tell the

14   Court, but she does not want to be alone with her mother.

15   And even ███ told me that when she was alone with her

16   mother after she ran away, she was afraid.  So I think the

17   access as it is currently cannot go forward.

18          THE COURT:  Okay.  Ms. White, could you raise

19   your right hand, please?

20   C H A V A   W H I T E,

21   after having been duly sworn by the Clerk of the Court, was

22   examined and testified as follows:

23          THE COURT:  Could you state your full name and

24   your business address for the record?

25          MS. WHITE:  Chava White.  2825 Third Avenue,

C. White/The Court/Direct

1        Bronx, New York.

2    DIRECT EXAMINATION BY

3    THE COURT:

4        Q    Ms. White, you were the supervisor providing

5    in-person supervision to Ms. Kassenoff, correct?

6        A    That's correct.

7        Q    And the Court is in receipt of information indicating

8    that as a result of the visit earlier this month, you have

9    required Ms. Kassenoff to sign a contract regarding the

10   protocols and behaviors to be observed during the visit; is

11   that correct?

12       A    I did.

13       Q    And Ms. Kassenoff signed that in preparation for the

14   visit that was held this past weekend, correct?

15       A    That's correct.

16       Q    So could you advise the Court, please, what

17   transpired during the visit?  I believe it was May 30.

18       A    This past Sunday, yeah.

19       Q    Okay.

20       A    I mean, you just want me to give you just a general

21   overview of how that visit went?

22       Q    Yes, because you didn't have time to write a report.

23   So you have heard what the Court has been presented with, the

24   girls not wanting to return.

25       A    So I was aware even before Sunday that the children

C. White/The Court/Direct

1   were reluctant to visit, to participate in the visit.  And we

2   have been having some issues with transition, especially with

3   ███████  lately.  So I preemptively actually spoke with each of

4   the children individually the night before the visit, to try to

5   encourage them all to participate, to hopefully not have to

6   deal with transition issues right then and there at the start

7   of the visit.

8           During that meeting with the kids, all of them

9   expressed varying degrees of reluctance to come to the visit.

10  And I was able to sort of bring around ████████████████

11  ████████████  So in the morning, on Sunday when they arrived,

12  ████████████  did transition, although █████  said to me

13  straight out that she wants to leave after an hour.  I chose

14  not to address it then, because I figured she would get

15  involved in the visit and then hopefully it wouldn't be an

16  issue.  So I didn't really say anything to her about that.  I

17  said, "Let's go.  Let's at least start."  I encouraged ████████

18  to come.  ████████  did not want to come.

19          I told the kids what was relayed to me by

20  Ms. Kassenoff via e-mail of her plan for the visit, which was

21  to get sushi and watch a movie together; some other things, but

22  those were the highlights.  Those are things that ████████

23  likes.  I told ████████  "This is your mom's plan for the

24  visit," and she was immediately sort of ambivalent about

25  whether or not she now wanted to join.  But she still said no.

C. White/The Court/Direct

```
 1   She also said, "My mom is just trying to bribe me."  However,

 2   as me and ███████████ were walking down the driveway, we

 3   could see █████ eventually got out of the car and joined us.

 4   So she came.

 5             So the visit started okay, and -- there was no sushi

 6   or movie when we got there, however; at least that wasn't,

 7   like, initially happening.  But Ms. Kassenoff said she would

 8   order the sushi later.  The kids seemed a little bit, like,

 9   surprised by that.  But they, you know, started interacting

10   with her and chatting with her.  And █████ was on her phone a

11   lot.

12             And at some point, I don't know, I don't remember

13   exactly how much later -- I can check my phone and see --

14   Mr. Kassenoff texted me that █████ was texting him a lot,

15   saying she wanted to leave and she wanted to be picked up at

16   certain times.  I asked him -- well, two things.  I eventually

17   asked him to just give █████ my cellphone number so that she

18   wasn't going through him.

19             And also I explained to him, "Look, if █████ has,

20   like, a reason to leave, if she is upset about something, if

21   there is something going on that's uncomfortable and she wants

22   to leave, we can do that.  But I don't want you running back

23   and forth here on the children's whims because one wants to

24   leave at this time and one wants to leave at this time for no,

25   like, apparent reason."  Because at the time the kids were just
```

C. White/The Court/Direct

1    playing bingo with their mom.  And the normal, like, sibling

2    bickering and that stuff, but it was going more or less

3    smoothly, comparatively speaking.

4              So he said fine.  And I told ████████ because she

5    texted me she wanted to leave at a certain time, I said,

6    "Listen, if you want to go, if you feel like you can't stay and

7    you need to leave, you can let your dad know at that point.

8    But I don't want you to ask him to come back at a certain time

9    when you might be involved in playing or doing something; you

10   you might not want to leave at that point.  Don't make plans to

11   leave at 3:40" or whatever times she decided.  So she said

12   okay.

13             The kids kept playing, but clearly something else was

14   going on for █████████████████████████████████

15   ███████████████ that was not necessarily apparent in the

16   interactions that I was viewing; because at some point she went

17   upstairs to go to the bathroom, although apparently to be on

18   her phone to text.  And she texted her dad, and she texted me

19   as well, that she really, really wanted to leave.  So I said to

20   her, "Okay, well, if that's the case, we have to talk to your

21   mom.  You can't just, like, run out of here.  We have to talk

22   to your mom.  I can come, and we will talk to her.  And you

23   have to explain to her that you want to leave and why you want

24   to leave.  And if you are going to leave, you will leave."

25   That's kind of when everything went south.

C. White/The Court/Direct

1          So I did -- I went upstairs with Ms. Kassenoff.  And

2    I quickly explained to her that ██████ had asked her dad to

3    come pick her up, and she really wanted to leave.

4    Ms. Kassenoff sort of immediately became, you know, visibly

5    upset, understandably so.  I sort of tried to ask her to stay

6    calm so we can have a conversation with ██████  I explained

7    we have to talk about it, let's talk to her about it.  I think

8    it was difficult to have a calm conversation because

9    Ms. Kassenoff was obviously very emotional at the time.  And

10   ██████ is really uncomfortable, I mean from what I can see,

11   with emotions in general.  She really couldn't tolerate the

12   conversation.  And --

13        Q    When you say Ms. Kassenoff was emotional, what

14   exactly was she displaying?

15        A    In tone of voice.  She wasn't crying yet, but in tone

16   of voice and in what she was saying, she was -- right away she

17   was saying, "I don't want you to leave" and "We used to have

18   such a strong bond; what happened?"  ██████ really did not

19   seem to be able to, like, handle it.  She was really trying to

20   evade the whole conversation.  And after less than five

21   minutes, maybe two to three minutes, she just left; she went

22   out.

23        Ms. Kassenoff started crying.  I tried really hard

24   to, like, ask her to please get herself together before she

25   went downstairs to join the kids.  I tried to point out that,

C. White/The Court/Direct

1    "Look, if ██████ is going to leave, she is going to leave.

2    But we could still have the rest of the visit."  We were only

3    maybe a little over an hour in at that point.  We could do the

4    rest of the visit with ████████ and have a good time.

5    "If ██████ is going to leave," I said, "look, she came to the

6    visit today.  The last -- I don't know what, two visits before,

7    she didn't come.  So at least she came at all.  And let's

8    salvage what we have here."

9            It didn't really go that way.  Ms. Kassenoff was able

10   to sort of on the face of it put herself together, stop crying,

11   but clearly was quite internally agitated and -- which came

12   through in her voice and some of the things she was saying.

13   And things really just escalated when we went downstairs.  And

14   ██████ also was at a point where she, like, just couldn't

15   handle being around her mother, and didn't -- made it very

16   clear she didn't want to be talked to by her and didn't want to

17   be in the same room.  But Ms. Kassenoff sort of kept trying to

18   engage with her.  And ██████ was getting really agitated and

19   wanted to go outside and wait in the rain by herself, and I

20   didn't want her to do that.

21           I was trying to intervene on that, and trying to get

22   ██████ to calm down, and trying to get Ms. Kassenoff to stop

23   engaging.  Then ████ puts her hood on and said she also wants

24   to leave.  And I think at that point Ms. Kassenoff became even

25   more upset.  And I tried to sort of encourage ████ to stay.

C. White/The Court/Direct

1   "Well, how about we can watch the movie?  You know, why do you

2   want to leave?"  It wasn't 100 percent clear to me why ███

3   wanted to leave at that point.  It's still not 100 percent

4   clear to me.  It's possible that it was just because conflict

5   was escalating, and generally that's triggers them, but I'm not

6   really sure.

7           In any case, things escalated from there emotionally.

8   Ms. Kassenoff started telling the kids, "Okay, if you don't

9   want me in your life, then sure, you can leave early, and you

10  will see, you will have less and less time with me, and that's

11  what it will be."  The kids are clearly starting to get more

12  and more agitated, and they all left the room.  ███ went

13  outside by herself in the rain.  I tried to help Ms. Kassenoff

14  regulate, but I couldn't.  She was already really, really

15  upset, and just really very focused on her feelings at that

16  point and her beliefs that everything is entirely a result of

17  the father's intervention and the AFC's interference and

18  whatnot.

19          I really couldn't salvage it at that point, and I

20  figured at that point that probably ███ was going to say she

21  wanted to leave, because once the conflict escalates like that,

22  the kids can't handle it.  So I said, "I need to check on the

23  kids," because ██████████ had gone in the other room.  I

24  walked in the other room, and already ███ was walking back

25  and she said, "I want to leave."

C. White/The Court/Cross

1           Ms. Kassenoff was obviously pretty upset at that
2    point.  She said something like, "Okay, fine.  I'm going
3    upstairs."  And ███████████, I had asked them to wait for me
4    to grab my bag, and they ended up exiting one of the doors.  I
5    had to run back and get my bag.  And Ms. Kassenoff had me with
6    them outside.  And I ran out after her, and she was sort of
7    yelling after them, "Have a nice life.  Have a nice life."  I
8    walked the kids out to the street, and ██████ was, like, really,
9    really upset.  She was crying.  And they all said they don't
10   ever want to come back.
11        Q    Okay.  So your efforts -- as a therapeutic
12   supervisor, you were unable to deescalate the situation?
13        A    Yeah.  That's pretty much been the case lately.
14             THE COURT:  Mr. Dimopoulos, do you have any
15        questions of Ms. White?
16             MR. DIMOPOULOS:  Just one.
17   CROSS EXAMINATION BY
18   MR. DIMOPOULOS:
19        Q    Ms. White, were you scared for your safety during any
20   of the visits?
21        A    No.
22        Q    Were the children scared for their safety during any
23   of the visits?
24        A    I don't know.  They can't really be open with me
25   during the visits.  And I don't really talk with them outside

C. White/The Court/Cross

1    the visits, but for that one time this past Saturday night.

2        Q    And do you feel like you have tried everything in

3    your education and training to better supervise these visits?

4        A    No.  There are other things we could theoretically

5    do.  Yeah.

6        Q    Such as?

7        A    We could move it to a more controlled environment,

8    like my office, where I can, like, be better able to intervene

9    and separate and end things when they need to.

10       Q    Okay.  Anything else?

11            THE COURT:  Where is your office located?

12            MS. WHITE:  In the Bronx.

13            THE COURT:  Go ahead, Mr. Dimopoulos.

14       Q    During the visit with the children, did Ms. Kassenoff

15   say anything negative about Mr. Kassenoff in the presence of

16   the children?

17       A    You know, it's hard for me to remember off the top of

18   my head.  That's something that would happen regularly in a

19   more indirect way, but not in an overt way.

20            MR. DIMOPOULOS:  I don't have anything further,

21       Your Honor.

22            THE COURT:  Well, I have a question.  Can you

23       explain that?  Were there indirectly negative comments

24       about Mr. Kassenoff?

25            MS. WHITE:  Let's see if I can think of an

C. White/The Court/Cross

```
 1       example.  I mean, I feel like there must be some examples
 2       in my previous reports.  It's hard for me to think of
 3       something off the top of my head.
 4              THE COURT:  That's okay.
 5              Mr. Wiederkehr, any questions?
 6              MR. WIEDERKEHR:  I don't have any questions,
 7       Your Honor.  But I'd like to address the Court, if I may.
 8              THE COURT:  I just want to let Ms. White go.
 9              Most, do you have any questions?
10   CROSS EXAMINATION BY
11   MS. MOST:
12       Q    Ms. White, can you talk about the visit of May 22?  I
13   just briefly scanned your report, but you don't talk about the
14   fact that there was a screaming match between you and
15   Ms. Kassenoff that lasted for at least a half hour.  Because
16   you're aware I got the tape of -- part of that from Allie.
17       A    Which visit was that?
18       Q    Wasn't that May 22?  It was the last visit.
19       A    The visit before, right.  It was the visit before
20   this one.
21              THE COURT:  Before you had the contract?
22              MS. WHITE:  Right.  That's sort of what prompted
23       me to try to figure out a way to move forward and avoid
24       all that before.
25       A    So yes, there was just major conflict.
```

C. White/The Court/Cross

```
 1              MR. WIEDERKEHR:  Judge, I have to object.  If
 2     it's not in Ms. White's report -- I haven't been provided
 3     with a copy of the recording.  This should not be a
 4     hearing by ambush.  If it's not in Ms. White's report,
 5     then in theory she did not believe it warranted reporting
 6     to the Court.  I shouldn't be hearing about it now for the
 7     first time as she is sitting in open court.
 8              THE COURT:  The problem you have is we are aware
 9     of, and she did indicate in her report, a failure to
10     adhere to protocols and behaviors that were articulated by
11     her as set forth in prior visits, and a failure to adhere
12     to them resulting in the need for a behavior contract.
13     But who has the tape?  Was that sent to me?
14              MS. MOST:  I have a small piece of tape.  I know
15     it was sent to me and to her father.  And I did speak to
16     ███████ while it was going on.  They were very upset about
17     it, because apparently Ms. White was trying to get
18     Ms. Kassenoff to change topics, and --
19              MR. WIEDERKEHR:  Judge, I don't think it's
20     appropriate for Ms. Most to now testify.
21              THE COURT:  Okay.
22              MR. DIMOPOULOS:  Your Honor, I can play the
23     audio.
24              THE COURT:  Do you have it?
25              MR. DIMOPOULOS:  I can have it in minute, yes.
```

C. White/The Court/Cross

```
1              THE COURT:  Yes.  I want to hear the tape.
2              MR. WIEDERKEHR:  Judge, when the time is
3    appropriate, I would ask the Court's leave to inquire of
4    Ms. White briefly.
5              THE COURT:  Absolutely.  Let me just hear the
6    tape first.
7              (Whereupon Mr. Dimopoulos played audio.)
8              THE COURT:  It's probably easier if you e-mail
9    that to Maria, so we can upload it to the system and
10   everybody can hear it clearly.
11             MR. DIMOPOULOS:  I will do that right now, Your
12   Honor.
13             THE COURT:  Do you want to wait to hear the tape
14   before you do your inquiry, Mr. Wiederkehr?
15             MR. WIEDERKEHR:  Yes, Judge.  Thank you.
16             MR. DIMOPOULOS:  I just e-mailed it to
17   Ms. Baratta.
18             MR. WIEDERKEHR:  Can you e-mail it to me as
19   well, Your Honor?
20             THE COURT:  Send it to Mr. Wiederkehr as well.
21             MS. MOST:  Your Honor, this tape, according to
22   ████████ was just a little piece of -- it was a five-minute
23   excerpt of what -- after I spoke to Ms. White afterwards,
24   it was something that lasted --
25             MR. WIEDERKEHR:  I don't think it's
```

C. White/The Court/Cross

1          appropriate --

2                      THE COURT:  Hold on a second.  Let me just get

3          the tape.  Maria?

4                      THE COURT CLERK:  Yes, Judge?

5                      THE COURT:  There is an audiotape that

6          Mr. Dimopoulos is going to send to you.  When you get it,

7          can you please share and upload it to this so we can

8          listen to it?

9                      MR. DIMOPOULOS:  It's on its way to you,

10         Ms. Baratta.

11                     THE COURT:  While we're waiting for the tape,

12         Ms. White, is it fair to say that -- did Ms. Kassenoff

13         adhere to the behavioral contract that she executed before

14         your visit on Sunday?

15                     MS. WHITE:  She tried.

16                     THE COURT:  When you said the girls were

17         becoming agitated, what do you mean by that?

18                     MS. WHITE:  I mean, just in terms of body

19         language.  And ████████ just was very obviously agitated,

20         because she kept trying to leave the house and go outside

21         and, like, she wanted to get out.  The other kids, yeah,

22         they were, like, just in tone of voice and body language.

23                     There was a point that ████████ said something,

24         she was really upset about it.  I couldn't even catch it.

25         I'm not sure what she said.  She was very upset when she

C. White/The Court/Cross

1    said it.  But I know it was something that Ms. Kassenoff

2    was immediately upset about and went to, like, take her

3    phone to record and ask her to say again.  And all three

4    children immediately sort of reacted to that and started,

5    like, yelling at her not to record.  And ███████ was yelling

6    at ███████ not to repeat herself.  Just, everyone was

7    pretty agitated by the end, yeah.

8              THE COURT:  Okay.  Maria, did you get the

9    tape -- the audio?

10             THE COURT CLERK:  Not yet, Judge.

11             MR. DIMOPOULOS:  It's showing up as "sent," but

12   it's a large file.

13             THE COURT:  While we are waiting on that, a copy

14   of the text message that was sent by Ms. Kassenoff to the

15   girls was forwarded to me.  Do you have that,

16   Mr. Wiederkehr?

17             MR. WIEDERKEHR:  E-mail, if we're talking about

18   the same thing, yes.

19             THE COURT:  Was that e-mail that was forwarded

20   to me sent directly to you, Ms. Most, or was it sent to

21   Mr. Kassenoff?

22             MS. MOST:  ███████ sent it to me directly and then

23   called me on the telephone.

24             THE COURT:  When she called you on the

25   telephone, could you describe for me her emotional state?

C. White/The Court/Cross

1          MS. MOST:  She was extremely upset, because she

2      feels that her mother is dishonest.  I think that the

3      girls as a general rule feel that her mother -- their

4      mother is dishonest.  Just as an example, what ████ says

5      to me is:  "She makes us send her these e-mails saying we

6      want to live with her and we love her."

7          MR. WIEDERKEHR:  Judge, I apologize, but I don't

8      understand how this is now appropriate for the attorney

9      for the children to be opining as to the children's

10     emotion determinations and how they feel.  If she is going

11     to say what they said, I would also object to that.  But

12     if anything else, Judge, perhaps the time has come for

13     Your Honor to meet with these children and get to the

14     heart of this, so Your Honor can have an accurate

15     assessment of what is going on, as compared to subjective

16     characterizations.

17         THE COURT:  Mr. Wiederkehr, I have been trying

18     to find out what's going on since November of 2020, when I

19     requested an updated forensic evaluation that has been

20     delayed and delayed and delayed by the machinations of

21     your client.  So yes, it is time to see the children, and

22     I have endeavored to do that, and we still don't have the

23     updated forensic evaluation.

24         MR. WIEDERKEHR:  This will not perhaps please

25     Your Honor, but for the record, Ms. Kassenoff had seen

C. White/The Court/Cross

1   Dr. Abrams last week.  And up until yesterday, when the
2   Court directed this hearing, she was actually scheduled to
3   be with him again this morning.  So there is no question
4   but that Ms. Kassenoff has commenced the updated
5   interviews with Dr. Abrams.  But I imagine that will now
6   be slightly pushed back as a result of today.  Obviously
7   the Court was not aware of that, and Ms. Kassenoff was not
8   going to miss this appearance.

9           MR. DIMOPOULOS:  Your Honor, I have to just
10   wonder how Ms. Kassenoff --

11          THE COURT:  I'm a little confused.  If she had
12   her appointment scheduled with Dr. Abrams today, how does
13   she have all these meetings scheduled with her boss today?
14   But that's neither here nor there.  The Court acknowledges
15   that Ms. Kassenoff has, yes, engaged in the updated
16   forensic evaluation at this point.

17          Maria, is the audio available?

18          MS. KASSENOFF:  There is no delay in terms of
19   machinations.

20          THE COURT:  Ms. Kassenoff, you are muted.  Go
21   ahead, Maria.  Play it.

22          (Whereupon the court clerk played the audio.)

23          MR. WIEDERKEHR:  Judge, may I ask this be
24   paused?  I'd like to raise an objection.

25          THE COURT:  Pause it, Maria.

C. White/The Court/Cross

1              MR. WIEDERKEHR:   The way this was presented was

2       this was apparently an interaction between Ms. Kassenoff

3       and Ms. White.   Now this seems to be transitioning by a

4       child, who is not present in court, between -- an

5       interaction between mother and daughter.   It's now being

6       presented into the record without any foundation

7       whatsoever, without having been able to hear it before.

8       I'm trying to understand how it went from the offer of

9       proof as to what it was, to now becoming something

10      entirely different.

11              THE COURT:   Ms. Most?   What else is on the tape?

12              MS. MOST:   I think the tape ends very shortly, I

13      think, after that.   But what ███ sent me --

14              THE COURT:   Well, terminate the tape at this

15      point.   Go ahead, Mr. Wiederkehr; do you have questions of

16      Ms. White?

17              MR. WIEDERKEHR:   Yes, Judge.   Thank you.

18   CROSS EXAMINATION BY

19   MR. WIEDERKEHR:

20      Q     Good morning, Ms. White.

21      A     Good morning.

22      Q     You had testified earlier that leading up to this

23   most recent visit there had been issues with transition,

24   correct?

25      A     Correct.

C. White/The Court/Cross

1      Q      Would you agree that those transitions to the access

2  time had been less than easy to accomplish for you?

3      A      I'm sorry, can you clarify your question?

4             MR. WIEDERKEHR:  Withdrawn.

5      Q      The issue of getting the children to attend the

6  access has been something that has been becoming more and more

7  of an issue over the recent weeks?

8      A      With █████████ in particular, yes.

9      Q      And you are aware that Ms. Kassenoff has reported a

10 concern that Mr. Kassenoff told the children that she likely

11 had lice?  Are you aware of that?

12     A      I'm aware that that's her concern, yes.

13     Q      And that the children expressed the desire not to see

14 their mother for fear they would contract lice from her; are

15 you aware of that as well?

16     A      I'm aware of that.

17     Q      The time when █████████ did not want to get out of the

18 car -- your role as therapeutic supervisor is to assist in

19 facilitating the children's attendance; is that a fact?

20     A      My role is really to assist in the relationship

21 overall.  And to, you know, further that, yes, there has to be

22 some sort of interaction.  So I do try to make the visits

23 happen.

24     Q      And there was a time when Ms. Kassenoff asked that

25 you facilitate Mr. Kassenoff stepping away from his vehicle so

C. White/The Court/Cross

1    the two of you may speak to her daughter, to try to encourage

2    her to participate in the access, correct?

3         A    Yes.  She did ask that.

4         Q    And notwithstanding Ms. Kassenoff's --

5              MR. WIEDERKEHR:  Withdrawn.

6         Q    In your experience as a therapeutic supervisor, you

7    have been called upon previously to encourage a child to

8    attend, have you not?

9         A    Yes.

10        Q    So you would agree that that is in fact part of your

11   role, if a child is reluctant to participate in visitation?

12        A    Yes.

13        Q    And Ms. Kassenoff requested that you ask

14   Mr. Kassenoff to step away so that the two of you could try to

15   encourage the child, correct?

16        A    She did make that request.

17        Q    In fact, that request was not honored, was it?

18        A    We did not do that.

19        Q    And the child did not attend the visitation, did she?

20        A    On that day, I believe ███████████ did not

21   attend.

22        Q    Was that Mother's Day?

23        A    That was the Mother's Day visit, yeah, because only

24   ██████ was there that day.

25        Q    And you would agree, based upon your experience and

C. White/The Court/Cross

1    interaction with the parties, that that would be quite

2    disappointing for Ms. Kassenoff?  Correct?

3         A    She definitely expressed disappointment.

4         Q    Do you believe that was a justifiable expression of

5    upset?

6         A    That's not really for me to decide.  Certainly she

7    was very upset, and it's understandable.

8         Q    The following visit did not occur because you

9    reported -- forgive me if it wasn't you, but you or somebody

10   from your organization had experienced a car accident?

11        A    Yeah, on the way there.

12        Q    And then there was a visit on the 22nd of May, which

13   was the week before this past weekend?

14        A    Correct.  Right.

15        Q    And ███████ did not attend the visit?

16        A    ███████ did not attend the visit.

17        Q    Okay.  And did she come to the house that day?

18        A    Yes.

19        Q    She refused to get out?

20        A    Yes.

21        Q    Coming to this past weekend --

22             MR. WIEDERKEHR:  Withdrawn.

23        Q    Ms. White, the contract that you asked Ms. Kassenoff

24   to sign, isn't it a fact that that contract is really nothing

25   more than a memorialization of what you would consider to be

C. White/The Court/Cross

 1   appropriate behaviors for a supervised visiting parent?

 2       A    What's the question?

 3       Q    The contract asks that she follow what you otherwise

 4   communicate to be the ground rules for supervised visitation,

 5   correct?

 6       A    Right.  The contract addresses particular issues that

 7   had been coming up that I wanted to avoid.

 8       Q    In advance of this particular meeting, you said you

 9   spoke to Ms. Kassenoff and she asked you to relay her plan for

10   the visitation?

11       A    She sent an e-mail.

12       Q    Okay.  And isn't it fair to say that her communicated

13   plan was appropriate for the visitation?

14       A    Sure, yeah.  There was nothing wrong with it.

15       Q    Is it fair to say that Ms. Kassenoff was attempting

16   to put a schedule in place that she thought the children would

17   enjoy during their time together?

18       A    I can't speak to what she was attempting to do.

19   However, those were all activities that, yes, the children do

20   enjoy.

21       Q    And notwithstanding having suggested activities the

22   children enjoy, ███████ reaction to that was ambivalence, you

23   said?

24       A    So it went from absolute refusal to ambivalence once

25   I told her about the plan.

C. White/The Court/Cross

1      Q      Notwithstanding Ms. Kassenoff's attempt to put a plan

2    in place that she believed her children would enjoy, ███████

3    reaction was that her mother was merely trying to bribe her,

4    correct?

5      A      That's correct.

6      Q      So notwithstanding Ms. Kassenoff's obvious attempt to

7    do the right thing, it was received by the child as an attempt

8    to bribe her?

9      A      I mean, it just depends on your perspective, but --

10     Q      I'm asking you, based upon your testimony:  This was

11   a plan she put in place to try to have a nice time with the

12   kids, and it was received by this child as an attempt to bribe

13   her?

14     A      That is what ███████ said, yeah.

15     Q      And then she eventually came, and you said the visit

16   started out okay, correct?

17     A      Correct.

18     Q      And during that visit ██████ was on her phone a lot,

19   correct?

20     A      Yes.

21     Q      And when you saw ██████ on her phone a lot, did you

22   ask her with whom she was communicating?

23     A      No.

24     Q      Did you ask her to stop communicating?

25     A      No.

C. White/The Court/Cross

1     Q    Did you ask her to focus on the limited time she has

2  with her mother for this visit?

3     A    No.

4     Q    When -- did you believe it was appropriate for

5  ██████████ to be focused on text messages and communicating with

6  someone else during the supervised access?

7     A    That's not really my focus from a therapeutic

8  standpoint.  ███████ was interacting with her mother at the

9  same time, and participating in the play.  And it would have

10  been disruptive for me to start questioning that when things

11  were going smoothly.

12     Q    In fact, while you perceived ████████ was having a

13  nice time and was engaged and was playing, in fact she was

14  apparently texting with her father, correct?

15     A    Correct.

16     Q    And you saw nothing going on that would warrant

17  ██████████ leaving the visit while she was texting with her

18  father; isn't that a fact?

19     A    With my own two eyes, I did not see anything that was

20  obviously wrong at that time.

21     Q    Okay.  And you said that the children were actually

22  playing bingo, right?

23     A    Right.

24     Q    And that other than normal bickering which occurs

25  through three preteen girls, it was, to use your words, going

C. White/The Court/Cross

1    smoothly, correct?

2         A    It was.

3         Q    And something else was going on for ▌▌▌▌ that you

4    were unaware of?  That was your testimony?

5         A    It seemed that way.

6         Q    You have no other explanation for that, considering

7    the fact that based upon your professional oversight,

8    everything was, quote, "going smoothly," correct?

9         A    Everything seemed to be going smoothly based on what

10   I could physically see with my eyes and hear.

11        Q    So Ms. Kassenoff wasn't doing anything wrong as far

12   as you were concerned at this point when they were playing

13   bingo, right?

14        A    That's correct.

15        Q    Notwithstanding Ms. Kassenoff following every rule

16   that had been put in place and focusing on having a good time

17   with the kids while she was doing that, ▌▌▌▌ was doing

18   something else and apparently asking her father to leave,

19   right?

20        A    That's correct.

21        Q    And Ms. Kassenoff did nothing, in your professional

22   opinion as court-appointed therapeutic supervisor, to warrant

23   that during the visit; isn't that a fact?

24        A    During those -- that 45 minutes or so, correct.

25        Q    And now, you told ▌▌▌▌ to stop setting a specific

C. White/The Court/Cross

1    time to leave, right?

2        A    Correct.

3        Q    She might be having a great time, and she should be

4    more fluid with this interaction, wasn't that your direction?

5        A    I wanted her to -- my hope was that she would get

6    involved in things and not leave, basically.

7        Q    She was involved -- from what you saw, she was

8    involved?

9        A    She wasn't fully engaged, but yes.

10       Q    Despite your hope that she become fully engaged, you

11   then received a text message from the father saying, "The kids

12   want me to come and get them"?

13       A    ████████████      ████████████████████████

14       Q    When did you tell the father, "Please don't come,

15   everything seems to be going fine"?

16       A    Prior to that.

17       Q    And nevertheless, he did come?

18       A    Only after I told him he should.

19       Q    After you told him he should?

20       A    That was after ███████ was already really agitated

21   and leaving the house -- like, threatening to leave the house.

22       Q    And during your original inquiry from the judge, you

23   didn't mention anything that Ms. Kassenoff did to, quote, make

24   it go sideways, did you?

25       A    Are you talking about initially?

C. White/The Court/Cross

1      Q    I'm talking about your testimony, that you said --

2   and correct me if I'm wrong -- that ████████ wanted to leave,

3   and that you told her she had to talk to her mom, and then it

4   went sideways.  Do you remember that testimony?

5      A    I said it went south.  Yes.  So initially, yes,

6   Ms. Kassenoff and the children were engaged in a seemingly

7   positive manner.

8      Q    So Ms. Kassenoff is doing everything you asked her to

9   do, and the child says she wants to leave, right?

10     A    I would say she wasn't doing the things I asked her

11  not to do.  And ████████ did not wish to stay.  Yeah.

12     Q    You said ████████ was uncomfortable with emotion,

13  correct?

14     A    Overall that's been my observation of her.  Not just

15  with that visit.  Overall.

16     Q    And you said Ms. Kassenoff became teary and started

17  to cry?

18     A    At one point.

19     Q    And you would agree that, given the last approximate

20  month of supervised visits, which included one if not two

21  children refusing to come, including Mother's Day, and then a

22  canceled visit through no fault of Ms. Kassenoff, when she

23  understood that everybody was having a good time, and one child

24  said she wanted to leave, that that could become frustrating

25  and disappointing?  Correct?

C. White/The Court/Cross

1        A      Definitely.

2        Q      You would agree that demonstrating emotion in that

3    capacity by Ms. Kassenoff would be a fair exhibition of

4    emotion, correct?

5        A      I would think it's normal, yeah.

6        Q      And you testified that you're unclear as to why █████

7    wanted to leave that day?

8        A      That's correct.

9        Q      Ms. White --

10       A      That's correct.

11       Q      Ms. White, I just want to make sure I understand that

12   in substance, your testimony was that Ms. Kassenoff acted in

13   accordance with the parameters of the supervised visitation,

14   and the children texted their father and said they wanted to

15   leave?

16       A      So during the beginning of that one visit

17   Ms. Kassenoff did abide by the contract, and there were some

18   positive interactions, and ████████ still wanted to leave.

19       Q      Okay.  Thank you.

20              MR. WIEDERKEHR:  Nothing further, Judge.

21              THE COURT:  Okay.  Ms. Most?

22   CROSS EXAMINATION BY

23   MS. MOST:

24       Q      Do you believe that demonstrating emotion has a

25   derogatory effect on the children?

C. White/The Court/Cross

1          MR. WIEDERKEHR:  Objection.

2          THE COURT:  That's a little broad, Ms. Most.

3      Rephrase.

4      Q    When you have witnessed Ms. Kassenoff crying, which

5  she does frequently --

6          MR. WIEDERKEHR:  Objection.  Move to strike that

7      characterization.

8          THE COURT:  That's sustained.  Rephrase.

9      Q    In your experience with the girls, has the mother's

10  emotions had any effect on them --

11          MR. WIEDERKEHR:  Objection.

12      Q    -- that you could witness/that you have witnessed?

13          THE COURT:  Let's rephrase that.

14          Ms. White, after Ms. Kassenoff was told by

15      ███████   that she wanted to leave, and she became upset,

16      which is an emotion you said was understandable because

17      her daughter wanted to leave, at some point did that cross

18      over to a demonstration or display of emotion that you

19      thought was not appropriate with the children present?

20          MS. WHITE:  My issue with what happened at the

21      end of that visit was less about display of emotion on

22      that particular day, and more about the words coming out

23      of her mouth.  She actually was able to stop crying before

24      she rejoined the children.  However, she was clearly still

25      very agitated, and it came through in her demeanor, how

1      she spoke, and what she said.

2              THE COURT:  What did she say that you deemed

3      inappropriate as a therapeutic supervisor?

4              MS. WHITE:  "If you don't want to spend time

5      with me anymore, then you can just leave now."  And "Have

6      a nice life."  Or, "Well, you will see; if you decide to

7      leave, you will just have less and less time with me."

8      Honestly, there was a lot going on the last 20 minutes of

9      that visit, so I don't even have it all.  Yes, those

10     things off the top of my head I definitely remember.  That

11     was not appropriate.

12             THE COURT:  Okay.  So you said not on this

13     occasion, it wasn't the emotional issue that was a

14     problem.  On any of the other visits you had within the

15     last -- and I'm really focused on when we extended the

16     visit from one hour to four hours to get a larger block of

17     time to see how those interactions went; did you observe

18     there to be inappropriate emotional reactions from the

19     mother during the visit?

20             MS. WHITE:  I'm really hesitant to characterize

21     anyone's emotions as inappropriate.  However, I will say

22     that there have been times that the mother has become

23     emotional and cried during visits, that the children were

24     visibly uncomfortable, that ████████ and/or one of the

25     other kids said directly, "Please stop, we're here to have

C. White/The Court/Cross

 1     a good time;" where, you know, the kids tried to, like,

 2     comfort their mother in a sort of backwards kind of way.

 3                    THE COURT:  What does that mean, in a backwards

 4     kind of way?

 5                    MS. WHITE:  Meaning generally we would want to

 6     see a mother comforting a child, not the other way around.

 7                    THE COURT:  So you indicated in the response to

 8     a question from Mr. Dimopoulos that maybe the four-hour

 9     period of time in the house is difficult for you to

10     provide therapeutic supervision, because there are too

11     many moving parts.  And you indicated if you went to your

12     office, it might be easier to manage.  Is there another

13     alternative other than your office that you think would

14     be -- would work in terms of facilitating Ms. Kassenoff's

15     interaction with her children and her access to the

16     children?

17                    MS. WHITE:  I don't know.  I have to think about

18     that.  It's an issue because -- and not just with me

19     having better control over the interactions and

20     Ms. Kassenoff's behavior, but also just, with this last

21     visit I couldn't get ████████ to stay in the house.  That's

22     an issue.  If one of the kids goes and runs off and I'm

23     with the other kids, it's a problem.  And clearly if they

24     want to run off, they will.  So I just don't feel like I

25     can -- like I have 100 percent ability to keep things safe

C. White/The Court/Cross

1    and under control in that environment.

2           THE COURT:  So when ███████ left, she left the

3    house, but she remained on the grounds, as far as you

4    know?

5           MS. WHITE:  I couldn't see her anymore.  She

6    went out to the driveway.  I was with the other girls and

7    Ms. Kassenoff.  I couldn't see.  Presumably she was on the

8    grounds, but I couldn't see her.  She had gone towards the

9    driveway.  There are trees in the way.  I don't know.

10          THE COURT:  That was a concern for you?

11          MS. WHITE:  That was a concern.  I did not want

12    her out there in the first place.  And she was wearing

13    flip flops, and it was 50 and raining this past Sunday.

14          THE COURT:  And I missed a part of what you

15    said.  Did the other two children leave the house as well

16    at some point?

17          MS. WHITE:  So yeah, minutes later they also

18    left, and I had to run and grab my stuff.  And I had asked

19    them not to go out, to wait for me.  So they also left,

20    and I had to go run into another room and grab my stuff

21    before I could go out to join them.

22          THE COURT:  When that happened, was

23    Ms. Kassenoff upstairs, or had she changed her location in

24    the house?

25          MS. WHITE:  She followed them outside.

C. White/The Court/Cross

1           THE COURT:  Does anyone have any other questions

2     they would like to ask Ms. White before we let her go?

3           MR. DIMOPOULOS:  I have one or two, Your Honor.

4           THE COURT:  Go ahead.

5  CROSS EXAMINATION BY

6  MR. DIMOPOULOS:

7     Q    Ms. White, during the transitions is Mr. Kassenoff

8  cooperative and encouraging for the children to go on the

9  visits?

10    A    Yes.

11    Q    Has he ever in your opinion interfered with any of

12 the visits?

13    A    Not in my presence.

14    Q    Has he listened to all of your directives concerning

15 the visits?

16    A    He has.

17          MR. DIMOPOULOS:  Nothing further, Your Honor.

18     Just one thing, and I don't know that we need to belabor

19     the point, but my client has all of the text messages he

20     exchanged with ███████ that Ms. White testified about.  I

21     think those are somewhat probative.

22          THE COURT:  We can discuss it afterwards.  I

23     just want to let the witness go.

24          Mr. Wiederkehr, do you have anymore questions

25     for Ms. White?

C. White/The Court/Cross

```
 1                    MR. WIEDERKEHR:  I just wanted to ask one thing

 2          as a follow-up to Mr. Dimopoulos.

 3   CROSS EXAMINATION BY

 4   MR. WIEDERKEHR:

 5          Q    Ms. White, do you recall when Ms. Kassenoff requested

 6   that Mr. Kassenoff step away from his vehicle to try to

 7   encourage the child to participate in the access when she would

 8   not get out of the car?

 9          A    Yes.

10          Q    Isn't it a fact that Mr. Kassenoff refused to step

11   away?

12          A    That was her request, not mine.

13          Q    Isn't it a fact that he refused to step away?

14          A    He did refuse to step away.

15                    MS. MOST:  Can I follow that up, Your Honor?

16                    THE COURT:  Yes.

17                    MS. MOST:  In the report it says that she did

18          not think it was -- Ms. White did not think it was an

19          appropriate way of handling the situation.

20   CROSS EXAMINATION BY

21   MS. MOST:

22          Q    What were your thoughts on that, Ms. White?

23          A    From my understanding, in the first place,

24   Ms. Kassenoff was not supposed to be outside of the house

25   during the transitions.  That was number one.  Number two, she
```

Proceedings

1   was incredibly emotional and not in a state that I would have

2   wanted to bring her over to try to talk to anyone anyway.  It

3   was my job to try to encourage the kids to join in general.

4   When I have visits where a child is reluctant to join, I don't

5   bring the parent that they're reluctant to be around to come

6   with me to try convince them to join.  It's not appropriate.

7   It would not have -- yeah.  There are many, many reasons, and

8   many ways that could have gone badly.  I was not going to try

9   that.

10             THE COURT:  Anything else?  All right, thank you

11      very much for joining us on such short notice, Ms. White.

12      I appreciate it.

13             MS. WHITE:  Have a good day, everyone.

14             THE COURT:  Okay.  I do want to see the text

15      messages that were transmitted by ███████ and her father

16      during the visit on May 30.  So could you send those to

17      the Court as well as to Mr. Wiederkehr and Ms. Most, so

18      everybody has a copy of those?

19             I am going to give the parties an opportunity to

20      state their -- I'm going to reserve decision on this in

21      terms of what I want to do.  I want to read the -- listen

22      to the audio again and read the text messages.  But I will

23      hear arguments at this point on whether or not we should

24      grant the request for a protective order and/or modify the

25      visitation.

Proceedings

1          So Mr. Dimopoulos, we will start with you as the

2     representative of the plaintiff.

3          MR. WIEDERKEHR:  Your Honor, may I call my

4     client?

5          THE COURT:  Absolutely.  Why don't we take a

6     five-minute break so you can talk to your clients, and we

7     will come back.  Ms. Kassenoff, call your attorney.

8          MR. WIEDERKEHR:  Catherine, I will call you

9     momentarily.

10          THE COURT:  Take ten minutes to speak with her.

11          (Whereupon a recess was taken at this time.)

12          MR. WIEDERKEHR:  If Your Honor doesn't mind, if

13     I could start, I have an application, please.

14          THE COURT:  Go ahead.

15          MR. WIEDERKEHR:  I will try to be brief.  It

16     appears this supervised visitation has been in place for

17     quite some time.  And there have been competing and

18     combating allegations of fault in why it's succeeding and

19     why it remains in place.  But it appears to me in my short

20     time on the file that, rather than treat the symptoms,

21     perhaps we could treat the disease.  And my application is

22     that we transition from this current therapeutic,

23     supervised environment to an actual therapeutic

24     environment, because it appears even from just today's

25     testimony that the children are coming to this process

Proceedings

1   with a perspective that they are disinterested in engaging

2   in this supervised visitation.  I think there are probably

3   a whole host of reasons why, which are not necessarily

4   critical to get into.  But the mere fact that my client's

5   overt attempt to put a day in place that she thought the

6   children would embrace was received as some attempt at

7   bribery, I think is quite illuminating.

8           And in my opinion, and I'm asking the Court to

9   adopt this, it's time perhaps for this -- rather than

10  continue in this mode, I am suggesting that a transition

11  to a more therapeutic environment, in which Ms. Kassenoff

12  has the opportunity to be in front of a professional with

13  one child at a time -- unless the professional suggestion

14  is that there be more than one child at a time -- to

15  provide both mother and daughter a safe and appropriate

16  environment to address these issues at its core, and try

17  to permit some semblance of moving forward.

18          If a child is coming to this process with the

19  bias -- and I don't necessarily look to ascribe

20  negativity, but there is clearly a bias that is being

21  brought to the table -- the question is why and how does

22  that get rooted out so that they may proceed productively

23  and beneficially.  There was a time when the children

24  communicated their love and affection and desire to be

25  with their mother, and somehow, somewhere that changed.

Proceedings

1               I don't think it's necessary to ascribe blame.

2       It's not an issue of fault.  It's an issue of reality.

3       And I do believe, and I have spoken with my client, that

4       in order to get the most productive progress, that perhaps

5       it's time for a more focused mental health provider to

6       direct and oversee and facilitate this process.

7               And I think that while Ms. White had a

8       particular role and function, given her testimony today,

9       it's clear that it's limited.  And that's not intended as

10      a criticism.  It's just a reality.  Perhaps if there was

11      an adolescent psychologist or reunification psychologist

12      on something like that, they might be in a better position

13      to explore these issues and provide both mother and

14      children the guidance and assistance and insight that

15      would be beneficial to improve this.  Because I can

16      imagine that the Court prefers to not to be micromanaging

17      these types of situations.  And I'm certain my client

18      prefers not to be in a situation where she is defending

19      her maternal role.  And I thought it might be better

20      served for everyone to inject a professional who can

21      assist and provide guidance in making these situations

22      better for everyone.

23              THE COURT:  Mr. Dimopoulos?

24              MR. DIMOPOULOS:  I will address Mr. Wiederkehr's

25      application first, but then I would also like to address

Proceedings

1        the Court on my application.  I'm running out of battery,

2        give me one second.

3                Your Honor, since June of 2019 this Court has

4        been trying to fashion arrangements to facilitate

5        Ms. Kassenoff's relationship with these children.  At

6        first this was just a third-party supervisor.  It was a

7        robust access schedule.  That didn't work.  Then it was

8        therapeutic supervision with zoom calls that were

9        recorded, and that's not working.

10               The zoom calls, which aren't being addressed,

11       which I watch every single one of, and I'm going to submit

12       some to Your Honor with my updated materials to

13       Dr. Abrams, are an absolute, unadulterated disaster.  And

14       the therapeutic supervisors that do these calls are, quite

15       frankly, not doing a good job.  But they have thrown their

16       hands up anyway and are not doing them anymore, so I don't

17       think that's a problem.  Quite frankly, the children

18       terminate the calls on their own.  They don't want to be

19       interrogated, questioned, told things that are hurtful.

20               Ms. White, I think, did her best to convey to

21       this Court what the problems are in a very judicious way

22       and with a great degree of diplomacy.  The fact of the

23       matter is Ms. White says the children are disinterested.

24       But they're not disinterested; they're scared.  Your Honor

25       will review the text messages the children send them.

Proceedings

1      They say things like, "Mom is going crazy.  Please come

2      pick up us.  Come now.  Come now."  It's not working

3      either.

4             Now, what Mr. Wiederkehr's application is is

5      let's take one child and put them in an environment with

6      their mother with a professional, and he said a

7      professional who is better able to manage the situation.

8      Ms. White is a professional.  She is a therapeutic

9      supervisor.  We all looked at her resume and thought she

10     was highly, highly qualified.  She can't control the

11     situation.  What makes us think putting one child with a

12     mother who is behaving this way in that environment is

13     going to make any level of difference?

14            The fact of the matter is Ms. Kassenoff needs to

15     change her behavior.  It is not this therapeutic

16     arrangement versus that one, two hours versus four hours.

17     No matter what the requirement this Court places, she

18     fails.  And she fails because she doesn't understand that

19     it's not treating the symptoms of the disease.  The

20     disease is her mental illness.  She doesn't understand

21     that what she is doing is wrong.  I am not saying this to

22     attack her.  I'm saying this almost to justify what she is

23     doing.  If one doesn't understand that their actions are

24     hurtful, then by doing them, they're not trying to hurt.

25     She just doesn't understand.  She is unable to process.

Proceedings

1               When, and I'm going to talk about my -- segue

2       into my application, Your Honor.  When she posts on

3       Facebook and puts your name, Your Honor, or puts

4       Ms. Most's name, or Ms. Ratner's name, what she thinks she

5       is doing is shedding light on a tremendous dark conspiracy

6       that is ripping her from her children.  She doesn't

7       believe that she has done anything wrong ever in this

8       proceeding.  We have seen it time and time again.

9               She doesn't believe that posting a video of

10      Mr. Kassenoff and his engagements with the children on

11      Facebook is wrong.  She is saying, "How dare Ms. Most not

12      address this?"  She thinks she is shedding light.  She

13      wants to go to news outlets.  Her Facebook posts ask that

14      people come to the courthouse on June 16 to write the

15      conspiracy.  She writes letters to his employer, e-mails

16      to outside counsel.

17              Again, we can change the situation as many times

18      as this Court is willing to do it.  But the problem is, if

19      she doesn't understand that she is single-handedly

20      destroying her relationship with the children and hurting

21      them in the process, then no matter what we do, no matter

22      what this Court does in its supreme wisdom, it's not going

23      to have an effect.

24              The children have had it.  They're opening up to

25      their attorney and their father about what they have

Proceedings

1    endured.  The forensic process will go on.  I think

2    between now and then the wisest thing to do is, for a

3    temporary period of time, halt all access, because no

4    matter what we do, it's going to go on.  I think we take a

5    pause and we reach out -- wait for Dr. Abrams, who

6    incidentally understands this case and Ms. Kassenoff

7    better than anyone, from his testimony and his report, and

8    see what he advises to do.

9          I, quite frankly, don't see why you take an

10   environment of three children in a house with a supervisor

11   that is not going well, and then you focus the spotlight

12   on one child and put them in a room so that she can do

13   that one-on-one.  So I don't see it.

14         The e-mail to the children, I mean, this is on

15   top of so many violations of this Court's order concerning

16   contact.  The beauty of it now is that ███ is reporting

17   to her father when her mother tries to reach out to her,

18   this e-mail and her efforts to contact them.  There has

19   never been serious repercussions for her violations of the

20   Court order.  I'm not saying the Court hasn't addressed

21   those things time and time again and reminded her it's a

22   violation.  I understand the frustration; what's more to

23   do?  But the children read this stuff.  It's hurtful.  And

24   until she is at some level held accountable for her

25   violations of the Court order, I think it doesn't really

Proceedings

1    become real to her.  She thinks she can just act with

2    impunity.  I think that's one of the problems, she is just

3    never held accountable.

4            In closing, Your Honor, I think this Court has

5    issued an order two weeks ago, two and a half weeks ago,

6    that there is to be no contact with his employer and there

7    is to be no posting on social media denigrating

8    Mr. Kassenoff or anyone else.  Those orders have been not

9    violated, they have been -- she has thumbed her nose at

10   them.  The posts on Facebook are almost every day.  I sent

11   them all to the Court.  I'm sure the Court will look at

12   them.  It's embarrassing.  The children know about them.

13   They are told about them from third parties.  They see

14   themselves in some instances.  She posts them and then she

15   takes them down.  I'm sure her attorney tells her to take

16   them down, but she cannot control herself.  That's the

17   point.  She is told not to do something.  She does it.

18   She takes it down.  She does it again.

19           This Court, I believe, needs to act swiftly and

20   issue an order imposing a sanction on her.  I don't care

21   if it's a $100 fine or $25, but until she sees that there

22   are repercussions, she is not going to stop.

23           Very importantly, Your Honor, my client said

24   that he recently is increasingly concerned for the

25   children, for himself.  The threats she sends to Ms. Most,

Proceedings

1      and I'm sure she is too graceful to mention them -- but

2      the threats to Mr. Kassenoff, the threats to me, are

3      constant.  They're every few days.  "You will be held

4      accountable for what you're doing.  You're going to this.

5      You're going to that."

6              There needs to be an order of protection.  My

7      client should not have to endure the constant threats from

8      her.  A simple order that says any contact with him that

9      is not through what is already a Court order, that they

10     use the Talking Parents app solely to discuss the kids,

11     that went out the door maybe 300 e-mails ago.  She

12     continues to e-mail him on a near daily basis, sometimes

13     ten, 15 times a day.

14             So there needs to be a Court order that there is

15     an order of protection that can be enforced by my client

16     if she contacts him, an order of protection for the

17     children -- also because again, there are orders from this

18     Court from here to Timbuktu saying that she can't contact

19     them, but all I can do is come to the Court looking for

20     contempt.  If there were a criminal order of protection

21     that any communication with the children that is going to

22     be acted upon -- not to punish her; I don't want her to

23     violate it, but if there is a criminal order of protection

24     prohibiting this, it's actionable; it has consequences.

25             And the last thing I want to ask Your Honor is

Proceedings

1          that Ms. Kassenoff has a key to the marital residence.  My

2          client has asked her to deliver that key.

3                    MR. KASSENOFF:  I haven't.

4                    MR. DIMOPOULOS:  Sorry, he hasn't asked her to

5          deliver the key.  But he is asking now that she deliver

6          the key to the marital residence, for obvious reasons.

7                    And the last point is that I'm going to be, by

8          the end of this week, Your Honor, submitting a few updated

9          videos and things that I'd like for the Court to consider

10         that we sent to Dr. Abrams.  So thank you, Your Honor.  I

11         will submit the text messages to the Court for its

12         consideration.  Thank you.

13                   THE COURT:  Ms. Most?

14                   MS. MOST:  Yes, Your Honor.  At this point the

15         children have to be protected.  They have to be protected

16         from the behavior that their mother is doing.  They are

17         not disinterested.  They would like to have a mother, but

18         they don't -- they can't handle the conduct that's

19         happening right now.  The children see the posts, they see

20         all the posts, and in particular ███████████████.  They

21         respond to the posts.

22                   THE COURT:  How do they see all the posts?

23                   MS. MOST:  I actually saw one of the zoom

24         videos, where ██████ accused her mom of posting that she is

25         homeless, and her mother says, "I didn't say that."  ████

Proceedings

1   said, "Hold on one minute," she got off the zoom video,

2   she went to check, and she came back and reported the

3   video is there -- "the Facebook post is there today.  It

4   says you're homeless."  So ███ was very upset about

5   that.

6           So the children are seeing them.  They're

7   hearing them from their friends, whose parents are talking

8   about it.  So the children are being affected by these

9   Facebook posts, and it is a daily effect.  The children

10  are afraid, Judge.  They are afraid.  I can't disclose to

11  you what ███ described to me, but I can tell you that

12  ███ did tell me that she was afraid that she has seen her

13  mother drive by the house, and that was upsetting to her.

14          MS. KASSENOFF:  I --

15          THE COURT:  Ms. Kassenoff, one person at a time.

16          MS. KASSENOFF:  Your Honor, she is testifying.

17          THE COURT:  You need to mute yourself.  You have

18  an attorney that's speaking on your behalf.

19          MS. KASSENOFF:  I'm not sitting with him, Your

20  Honor.

21          THE COURT:  You can text him and tell him what

22  you want to say.

23          MS. KASSENOFF:  Judge, that's not true, and she

24  is testifying.

25          THE COURT:  She is relating to me and making her

Proceedings

1      argument.

2                    MS. KASSENOFF:  I'm sorry, but it's filled with

3      lies.  None of this is true.  I'd like to be able to

4      address the Court.

5                    THE COURT:  Well, I have copies of the Facebook

6      posts.

7                    MS. KASSENOFF:  Judge, the comments about being

8      homeless were made about a year ago.  They were about my

9      situation a year ago.  Not my current situation, but my

10     situation when I was homeless a year ago.  Those are

11     truthful posts.

12                   THE COURT:  Okay.  But we also directed you to

13     take them down a year ago.  Because I remember it

14     specifically; it was almost a year to the day.

15                   MS. KASSENOFF:  Judge, they were not directed to

16     to be taken down.  Number two, they address my situation

17     about being homeless.  I don't know why Ms. Most is

18     showing these posts to the children.  Your question is how

19     are the children seeing it.  She didn't answer that

20     question.  And I believe the father is showing them the

21     posts, or that Ms. Most is showing them the posts.  They

22     don't have Facebook accounts, Judge.

23                   MS. MOST:  Your Honor, I have never shown the

24     children a post, and I don't believe they're coming from

25     their father.  The children have told me that they are

Proceedings

1       being told about it by their friends, who hear their

2       parents talking.  But ███ actually went onto the

3       Facebook and responded on a zoom video.

4                  MS. KASSENOFF:  How does she have access to

5       Facebook, Ms. Most?

6                  MS. MOST:  I have no idea.  You were on that

7       zoom video.

8                  THE COURT:  All right, everybody needs to stop.

9       Ms. Kassenoff, you need to mute.  Ms. Most, you can finish

10      your argument.

11                 MS. MOST:  So the girls need to be protected.

12      They are afraid.  They are afraid.

13                 MS. KASSENOFF:  Of what?

14                 MS. MOST:  They are afraid of their mother's

15      conduct.  You can order them to go on a visit, Your Honor,

16      but I'm not sure that they will go.  I don't believe they

17      will.  Not that they want to say to you that they wouldn't

18      follow your directions, because they are girls that are

19      really very obedient little girls.  If you told them they

20      had to, they probably would; but I don't think that you're

21      comfortable doing that.  I'm certainly not going to say to

22      them that we're going to pull them out of a car so they

23      can go on their visit.

24                 THE COURT:  Nobody is pulling children out of

25      the car.

Proceedings

1          MS. MOST:  Of course not.  So these girls don't
2     want to go anymore.  They are not comfortable, and --
3          THE COURT:  I get your point.  Somebody address
4     to me why -- Ms. Kassenoff, you're not muted.
5          THE COURT:  -- why Mr. Wiederkehr's idea of
6     therapeutic therapy between Ms. Kassenoff and the girls
7     wouldn't go toward repairing their relationship.
8          MS. MOST:  Your Honor, if I could speak to that?
9          THE COURT:  Yes.
10         MS. MOST:  First of all, I don't think you're
11    going to get the girls to go, number one.  But I think for
12    me the better response would be to have Dr. Abrams
13    complete his report and then tell us what we should be
14    doing.  Because I think to have the girls sit with a
15    therapist one-on-one with their mother is not something
16    they will be comfortable doing.  I don't think they're --
17    they would be willing to do it.
18         THE COURT:  Okay.
19         MS. MOST:  And unfortunately, Judge, they
20    believe that what their mother is telling them -- that her
21    interactions with them are not honest.  They think she is
22    dishonest.  So having them sit with her while she explains
23    why her -- "I said I was homeless a year ago, but the post
24    is there now, but it refers to a year ago," is not
25    something --

Proceedings

1              THE COURT:  This is the problem as I see it:  I

2        have an obligation to act in the best interest of the

3        children.  And while -- the Court made findings a year ago

4        after a ten-day hearing, and the Court believes, based

5        upon the evidence deduced during that hearing, that

6        Ms. Kassenoff does have a mental illness that's impacting

7        her interactions with the children, okay.  And I

8        understand the children are reacting to that.

9              The children -- and there is still an obligation

10        to try to fashion a remedy where the children can talk

11        with their mother, because the children need to understand

12        as well at some point, as they get older, that some of the

13        behavior they're observing from their mother -- and I

14        understand Ms. Kassenoff denies that she has a mental

15        illness -- stems from a mental illness.

16              And so how do we go about getting the children

17        to understand it, if it isn't in a therapeutic -- a

18        therapeutic supervisor is different from a therapist.  So

19        maybe during that process, when you're with a therapist

20        and the mother can express what she is feeling, which is

21        the loss of time with her children whom she loves, and the

22        children can express their feelings about how they believe

23        their mother is being dishonest, whereas the mother

24        believes she is telling the truth -- at what point do we

25        try to address that underlying issue?  And what would your

Proceedings

```
 1        recommended remedy be?
 2                  MS. MOST:  I am waiting for Dr. Abrams's report.
 3                  MR. DIMOPOULOS:  Can I address that?
 4                  THE COURT:  I'm speaking to Ms. Most right now.
 5        Everybody will have a chance.  Ms. Kassenoff, your
 6        attorney will speak on your behalf to talk about it.
 7                  MS. MOST:  Your Honor, I had just this
 8        discussion this morning with Dr. Adler, because she was
 9        telling me about how the girls are doing.  ██████████  in
10        the last week has had a very hard time.  While she has
11        discussed with me some things going on, she was
12        uncomfortable discussing them with Dr. Adler.
13                  However, ████ opened up, █████ actually sent the
14        e-mail that they received.  And I said to Dr. Adler, "You
15        know, it seems to me the girls have to know that their
16        mother is mentally ill and that some of her conduct stems
17        from that illness.  How do we do that?"  And --
18                  MS. KASSENOFF:  This is ridiculous.
19                  MS. MOST:  -- her response to me was that that
20        has to be handled in such a very sensitive way.  She
21        certainly didn't feel that █████ was old enough to
22        understand.
23                  THE COURT:  I said age appropriate.  ████████
24        ███████.
25                  MS. MOST:  Right.
```

Proceedings

1            THE COURT:  But you're getting to the point

2    where -- ███████████████████████████████

3            MS. MOST:  Yes.

4            THE COURT:  ████████████████████████████.

5            MS. MOST:  ███████████████

6            THE COURT:  They're old enough to sense, you

7    know --

8            MS. MOST:  Judge, they get something is wrong.

9    They get it.  They understand that part, but it's not --

10            THE COURT:  At some point we need to address

11    that.  I'm not saying right this second, but people need

12    to start thinking about this.  I'm not rejecting out of

13    hand Mr. Wiederkehr's suggestion.  So I'm engaging counsel

14    in this discussion.  We're not going to get Dr. Abrams's

15    report.  He has to meet with Ms. Kassenoff, which has to

16    be rescheduled; I thought it was later this week.  And

17    Ms. Kassenoff and the children need to go.  And so it's

18    going to be 30 to 45 days at least, right?  I forget.

19            MR. WIEDERKEHR:  Judge, I want to say I think it

20    would make appropriate sense for this therapist

21    professional that I'm suggesting to work in concert with

22    Dr. Adler, as compared to in a vacuum.

23            THE COURT:  All the children have therapists.

24    It would have to be -- I'm not going to do something

25    that's going to be detrimental to the children.  But I

Proceedings

1        think if there is an underlying issue, and some of the

2        children are getting to the ages where it's appropriate,

3        they have to be given the skills too, and the

4        understanding and --

5                THE MR. WIEDERKEHR:  Judge, I'm not adopting the

6        narrative of mental illness.

7                THE COURT:  I understand your client denies it.

8                MR. WIEDERKEHR:  I'm simply saying,

9        notwithstanding that, I'm trying to present a viable path.

10       And I can assure the Court that I could recite chapter and

11       verse of criticisms of Mr. Kassenoff, and the Court would

12       accept some and probably reject others.

13               THE COURT:  I have heard ten days of testimony

14       and a year of at least 30-plus conferences, both sides.

15               MR. WIEDERKEHR:  I respect that.

16               THE COURT:  Now I'm concerned about the

17       children.  You're new to the table, Mr. Wiederkehr.

18               MR. WIEDERKEHR:  That's why I'm not muddying the

19       transcript with this.

20               THE COURT:  You're trying to stay -- I get it.

21       I appreciate it.  Go ahead.

22               MS. MOST:  If I could just finish:  What

23       Dr. Adler actually wanted was to have a discussion with

24       Dr. McGuffog to decide on how that should be handled.  And

25       I'd like to wait to hear from them.

Proceedings

1              THE COURT:  Of course.  That's what I'm saying.
2       I'm just thinking about it.
3              Mr. Dimopoulos?
4              MR. DIMOPOULOS:  Judge, it's pretty remarkable
5       to me that Dr. Abrams, when he testified before you in
6       July, is almost saying exactly what Your Honor is
7       considering right now.  He said -- I remember like it was
8       yesterday, because he used the word "titration," and I
9       thought that was interesting.  He recommended what
10      Mr. Wiederkehr is recommending, that the therapy happen in
11      a controlled environment, shorter periods of time, and
12      titrate into something more.
13             The problem is that key to that recommendation
14      was this very specific therapy; I remember the word
15      "dialectical."
16             THE COURT:  Dialectical behavioral therapy.
17             MR. DIMOPOULOS:  DBT, you're right.  It was
18      something recommended and specific to the personality
19      disorder with which he diagnosed Ms. Kassenoff.  And the
20      idea --
21             MS. KASSENOFF:  He didn't diagnose me with that,
22      Mr. Dimopoulos.  There is no diagnosis of mental illness.
23             THE COURT:  Ms. Kassenoff --
24             MS. KASSENOFF:  Judge, I'm sorry.  This has
25      really gotten out of hand.  I don't have a diagnosis, and

Proceedings

```
 1       I don't know why we are saying that.  This is not a

 2       situation where there is a history of mental illness.  I

 3       have a job.  I have been working as a productive member of

 4       society for my entire adult life.  I don't appreciate or

 5       understand that characterization.  There have been no

 6       findings.  We actually brought forward my therapist and

 7       other therapists to testify that I don't have a mental

 8       illness.  I don't understand that characterization at all.

 9              THE COURT:  I want to ask you a question.  Can

10       you stop?  Did you continue the therapy in the last year?

11              MS. KASSENOFF:  Judge, I have been with the same

12       therapist for two years.  I have never had a history of

13       mental illness, and I have never been on medication for

14       mental illness.

15              THE COURT:  So Ms. Kassenoff, this is the issue:

16       I told this to you before, and I wrote it in my decision,

17       and I have observed it.  And what we have seen here is

18       you're not supposed to communicate with the girls

19       unsupervised.  In my order that was very clear.  And you

20       have done that.  You were not supposed to leave the house

21       during transitions, drop-offs and pickups.

22              MS. KASSENOFF:  It's all my fault, Judge.

23              THE COURT:  I'm not saying it's your fault.

24       Either there is an underlying issue, or you're just

25       blatantly disregarding the Court order.
```

Proceedings

1              MS. KASSENOFF:  Judge, I'm trying so hard.

2              THE COURT:  I don't believe you are blatantly

3      disobeying the Court orders.  But there has been evidence

4      in Court conferences of you not following my orders.  I

5      want you to have a relationship with your children.

6              MS. KASSENOFF:  Judge, I appreciate that.  I

7      just want to say it's a long time to be in compliance with

8      these orders.  They are draconian.  It's very hard.  I

9      have done everything I can.  I think you heard from the

10     therapeutic supervisor that I am trying very, very hard.

11              And we did not discuss what -- all the months

12     and months and months of visits I had up to this point,

13     where I believe the children were speaking the truth; and

14     I believe at this point they're not.  I believe they are

15     under the thumb of the AFC and their father.  I have no

16     ability to talk to them.  I'm not texting or e-mailing

17     them.  I had one e-mail with them that you saw.  That's

18     it.

19              And so we have a situation where these children

20     for one year have been pleading for help from every adult

21     on this phonecall, and no one helps them.  But we don't

22     discuss that, Judge.  We don't discuss the plaintiff's

23     conduct and what leads up to their pleas for help.  We

24     don't discuss the assault.  We don't discuss any of that.

25     So now we're in a situation where Ms. Most is standing up

Proceedings

1    and saying, "Oh, suddenly the girls have a voice."  That's
2    not true.  Suddenly the girls have been manipulated.  This
3    is an alienation that I raised in my May 10th and 11th
4    letters.  I foresaw this issue.
5            I know my children very well, and I'm very
6    concerned by what's happening in the father's home.  We
7    don't know.  We just see the tip of the iceberg.  There is
8    a recording where █████ is discussing how her father has
9    told her that he is going to have to work at a gas station
10   because the mother -- I am allegedly making him lose his
11   job, Judge.  These are the kinds of --
12           THE COURT:  Well, if Mr. Kassenoff in fact said
13   that, Mr. Kassenoff is under the same restriction that you
14   have, which is -- and again, maybe I need to reiterate
15   this:  Nobody is to discuss the litigation with the
16   children.  That includes you and that includes
17   Mr. Kassenoff.  That includes any third party they
18   interact with.  Nobody, period.
19           MS. KASSENOFF:  Judge, I just want to say I
20   really have tried, and I'm willing to do anything to see
21   my children.  And I really agree with Mr. Wiederkehr's
22   proposal.  I want to also have a normalized relationship
23   with them.  I was their caretaker for their entire lives.
24   Suddenly I have this mental illness?  It doesn't really
25   make sense.  How is it for 11 years everything was okay,

Proceedings

1     and suddenly, when Mr. Kassenoff decides he wants to

2     divorce, I suddenly have this mental illness?  Judge, it

3     doesn't add up.

4              THE COURT:  I don't think it was okay,

5     Ms. Kassenoff.  I saw the videos about what transpired in

6     the house during the hearing.

7              MS. KASSENOFF:  A lot of those deal with the

8     domestic violence of the plaintiff.  I was dealing with it

9     on a day-in-day-out basis.

10             THE COURT:  Okay, stop.

11             Anybody else have anything else they want to

12    say?  I'm going to get the text messages.  Mr. Wiederkehr,

13    is there anything you want to send to me for consideration

14    that hasn't already been sent to me?

15             MR. WIEDERKEHR:  If I could respectfully just

16    ask if I could confer with my client, and if there is, I

17    will send it on notice to everyone, obviously.

18             THE COURT:  That's fine.

19             MR. DIMOPOULOS:  Just a final point, Your

20    Honor --

21             MR. WIEDERKEHR:  Sorry, Mr. Dimopoulos.

22             Timing, Judge?  Other than as soon as possible?

23             THE COURT:  As soon as possible.  Send it to me

24    by mid afternoon tomorrow.  If anyone wants to comment or

25    object to it or make a statement, they can respond to it.

Proceedings

1     I will get the transcript, and I want to think about and

2     review it before I issue something.

3               MR. DIMOPOULOS:  Thank you.

4               MR. WIEDERKEHR:  Thank you, Your Honor.

5               THE COURT:  That goes for anybody else.  If

6     there is anything -- Ms. Kassenoff, while I have you here,

7     I will state that there's no posting on Facebook.  We were

8     here a year ago with posts, and I had a protective order

9     at that time.  You are certainly free to post about

10    yourself, but your children are seeing it and the children

11    are hearing about it.  If they're not seeing it, they're

12    hearing about it.  And that's not appropriate and good for

13    their health.  I have an order, and you need to follow it.

14              MS. KASSENOFF:  Your Honor, I did follow your

15    order.

16              THE COURT:  Okay.

17              MS. KASSENOFF:  I have not -- look, I think your

18    order does address very specifically the children and the

19    plaintiff.  I will say that I also think I have First

20    Amendment rights.  We know that; there are cases on this.

21    We are going to be moving to vacate the order because it

22    is overbroad.  And I am --

23              THE COURT:  You can absolutely move to vacate

24    the order if you choose to.  Having researched the issue

25    of First Amendment rights, when they come into play

Proceedings

1       involving the best interests of the children -- and there

2       is case law on it, you're absolutely correct, and I have

3       read the case law.  The order, in my opinion, is perfectly

4       acceptable, especially when children are learning of it.

5       It goes to children's rights and the husband's rights.

6       You should feel free to appeal.  Post anything you want

7       other than this litigation that impacts your children or

8       their father.  That's it.

9                   COURT ATTORNEY REFEREE:  Judge, I reviewed the

10      transcript after which -- this is the May 2020 or the

11      March 2020 order.

12                  THE COURT:  I said it back then, yes.

13                  COURT ATTORNEY REFEREE:  Right.  If you read the

14      transcript, Judge, Jill Spielberg consented to the entry

15      of that order.  Therefore, Ms. Kassenoff does not have a

16      right of appeal.  She must move to vacate her consent.

17      There is no right of appeal to a consent order.  That is a

18      consent order.  The fact that Ms. Spielberg is not her

19      attorney doesn't make a difference.

20                  THE COURT:  If she wants to move to vacate it,

21      move to vacate it.  Go ahead.

22                  COURT ATTORNEY REFEREE:  She can't move to

23      vacate it yet.  She has to move to vacate her consent to

24      the order.

25                  THE COURT:  Okay.

Proceedings

1              MS. KASSENOFF:  I don't know if Referee Ratner
2       realizes there is a more recent order, and it does deal
3       with --
4              THE COURT:  No.  The more recent order that
5       arose out of that conference didn't get signed, because it
6       got lost in the pandemic.
7              MR. WIEDERKEHR:  Judge, I will review the
8       transcript.  I will address these issues.  I know my
9       client's concerns, and I will proceed accordingly.
10             THE COURT:  Very good.  Thank you.
11             COURT ATTORNEY REFEREE:  Judge, one other thing.
12      I have a trial ready conference scheduled for June 16 at
13      11:30.  Do you see any reason that should not proceed and
14      that the trial ready order cannot issue, even though we're
15      awaiting Dr. Abrams's report?
16             THE COURT:  The doctor's report is not going to
17      stop that.  There is a deposition schedule this week.
18             MR. WIEDERKEHR:  Not G&T.  It was
19      Mr. Kassenoff's continued deposition.
20             THE COURT:  Right.
21             MR. WIEDERKEHR:  Which -- I just texted counsel
22      while we were doing this.  This obviously was a bit of a
23      surprise appearance, and it's kind of impacting my ability
24      to proceed tomorrow.  So I asked if perhaps the 9th was
25      available for Mr. Kassenoff and counsel.

Proceedings

1            MR. DIMOPOULOS:  Judge Koba --

2            MR. WIEDERKEHR:  Mr. Dimopoulos is not available

3       on the 9th.

4            MR. DIMOPOULOS:  Judge Koba, I am involved in

5       matters every single day, twice a day, often, from here

6       until July 11.  There is no way.  I have had this

7       deposition in my books for a month, and that's saying

8       nothing of Mr. Kassenoff's schedule.  Mr. Wiederkehr has

9       had the documents from GT for the better part of seven

10      days, and under no circumstances will we consent.

11           MR. WIEDERKEHR:  Let's not mischaracterize how

12      long I have had the documents.  That's okay, counsel; it's

13      perfectly fine.  If there is a lack of courtesy

14      forthcoming, it will be understood.

15           THE COURT:  The deposition will proceed

16      tomorrow.  Mr. Dimopoulos is on trial before me on the

17      9th, so he is not available.

18           MR. WIEDERKEHR:  Not a problem, Judge.

19           COURT ATTORNEY REFEREE:  So the trial ready

20      conference will proceed on the 16th at 11:30 a.m.

21           MR. DIMOPOULOS:  Thank you.

22           THE COURT:  All we have left is the deposition,

23      Dr. Abrams's report -- he will send his report, and then

24      all you would have from that would be any post-deposition

25      demands that they can get done.  When is the thing

Proceedings

1      scheduled?  Tomorrow?

2                  MR. WIEDERKEHR:  The deposition is tomorrow.

3                  MR. DIMOPOULOS:  We will have any

4      post-deposition demands prior to the 16th?

5                  THE COURT:  Yeah, I would push it out.  I would

6      give them ten days to write their post-deposition demands.

7      Ten days to respond.  Push it out to the end of the month.

8                  COURT ATTORNEY REFEREE:  June 30?

9                  THE COURT:  Yes.

10                 COURT ATTORNEY REFEREE:  June 29?

11                 MS. MOST:  Either day is good for me.

12                 MR. WIEDERKEHR:  Whatever works for the referee.

13                 MR. DIMOPOULOS:  Is June 29 at 11:00 possible?

14                 COURT ATTORNEY REFEREE:  Sure, or 2:00.

15                 MR. DIMOPOULOS:  I will take the 11:00, please.

16                 COURT ATTORNEY REFEREE:  Mr. Wiederkehr?

17                 MR. WIEDERKEHR:  That will work.  Thank you.

18                 COURT ATTORNEY REFEREE:  June 29 at 11:00.

19                 (Continued on next page to include jurat.)

20

21

22

23

24

25

Proceedings

1              THE COURT:  Thank you.

2              *      *      *      *      *      *

3    It is hereby certified that the foregoing is a true and

4    accurate transcript of the proceedings in the matter of

5    ALLAN KASSENOFF against CATHERINE KASSENOFF, Index No.

6    58217/2019.

7

8

9    _____

     JACQUELINE NISHI-BROACH
10   Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25