1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF WESTCHESTER
2  -----------------------------------------x
    ALLAN KASSENOFF,
3                   Plaintiff,

4       -against-                Index No. 58217/2019

5  CATHERINE KASSENOFF,
                   Defendant.
6  -----------------------------------------x

7

                June 2, 2021
8                Microsoft Teams Virtual Meeting
    B E F O R E :
9          HONORABLE NANCY QUINN KOBA,
                          Justice
10
    A P P E A R A N C E S :
11

    DIMOPOULOS BRUGGEMANN P.C.
12  Attorneys for the Plaintiff
    73 Main Street, 2nd Floor
13  Tuckahoe, New York 10707
    BY:  GUS DIMOPOULOS, ESQ.
14
    THE WIEDERKEHR LAW GROUP, P.C.
15  Attorneys for the Defendant
    One North Lexington Avenue, 11th Floor
16  White Plains, New York 10601
    BY:  EVAN WIEDERKEHR, ESQ.
17
    MOST & SCHNEID, P.C.
18  Attorneys for
    222 Bloomingdale Road, Suite 302
19  White Plains, New York 10605
    BY:  CAROL W. MOST, ESQ.
20

21  ALSO PRESENT: Blake Marlowe Burke

22

23

24

25                           JACQUELINE NISHI-BROACH
                            Senior Court Reporter

Proceedings

1          COURT ATTORNEY REFEREE:  Appearances, please.

2          MR. DIMOPOULOS:  Good morning, Your Honor.

3     Dimopoulos Bruggemann, by Gus Dimopoulos, on behalf of

4     plaintiff, Allan Kassenoff, who is here with me.  Good

5     morning.

6          MR. WIEDERKEHR:  Evan Wiederkehr, The Wiederkehr

7     Law Group, for Ms. Kassenoff.  Good morning, Referee

8     Ratner.

9          COURT ATTORNEY REFEREE:  I see your client is

10    present.

11         MR. WIEDERKEHR:  I believe that is the case.

12         MS. KASSENOFF:  I want to mention I have a

13    friend who would like to attend this conference as well.

14         COURT ATTORNEY REFEREE:  I would have to ask

15    Judge Koba.  Who is the friend?

16         MS. KASSENOFF:  A friend of mine.  Her name is

17    Marlowe Burke.

18         COURT ATTORNEY REFEREE:  Mr. Wiederkehr, do you

19    know who this is and why she is attending?

20         MR. WIEDERKEHR:  I do not know Ms. Burke

21    personally.  My understanding is she is attending to

22    provide support to Ms. Kassenoff during these difficult

23    times.

24         COURT ATTORNEY REFEREE:  Okay.  Ms. Most?

25         MS. MOST:  Good morning, everybody.  Carol Most,

Proceedings

1          attorney for the children.

2                    COURT ATTORNEY REFEREE:  I see Chava White is

3          present.

4                    MS. WHITE:  Hi.  My name is Chava White.  I work

5          for Comprehensive Family Services, from the Bronx office,

6          located at 2825 Third Avenue in Bronx, New York.

7                    COURT ATTORNEY REFEREE:  Thank you.  Hold on,

8          let me speak to the judge.

9                    (Pause.)

10                   COURT ATTORNEY REFEREE:  I have been advised

11         that Judge Koba will join us shortly.  She is just going

12         into the courtroom.

13                   (Pause.)

14                   COURT ATTORNEY REFEREE:  Did all of you receive

15         the prior report of Ms. White?

16                   MS. MOST:  It just came through this morning.

17                   COURT ATTORNEY REFEREE:  Mr. Wiederkehr, did you

18         get it?

19                   MR. WIEDERKEHR:  Yes, two or three minutes ago.

20                   COURT ATTORNEY REFEREE:  And Mr. Dimopoulos, did

21         you receive it?

22                   MS. MOST:  It came through at 9:32.

23                   COURT ATTORNEY REFEREE:  Gus, can you hear?

24                   MR. DIMOPOULOS:  Yes.  I just forgot -- can you

25         hear me?

Proceedings

```
1                    MS. MOST:  Now we can.

2                    COURT ATTORNEY REFEREE:  Did you receive the

3         report?

4                    MR. DIMOPOULOS:  I did.  Thank you.

5                    THE COURT:  Good morning, everyone.

6                    MR. DIMOPOULOS:  Good morning, Your Honor.

7                    MS. MOST:  Good morning, Your Honor.

8                    THE COURT:  Let's go on the record.

9                    COURT ATTORNEY REFEREE:  I have had them already

10        put their appearances on the record.

11                   THE COURT:  Very good.  I called this conference

12        because of a letter that I received from Ms. Most.

13                   Ms. Kassenoff, is your camera working?  Can

14        everybody see her?  It might just be my screen.

15                   COURT ATTORNEY REFEREE:  There is one issue.

16        Ms. Kassenoff has a friend who is apparently with her,

17        Marlowe Burke.  She wants this friend to be present during

18        the conference.  I said that would await your

19        determination.

20                   MS. KASSENOFF:  She is not with me.  She would

21        appear by zoom from her own location.

22                   THE COURT:  Ms. Kassenoff, do you have a camera?

23        Because I can't see you.

24                   MS. KASSENOFF:  It's not working, Judge.  But

25        I'm here, and I would like my friend to attend.  This is a
```

Proceedings

```
 1      very, very difficult set of circumstances, and I would ask

 2      that the Court allow me to have some emotional support.

 3      It's very hard to lose your children and to go through a

 4      process like this.

 5              THE COURT:  I need you to have a camera, because

 6      I need to see you.  I haven't seen you at the last several

 7      conferences that we have had.  Do you have a phone or

 8      something where you have a working camera?

 9              MS. KASSENOFF:  I don't, Judge.  May I include

10      my friend?

11              THE COURT:  I'm thinking about it.  I'm

12      concerned, and I'm unable to see you.  I might just move

13      this to in person.  There is no camera where you are at

14      work, in the house, on the phone?

15              MS. KASSENOFF:  Judge, I don't even have wifi.

16              THE COURT:  Okay.

17              MS. KASSENOFF:  And we have done conferences

18      without the camera many, many times, so I wasn't aware

19      that you needed the camera.

20              THE COURT:  Yeah.  On a conference like this,

21      yes, I would prefer the camera.

22              Ms. White, is your camera working?

23              MS. WHITE:  I believe so.

24              THE COURT:  Can everybody see her?

25              MR. WIEDERKEHR:  Yes.
```

Proceedings

```
 1                MR. DIMOPOULOS:  Yes.
 2                THE COURT:  I will sign out and sign in again.
 3                (Pause.)
 4                THE COURT:  Ms. White, do you have any other
 5      time today?
 6                MS. WHITE:  After 12:30, no, but before then,
 7      yes.
 8                THE COURT:  Ms. Kassenoff, are you located in
 9      Westchester County?
10                MS. KASSENOFF:  Yes, Judge, I am, but I'm
11      working today.  I mean, I have a full-time job.
12                THE COURT:  Right, which I thought you typically
13      worked at from home.
14                MS. KASSENOFF:  I work at home, and sometimes I
15      work from the office, or from the city.
16                THE COURT:  So I need to see you for the
17      purposes of this conference.  Are you in a situation
18      where -- Mr. Wiederkehr, do you have a place in your
19      office where she can use the camera?
20                MR. WIEDERKEHR:  I don't have a laptop for her.
21      I could theoretically put her in front of a computer in
22      somebody else's office, yes, if Your Honor would like.  I
23      would do whatever it is to be accommodating, Your Honor.
24                THE COURT:  Fine.  How far is it from your
25      office to Ms. Kassenoff?  Are you in New Rochelle or in
```

Proceedings

1      White Plains at your office?

2              MS. KASSENOFF:  I'm currently in New Rochelle,

3      Judge.  My issue is that I have important meetings today

4      with my boss.  I just -- I'm not sure that I can easily

5      accommodate a new change in the schedule.  These are

6      last-minute changes that are really starting to interfere

7      with my employment.

8              THE COURT:  Unfortunately, when I get a letter

9      about the safety of children, I make that a priority.

10     This is also something that I didn't have scheduled on my

11     calendar, and I had to shuffle other prior cases in order

12     to do this and also to make sure Ms. White was available.

13     But very well, we will continue this way.

14             Who is 1(646)472-4520?  Does anybody know that

15     telephone number?

16             MS. KASSENOFF:  Judge, I think that's Ms. Burke.

17             THE COURT:  Does she have a camera?  Because I'm

18     not having her in here where I can't observe what's going

19     on.

20             MS. KASSENOFF:  I will ask her now.

21             THE COURT:  Okay.

22             COURT ATTORNEY REFEREE:  That's a call-in

23     number, Judge.  It would not be with a video.

24             THE COURT:  Okay.  Ms. Kassenoff, nevermind.

25             MS. KASSENOFF:  Okay, Judge.

Proceedings

1          THE COURT:  Okay, the individual whom I just
2     admitted to the proceeding, could you please state your
3     full name and address for the record?
4          MS. BURKE:  My name is Blake Marlowe Burke.
5     231 Carrollwood Drive, Tarrytown, New York 10591.
6          THE COURT:  Okay.  Ms. Burke, I'm allowing you
7     to observe the proceedings as a member of the public.
8     Please understand the following rules apply to your
9     observation here and to everyone else on this virtual
10    conference:
11          There is no recording or streaming of this court
12    appearance.  This is a virtual courtroom.  All rules of
13    decorum apply, as do the Administrative Judge's rules that
14    there is no recording or streaming.  Do you understand
15    these rules?
16          MS. BURKE:  Yes, ma'am, I understand.
17          THE COURT:  And you will adhere to them?
18          MS. BURKE:  Yes.
19          THE COURT:  So you need to mute.  You may
20    observe.
21          Ms. Most, this conference was scheduled as a
22    result of the correspondence you received from the Court.
23    Could you please quickly state your concerns?  And then
24    I'm going to swear in Ms. White, and she can advise what
25    transpired at the recent visit.

Proceedings

1          MS. MOST:  Yes, Your Honor.  Thank you.  Good

2     morning, Your Honor.  The girls have been very open, and

3     have been open, and have been finding their own voices.

4     They have begun to tell me how unhappy they have been.

5     They have given me some history, which I put into my

6     letter to the Court.  But in sum and substance, the

7     visitations have been going very poorly, from their

8     perspective.  The -- not just the in-person visitation,

9     but also the telephonic visitations, which are currently

10    not happening because the services were discontinued.

11          However, the in-person visits have been very

12    upsetting to the girls.  They do not want to return.  They

13    actually did not want to return to the visit they had this

14    past Sunday, but they were -- it was discussed with

15    Ms. White, and they agreed to all come.  And the

16    visitation was a disaster from their perspective.  And

17    after about an hour, they asked to be -- have the visit

18    terminated.  The visit prior to that was also a disaster.

19    And I would say that the visit prior to that was not a

20    good visit.

21          The girls believe that their mother has been

22    dishonest with them.  She has been contacting them despite

23    there being a Court order for that not to happen.  There

24    have been multiple WhatsApp calls.  There have been

25    multiple e-mails.  There have been multiple phonecalls

Proceedings

1       now.  And this past weekend, after the visit, there was

2       actually an e-mail to all three girls, and Allie sent that

3       to me.  And she told me -- after receiving it, she

4       actually called me to tell me they were all very, very

5       upset about the e-mail they received.  They feel it was

6       dishonest, and they're just upset.

7                They're upset about the crying; there is

8       constant crying on the visits.  They are very upset about

9       that.  They feel the crying is a manipulation.  Whenever

10      the mom doesn't get what she wants, she gets hysterical

11      and starts to cry.  It's something we have seen on the

12      Zoom video calls.  And the girls, all three girls, cannot

13      handle the crying.  They're not willing to go back.  They

14      don't want to have visits at this time.

15               I just want to tell you that I did speak to

16      Dr. Susan Adler.  She met with both girls this week.

17      Charlotte was extremely upset.  Jojo was as well.  They

18      don't want to have visits.  And she thinks the visits

19      should be terminated, at least for a while, because it's

20      just bad for the girls.

21               I didn't have a chance to speak to Dr. McGuffog,

22      but Allie is very -- really very clear that she does not

23      want to have visits right now.  She feels she has been

24      manipulated by her mother.  She feels her mother

25      manipulates them constantly.  You did hear the information

Proceedings

1       in my letter about the times she ran away.  I'm sure the

2       Court was very disturbed about that, because that was

3       information that Allie -- she has talked about it with me

4       before, but now she even told me her mother insisted she

5       run away to the police station, and actually followed her

6       there.  Allie just feels that she has been manipulated by

7       her mother for a very long time.  She can't handle it

8       anymore.

9            So from the three girls' point of view, they

10      don't want access.  Jojo would like access, but only if

11      her sisters will be there; otherwise she is afraid to be

12      alone with her mother.  I can't disclose to the Court what

13      she told me because I didn't get permission to tell the

14      Court, but she does not want to be alone with her mother.

15      And even Allie told me that when she was alone with her

16      mother after she ran away, she was afraid.  So I think the

17      access as it is currently cannot go forward.

18                  THE COURT:  Okay.  Ms. White, could you raise

19      your right hand, please?

20  C H A V A   W H I T E,

21  after having been duly sworn by the Clerk of the Court, was

22  examined and testified as follows:

23                  THE COURT:  Could you state your full name and

24      your business address for the record?

25                  MS. WHITE:  Chava White.  2825 Third Avenue,

C. White/The Court/Direct

1        Bronx, New York.

2    DIRECT EXAMINATION BY

3    THE COURT:

4        Q    Ms. White, you were the supervisor providing

5    in-person supervision to Ms. Kassenoff, correct?

6        A    That's correct.

7        Q    And the Court is in receipt of information indicating

8    that as a result of the visit earlier this month, you have

9    required Ms. Kassenoff to sign a contract regarding the

10   protocols and behaviors to be observed during the visit; is

11   that correct?

12       A    I did.

13       Q    And Ms. Kassenoff signed that in preparation for the

14   visit that was held this past weekend, correct?

15       A    That's correct.

16       Q    So could you advise the Court, please, what

17   transpired during the visit?  I believe it was May 30.

18       A    This past Sunday, yeah.

19       Q    Okay.

20       A    I mean, you just want me to give you just a general

21   overview of how that visit went?

22       Q    Yes, because you didn't have time to write a report.

23   So you have heard what the Court has been presented with, the

24   girls not wanting to return.

25       A    So I was aware even before Sunday that the children

C. White/The Court/Direct

1   were reluctant to visit, to participate in the visit.  And we

2   have been having some issues with transition, especially with

3   Charley lately.  So I preemptively actually spoke with each of

4   the children individually the night before the visit, to try to

5   encourage them all to participate, to hopefully not have to

6   deal with transition issues right then and there at the start

7   of the visit.

8          During that meeting with the kids, all of them

9   expressed varying degrees of reluctance to come to the visit.

10  And I was able to sort of bring around Allie and Jojo; not so

11  much Charley.  So in the morning, on Sunday when they arrived,

12  Allie and Jojo did transition, although Jojo said to me

13  straight out that she wants to leave after an hour.  I chose

14  not to address it then, because I figured she would get

15  involved in the visit and then hopefully it wouldn't be an

16  issue.  So I didn't really say anything to her about that.  I

17  said, "Let's go.  Let's at least start."  I encouraged Charley

18  to come.  Charley did not want to come.

19         I told the kids what was relayed to me by

20  Ms. Kassenoff via e-mail of her plan for the visit, which was

21  to get sushi and watch a movie together; some other things, but

22  those were the highlights.  Those are things that Charley

23  likes.  I told Charley, "This is your mom's plan for the

24  visit," and she was immediately sort of ambivalent about

25  whether or not she now wanted to join.  But she still said no.

C. White/The Court/Direct

1   She also said, "My mom is just trying to bribe me."  However,

2   as me and Allie and Jojo were walking down the driveway, we

3   could see Charley eventually got out of the car and joined us.

4   So she came.

5           So the visit started okay, and -- there was no sushi

6   or movie when we got there, however; at least that wasn't,

7   like, initially happening.  But Ms. Kassenoff said she would

8   order the sushi later.  The kids seemed a little bit, like,

9   surprised by that.  But they, you know, started interacting

10  with her and chatting with her.  And Charley was on her phone a

11  lot.

12          And at some point, I don't know, I don't remember

13  exactly how much later -- I can check my phone and see --

14  Mr. Kassenoff texted me that Charley was texting him a lot,

15  saying she wanted to leave and she wanted to be picked up at

16  certain times.  I asked him -- well, two things.  I eventually

17  asked him to just give Charley my cellphone number so that she

18  wasn't going through him.

19          And also I explained to him, "Look, if Charley has,

20  like, a reason to leave, if she is upset about something, if

21  there is something going on that's uncomfortable and she wants

22  to leave, we can do that.  But I don't want you running back

23  and forth here on the children's whims because one wants to

24  leave at this time and one wants to leave at this time for no,

25  like, apparent reason."  Because at the time the kids were just

C. White/The Court/Direct

 1   playing bingo with their mom.  And the normal, like, sibling

 2   bickering and that stuff, but it was going more or less

 3   smoothly, comparatively speaking.

 4        So he said fine.  And I told Charley, because she

 5   texted me she wanted to leave at a certain time, I said,

 6   "Listen, if you want to go, if you feel like you can't stay and

 7   you need to leave, you can let your dad know at that point.

 8   But I don't want you to ask him to come back at a certain time

 9   when you might be involved in playing or doing something; you

10   you might not want to leave at that point.  Don't make plans to

11   leave at 3:40" or whatever times she decided.  So she said

12   okay.

13        The kids kept playing, but clearly something else was

14   going on for Charley, I guess behind the scenes, meaning

15   psychologically, that was not necessarily apparent in the

16   interactions that I was viewing; because at some point she went

17   upstairs to go to the bathroom, although apparently to be on

18   her phone to text.  And she texted her dad, and she texted me

19   as well, that she really, really wanted to leave.  So I said to

20   her, "Okay, well, if that's the case, we have to talk to your

21   mom.  You can't just, like, run out of here.  We have to talk

22   to your mom.  I can come, and we will talk to her.  And you

23   have to explain to her that you want to leave and why you want

24   to leave.  And if you are going to leave, you will leave."

25   That's kind of when everything went south.

C. White/The Court/Direct

 1        So I did -- I went upstairs with Ms. Kassenoff.  And
 2   I quickly explained to her that Charley had asked her dad to
 3   come pick her up, and she really wanted to leave.
 4   Ms. Kassenoff sort of immediately became, you know, visibly
 5   upset, understandably so.  I sort of tried to ask her to stay
 6   calm so we can have a conversation with Charley.  I explained
 7   we have to talk about it, let's talk to her about it.  I think
 8   it was difficult to have a calm conversation because
 9   Ms. Kassenoff was obviously very emotional at the time.  And
10   Charley is really uncomfortable, I mean from what I can see,
11   with emotions in general.  She really couldn't tolerate the
12   conversation.  And --
13        Q    When you say Ms. Kassenoff was emotional, what
14   exactly was she displaying?
15        A    In tone of voice.  She wasn't crying yet, but in tone
16   of voice and in what she was saying, she was -- right away she
17   was saying, "I don't want you to leave" and "We used to have
18   such a strong bond; what happened?"  Charley really did not
19   seem to be able to, like, handle it.  She was really trying to
20   evade the whole conversation.  And after less than five
21   minutes, maybe two to three minutes, she just left; she went
22   out.
23        Ms. Kassenoff started crying.  I tried really hard
24   to, like, ask her to please get herself together before she
25   went downstairs to join the kids.  I tried to point out that,

C. White/The Court/Direct

1    "Look, if Charley is going to leave, she is going to leave.
2    But we could still have the rest of the visit."  We were only
3    maybe a little over an hour in at that point.  We could do the
4    rest of the visit with Allie and Jojo and have a good time.
5    "If Charley is going to leave," I said, "look, she came to the
6    visit today.  The last -- I don't know what, two visits before,
7    she didn't come.  So at least she came at all.  And let's
8    salvage what we have here."

9         It didn't really go that way.  Ms. Kassenoff was able
10   to sort of on the face of it put herself together, stop crying,
11   but clearly was quite internally agitated and -- which came
12   through in her voice and some of the things she was saying.
13   And things really just escalated when we went downstairs.  And
14   Charley also was at a point where she, like, just couldn't
15   handle being around her mother, and didn't -- made it very
16   clear she didn't want to be talked to by her and didn't want to
17   be in the same room.  But Ms. Kassenoff sort of kept trying to
18   engage with her.  And Charley was getting really agitated and
19   wanted to go outside and wait in the rain by herself, and I
20   didn't want her to do that.

21        I was trying to intervene on that, and trying to get
22   Charley to calm down, and trying to get Ms. Kassenoff to stop
23   engaging.  Then Jojo puts her hood on and said she also wants
24   to leave.  And I think at that point Ms. Kassenoff became even
25   more upset.  And I tried to sort of encourage Jojo to stay.

C. White/The Court/Direct

1   "Well, how about we can watch the movie?  You know, why do you

2   want to leave?"  It wasn't 100 percent clear to me why Jojo

3   wanted to leave at that point.  It's still not 100 percent

4   clear to me.  It's possible that it was just because conflict

5   was escalating, and generally that's triggers them, but I'm not

6   really sure.

7         In any case, things escalated from there emotionally.

8   Ms. Kassenoff started telling the kids, "Okay, if you don't

9   want me in your life, then sure, you can leave early, and you

10   will see, you will have less and less time with me, and that's

11   what it will be."  The kids are clearly starting to get more

12   and more agitated, and they all left the room.  Charley went

13   outside by herself in the rain.  I tried to help Ms. Kassenoff

14   regulate, but I couldn't.  She was already really, really

15   upset, and just really very focused on her feelings at that

16   point and her beliefs that everything is entirely a result of

17   the father's intervention and the AFC's interference and

18   whatnot.

19         I really couldn't salvage it at that point, and I

20   figured at that point that probably Allie was going to say she

21   wanted to leave, because once the conflict escalates like that,

22   the kids can't handle it.  So I said, "I need to check on the

23   kids," because Jojo and Allie had gone in the other room.  I

24   walked in the other room, and already Allie was walking back

25   and she said, "I want to leave."

C. White/The Court/Cross

1          Ms. Kassenoff was obviously pretty upset at that

2     point.  She said something like, "Okay, fine.  I'm going

3     upstairs."  And Allie and Jojo, I had asked them to wait for me

4     to grab my bag, and they ended up exiting one of the doors.  I

5     had to run back and get my bag.  And Ms. Kassenoff had me with

6     them outside.  And I ran out after her, and she was sort of

7     yelling after them, "Have a nice life.  Have a nice life."  I

8     walked the kids out to the street, and Allie was, like, really,

9     really upset.  She was crying.  And they all said they don't

10    ever want to come back.

11         Q    Okay.  So your efforts -- as a therapeutic

12    supervisor, you were unable to deescalate the situation?

13         A    Yeah.  That's pretty much been the case lately.

14              THE COURT:  Mr. Dimopoulos, do you have any

15         questions of Ms. White?

16              MR. DIMOPOULOS:  Just one.

17    CROSS EXAMINATION BY

18    MR. DIMOPOULOS:

19         Q    Ms. White, were you scared for your safety during any

20    of the visits?

21         A    No.

22         Q    Were the children scared for their safety during any

23    of the visits?

24         A    I don't know.  They can't really be open with me

25    during the visits.  And I don't really talk with them outside

C. White/The Court/Cross

1    the visits, but for that one time this past Saturday night.

2         Q    And do you feel like you have tried everything in

3    your education and training to better supervise these visits?

4         A    No.  There are other things we could theoretically

5    do.  Yeah.

6         Q    Such as?

7         A    We could move it to a more controlled environment,

8    like my office, where I can, like, be better able to intervene

9    and separate and end things when they need to.

10        Q    Okay.  Anything else?

11             THE COURT:  Where is your office located?

12             MS. WHITE:  In the Bronx.

13             THE COURT:  Go ahead, Mr. Dimopoulos.

14        Q    During the visit with the children, did Ms. Kassenoff

15   say anything negative about Mr. Kassenoff in the presence of

16   the children?

17        A    You know, it's hard for me to remember off the top of

18   my head.  That's something that would happen regularly in a

19   more indirect way, but not in an overt way.

20             MR. DIMOPOULOS:  I don't have anything further,

21        Your Honor.

22             THE COURT:  Well, I have a question.  Can you

23        explain that?  Were there indirectly negative comments

24        about Mr. Kassenoff?

25             MS. WHITE:  Let's see if I can think of an

C. White/The Court/Cross

1       example.  I mean, I feel like there must be some examples

2       in my previous reports.  It's hard for me to think of

3       something off the top of my head.

4                   THE COURT:  That's okay.

5                   Mr. Wiederkehr, any questions?

6                   MR. WIEDERKEHR:  I don't have any questions,

7       Your Honor.  But I'd like to address the Court, if I may.

8                   THE COURT:  I just want to let Ms. White go.

9                   Most, do you have any questions?

10  CROSS EXAMINATION BY

11  MS. MOST:

12      Q    Ms. White, can you talk about the visit of May 22?  I

13  just briefly scanned your report, but you don't talk about the

14  fact that there was a screaming match between you and

15  Ms. Kassenoff that lasted for at least a half hour.  Because

16  you're aware I got the tape of -- part of that from Allie.

17      A    Which visit was that?

18      Q    Wasn't that May 22?  It was the last visit.

19      A    The visit before, right.  It was the visit before

20  this one.

21                  THE COURT:  Before you had the contract?

22                  MS. WHITE:  Right.  That's sort of what prompted

23      me to try to figure out a way to move forward and avoid

24      all that before.

25      A    So yes, there was just major conflict.

C. White/The Court/Cross

1            MR. WIEDERKEHR:  Judge, I have to object.  If

2     it's not in Ms. White's report -- I haven't been provided

3     with a copy of the recording.  This should not be a

4     hearing by ambush.  If it's not in Ms. White's report,

5     then in theory she did not believe it warranted reporting

6     to the Court.  I shouldn't be hearing about it now for the

7     first time as she is sitting in open court.

8            THE COURT:  The problem you have is we are aware

9     of, and she did indicate in her report, a failure to

10    adhere to protocols and behaviors that were articulated by

11    her as set forth in prior visits, and a failure to adhere

12    to them resulting in the need for a behavior contract.

13    But who has the tape?  Was that sent to me?

14           MS. MOST:  I have a small piece of tape.  I know

15    it was sent to me and to her father.  And I did speak to

16    Allie while it was going on.  They were very upset about

17    it, because apparently Ms. White was trying to get

18    Ms. Kassenoff to change topics, and --

19           MR. WIEDERKEHR:  Judge, I don't think it's

20    appropriate for Ms. Most to now testify.

21           THE COURT:  Okay.

22           MR. DIMOPOULOS:  Your Honor, I can play the

23    audio.

24           THE COURT:  Do you have it?

25           MR. DIMOPOULOS:  I can have it in minute, yes.

C. White/The Court/Cross

```
 1              THE COURT:  Yes.  I want to hear the tape.

 2              MR. WIEDERKEHR:  Judge, when the time is

 3    appropriate, I would ask the Court's leave to inquire of

 4    Ms. White briefly.

 5              THE COURT:  Absolutely.  Let me just hear the

 6    tape first.

 7              (Whereupon Mr. Dimopoulos played audio.)

 8              THE COURT:  It's probably easier if you e-mail

 9    that to Maria, so we can upload it to the system and

10    everybody can hear it clearly.

11              MR. DIMOPOULOS:  I will do that right now, Your

12    Honor.

13              THE COURT:  Do you want to wait to hear the tape

14    before you do your inquiry, Mr. Wiederkehr?

15              MR. WIEDERKEHR:  Yes, Judge.  Thank you.

16              MR. DIMOPOULOS:  I just e-mailed it to

17    Ms. Baratta.

18              MR. WIEDERKEHR:  Can you e-mail it to me as

19    well, Your Honor?

20              THE COURT:  Send it to Mr. Wiederkehr as well.

21              MS. MOST:  Your Honor, this tape, according to

22    Allie, was just a little piece of -- it was a five-minute

23    excerpt of what -- after I spoke to Ms. White afterwards,

24    it was something that lasted --

25              MR. WIEDERKEHR:  I don't think it's
```

C. White/The Court/Cross

1          appropriate --

2                    THE COURT:  Hold on a second.  Let me just get

3          the tape.  Maria?

4                    THE COURT CLERK:  Yes, Judge?

5                    THE COURT:  There is an audiotape that

6          Mr. Dimopoulos is going to send to you.  When you get it,

7          can you please share and upload it to this so we can

8          listen to it?

9                    MR. DIMOPOULOS:  It's on its way to you,

10         Ms. Baratta.

11                   THE COURT:  While we're waiting for the tape,

12         Ms. White, is it fair to say that -- did Ms. Kassenoff

13         adhere to the behavioral contract that she executed before

14         your visit on Sunday?

15                   MS. WHITE:  She tried.

16                   THE COURT:  When you said the girls were

17         becoming agitated, what do you mean by that?

18                   MS. WHITE:  I mean, just in terms of body

19         language.  And Charley just was very obviously agitated,

20         because she kept trying to leave the house and go outside

21         and, like, she wanted to get out.  The other kids, yeah,

22         they were, like, just in tone of voice and body language.

23                   There was a point that Charley said something,

24         she was really upset about it.  I couldn't even catch it.

25         I'm not sure what she said.  She was very upset when she

C. White/The Court/Cross

1      said it.  But I know it was something that Ms. Kassenoff

2      was immediately upset about and went to, like, take her

3      phone to record and ask her to say again.  And all three

4      children immediately sort of reacted to that and started,

5      like, yelling at her not to record.  And Allie was yelling

6      at Charley not to repeat herself.  Just, everyone was

7      pretty agitated by the end, yeah.

8                 THE COURT:  Okay.  Maria, did you get the

9      tape -- the audio?

10                THE COURT CLERK:  Not yet, Judge.

11                MR. DIMOPOULOS:  It's showing up as "sent," but

12     it's a large file.

13                THE COURT:  While we are waiting on that, a copy

14     of the text message that was sent by Ms. Kassenoff to the

15     girls was forwarded to me.  Do you have that,

16     Mr. Wiederkehr?

17                MR. WIEDERKEHR:  E-mail, if we're talking about

18     the same thing, yes.

19                THE COURT:  Was that e-mail that was forwarded

20     to me sent directly to you, Ms. Most, or was it sent to

21     Mr. Kassenoff?

22                MS. MOST:  Allie sent it to me directly and then

23     called me on the telephone.

24                THE COURT:  When she called you on the

25     telephone, could you describe for me her emotional state?

C. White/The Court/Cross

1          MS. MOST:  She was extremely upset, because she

2     feels that her mother is dishonest.  I think that the

3     girls as a general rule feel that her mother -- their

4     mother is dishonest.  Just as an example, what Allie says

5     to me is:  "She makes us send her these e-mails saying we

6     want to live with her and we love her."

7          MR. WIEDERKEHR:  Judge, I apologize, but I don't

8     understand how this is now appropriate for the attorney

9     for the children to be opining as to the children's

10    emotion determinations and how they feel.  If she is going

11    to say what they said, I would also object to that.  But

12    if anything else, Judge, perhaps the time has come for

13    Your Honor to meet with these children and get to the

14    heart of this, so Your Honor can have an accurate

15    assessment of what is going on, as compared to subjective

16    characterizations.

17         THE COURT:  Mr. Wiederkehr, I have been trying

18    to find out what's going on since November of 2020, when I

19    requested an updated forensic evaluation that has been

20    delayed and delayed and delayed by the machinations of

21    your client.  So yes, it is time to see the children, and

22    I have endeavored to do that, and we still don't have the

23    updated forensic evaluation.

24         MR. WIEDERKEHR:  This will not perhaps please

25    Your Honor, but for the record, Ms. Kassenoff had seen

C. White/The Court/Cross

1    Dr. Abrams last week.  And up until yesterday, when the

2    Court directed this hearing, she was actually scheduled to

3    be with him again this morning.  So there is no question

4    but that Ms. Kassenoff has commenced the updated

5    interviews with Dr. Abrams.  But I imagine that will now

6    be slightly pushed back as a result of today.  Obviously

7    the Court was not aware of that, and Ms. Kassenoff was not

8    going to miss this appearance.

9              MR. DIMOPOULOS:  Your Honor, I have to just

10    wonder how Ms. Kassenoff --

11              THE COURT:  I'm a little confused.  If she had

12    her appointment scheduled with Dr. Abrams today, how does

13    she have all these meetings scheduled with her boss today?

14    But that's neither here nor there.  The Court acknowledges

15    that Ms. Kassenoff has, yes, engaged in the updated

16    forensic evaluation at this point.

17              Maria, is the audio available?

18              MS. KASSENOFF:  There is no delay in terms of

19    machinations.

20              THE COURT:  Ms. Kassenoff, you are muted.  Go

21    ahead, Maria.  Play it.

22              (Whereupon the court clerk played the audio.)

23              MR. WIEDERKEHR:  Judge, may I ask this be

24    paused?  I'd like to raise an objection.

25              THE COURT:  Pause it, Maria.

C. White/The Court/Cross

 1              MR. WIEDERKEHR:  The way this was presented was
 2       this was apparently an interaction between Ms. Kassenoff
 3       and Ms. White.  Now this seems to be transitioning by a
 4       child, who is not present in court, between -- an
 5       interaction between mother and daughter.  It's now being
 6       presented into the record without any foundation
 7       whatsoever, without having been able to hear it before.
 8       I'm trying to understand how it went from the offer of
 9       proof as to what it was, to now becoming something
10       entirely different.
11              THE COURT:  Ms. Most?  What else is on the tape?
12              MS. MOST:  I think the tape ends very shortly, I
13       think, after that.  But what Allie sent me --
14              THE COURT:  Well, terminate the tape at this
15       point.  Go ahead, Mr. Wiederkehr; do you have questions of
16       Ms. White?
17              MR. WIEDERKEHR:  Yes, Judge.  Thank you.
18   CROSS EXAMINATION BY
19   MR. WIEDERKEHR:
20       Q    Good morning, Ms. White.
21       A    Good morning.
22       Q    You had testified earlier that leading up to this
23   most recent visit there had been issues with transition,
24   correct?
25       A    Correct.

C. White/The Court/Cross

 1      Q      Would you agree that those transitions to the access

 2    time had been less than easy to accomplish for you?

 3      A      I'm sorry, can you clarify your question?

 4             MR. WIEDERKEHR:  Withdrawn.

 5      Q      The issue of getting the children to attend the

 6    access has been something that has been becoming more and more

 7    of an issue over the recent weeks?

 8      A      With Charley in particular, yes.

 9      Q      And you are aware that Ms. Kassenoff has reported a

10    concern that Mr. Kassenoff told the children that she likely

11    had lice?  Are you aware of that?

12      A      I'm aware that that's her concern, yes.

13      Q      And that the children expressed the desire not to see

14    their mother for fear they would contract lice from her; are

15    you aware of that as well?

16      A      I'm aware of that.

17      Q      The time when Charley did not want to get out of the

18    car -- your role as therapeutic supervisor is to assist in

19    facilitating the children's attendance; is that a fact?

20      A      My role is really to assist in the relationship

21    overall.  And to, you know, further that, yes, there has to be

22    some sort of interaction.  So I do try to make the visits

23    happen.

24      Q      And there was a time when Ms. Kassenoff asked that

25    you facilitate Mr. Kassenoff stepping away from his vehicle so

C. White/The Court/Cross

1  the two of you may speak to her daughter, to try to encourage

2  her to participate in the access, correct?

3      A    Yes.  She did ask that.

4      Q    And notwithstanding Ms. Kassenoff's --

5           MR. WIEDERKEHR:  Withdrawn.

6      Q    In your experience as a therapeutic supervisor, you

7  have been called upon previously to encourage a child to

8  attend, have you not?

9      A    Yes.

10     Q    So you would agree that that is in fact part of your

11 role, if a child is reluctant to participate in visitation?

12     A    Yes.

13     Q    And Ms. Kassenoff requested that you ask

14 Mr. Kassenoff to step away so that the two of you could try to

15 encourage the child, correct?

16     A    She did make that request.

17     Q    In fact, that request was not honored, was it?

18     A    We did not do that.

19     Q    And the child did not attend the visitation, did she?

20     A    On that day, I believe Jojo and Charley did not

21 attend.

22     Q    Was that Mother's Day?

23     A    That was the Mother's Day visit, yeah, because only

24 Allie was there that day.

25     Q    And you would agree, based upon your experience and

C. White/The Court/Cross

 1   interaction with the parties, that that would be quite

 2   disappointing for Ms. Kassenoff?  Correct?

 3        A    She definitely expressed disappointment.

 4        Q    Do you believe that was a justifiable expression of

 5   upset?

 6        A    That's not really for me to decide.  Certainly she

 7   was very upset, and it's understandable.

 8        Q    The following visit did not occur because you

 9   reported -- forgive me if it wasn't you, but you or somebody

10   from your organization had experienced a car accident?

11        A    Yeah, on the way there.

12        Q    And then there was a visit on the 22nd of May, which

13   was the week before this past weekend?

14        A    Correct.  Right.

15        Q    And Charley did not attend the visit?

16        A    Charley did not attend the visit.

17        Q    Okay.  And did she come to the house that day?

18        A    Yes.

19        Q    She refused to get out?

20        A    Yes.

21        Q    Coming to this past weekend --

22             MR. WIEDERKEHR:  Withdrawn.

23        Q    Ms. White, the contract that you asked Ms. Kassenoff

24   to sign, isn't it a fact that that contract is really nothing

25   more than a memorialization of what you would consider to be

C. White/The Court/Cross

1    appropriate behaviors for a supervised visiting parent?

2        A    What's the question?

3        Q    The contract asks that she follow what you otherwise

4    communicate to be the ground rules for supervised visitation,

5    correct?

6        A    Right.  The contract addresses particular issues that

7    had been coming up that I wanted to avoid.

8        Q    In advance of this particular meeting, you said you

9    spoke to Ms. Kassenoff and she asked you to relay her plan for

10   the visitation?

11       A    She sent an e-mail.

12       Q    Okay.  And isn't it fair to say that her communicated

13   plan was appropriate for the visitation?

14       A    Sure, yeah.  There was nothing wrong with it.

15       Q    Is it fair to say that Ms. Kassenoff was attempting

16   to put a schedule in place that she thought the children would

17   enjoy during their time together?

18       A    I can't speak to what she was attempting to do.

19   However, those were all activities that, yes, the children do

20   enjoy.

21       Q    And notwithstanding having suggested activities the

22   children enjoy, Charley's reaction to that was ambivalence, you

23   said?

24       A    So it went from absolute refusal to ambivalence once

25   I told her about the plan.

C. White/The Court/Cross

1       Q     Notwithstanding Ms. Kassenoff's attempt to put a plan
2  in place that she believed her children would enjoy, Charley's
3  reaction was that her mother was merely trying to bribe her,
4  correct?

5       A     That's correct.

6       Q     So notwithstanding Ms. Kassenoff's obvious attempt to
7  do the right thing, it was received by the child as an attempt
8  to bribe her?

9       A     I mean, it just depends on your perspective, but --

10      Q     I'm asking you, based upon your testimony:  This was
11 a plan she put in place to try to have a nice time with the
12 kids, and it was received by this child as an attempt to bribe
13 her?

14      A     That is what Charley said, yeah.

15      Q     And then she eventually came, and you said the visit
16 started out okay, correct?

17      A     Correct.

18      Q     And during that visit Charley was on her phone a lot,
19 correct?

20      A     Yes.

21      Q     And when you saw Charley on her phone a lot, did you
22 ask her with whom she was communicating?

23      A     No.

24      Q     Did you ask her to stop communicating?

25      A     No.

C. White/The Court/Cross

 1       Q     Did you ask her to focus on the limited time she has
 2    with her mother for this visit?
 3       A     No.
 4       Q     When -- did you believe it was appropriate for
 5    Charley to be focused on text messages and communicating with
 6    someone else during the supervised access?
 7       A     That's not really my focus from a therapeutic
 8    standpoint.  Charley was interacting with her mother at the
 9    same time, and participating in the play.  And it would have
10    been disruptive for me to start questioning that when things
11    were going smoothly.
12       Q     In fact, while you perceived Charley was having a
13    nice time and was engaged and was playing, in fact she was
14    apparently texting with her father, correct?
15       A     Correct.
16       Q     And you saw nothing going on that would warrant
17    Charley leaving the visit while she was texting with her
18    father; isn't that a fact?
19       A     With my own two eyes, I did not see anything that was
20    obviously wrong at that time.
21       Q     Okay.  And you said that the children were actually
22    playing bingo, right?
23       A     Right.
24       Q     And that other than normal bickering which occurs
25    through three preteen girls, it was, to use your words, going

C. White/The Court/Cross

1    smoothly, correct?

2          A    It was.

3          Q    And something else was going on for Charley that you

4    were unaware of?  That was your testimony?

5          A    It seemed that way.

6          Q    You have no other explanation for that, considering

7    the fact that based upon your professional oversight,

8    everything was, quote, "going smoothly," correct?

9          A    Everything seemed to be going smoothly based on what

10   I could physically see with my eyes and hear.

11         Q    So Ms. Kassenoff wasn't doing anything wrong as far

12   as you were concerned at this point when they were playing

13   bingo, right?

14         A    That's correct.

15         Q    Notwithstanding Ms. Kassenoff following every rule

16   that had been put in place and focusing on having a good time

17   with the kids while she was doing that, Charley was doing

18   something else and apparently asking her father to leave,

19   right?

20         A    That's correct.

21         Q    And Ms. Kassenoff did nothing, in your professional

22   opinion as court-appointed therapeutic supervisor, to warrant

23   that during the visit; isn't that a fact?

24         A    During those -- that 45 minutes or so, correct.

25         Q    And now, you told Charley to stop setting a specific

C. White/The Court/Cross

1   time to leave, right?

2        A    Correct.

3        Q    She might be having a great time, and she should be

4   more fluid with this interaction, wasn't that your direction?

5        A    I wanted her to -- my hope was that she would get

6   involved in things and not leave, basically.

7        Q    She was involved -- from what you saw, she was

8   involved?

9        A    She wasn't fully engaged, but yes.

10       Q    Despite your hope that she become fully engaged, you

11   then received a text message from the father saying, "The kids

12   want me to come and get them"?

13       A    Charley did.  Charley really wanted to leave.

14       Q    When did you tell the father, "Please don't come,

15   everything seems to be going fine"?

16       A    Prior to that.

17       Q    And nevertheless, he did come?

18       A    Only after I told him he should.

19       Q    After you told him he should?

20       A    That was after Charley was already really agitated

21   and leaving the house -- like, threatening to leave the house.

22       Q    And during your original inquiry from the judge, you

23   didn't mention anything that Ms. Kassenoff did to, quote, make

24   it go sideways, did you?

25       A    Are you talking about initially?

C. White/The Court/Cross

```
 1       Q    I'm talking about your testimony, that you said --
 2  and correct me if I'm wrong -- that Charley wanted to leave,
 3  and that you told her she had to talk to her mom, and then it
 4  went sideways.  Do you remember that testimony?
 5       A    I said it went south.  Yes.  So initially, yes,
 6  Ms. Kassenoff and the children were engaged in a seemingly
 7  positive manner.
 8       Q    So Ms. Kassenoff is doing everything you asked her to
 9  do, and the child says she wants to leave, right?
10       A    I would say she wasn't doing the things I asked her
11  not to do.  And Charley did not wish to stay.  Yeah.
12       Q    You said Charley was uncomfortable with emotion,
13  correct?
14       A    Overall that's been my observation of her.  Not just
15  with that visit.  Overall.
16       Q    And you said Ms. Kassenoff became teary and started
17  to cry?
18       A    At one point.
19       Q    And you would agree that, given the last approximate
20  month of supervised visits, which included one if not two
21  children refusing to come, including Mother's Day, and then a
22  canceled visit through no fault of Ms. Kassenoff, when she
23  understood that everybody was having a good time, and one child
24  said she wanted to leave, that that could become frustrating
25  and disappointing?  Correct?
```

C. White/The Court/Cross

1      A      Definitely.

2      Q      You would agree that demonstrating emotion in that

3  capacity by Ms. Kassenoff would be a fair exhibition of

4  emotion, correct?

5      A      I would think it's normal, yeah.

6      Q      And you testified that you're unclear as to why Jojo

7  wanted to leave that day?

8      A      That's correct.

9      Q      Ms. White --

10     A      That's correct.

11     Q      Ms. White, I just want to make sure I understand that

12  in substance, your testimony was that Ms. Kassenoff acted in

13  accordance with the parameters of the supervised visitation,

14  and the children texted their father and said they wanted to

15  leave?

16     A      So during the beginning of that one visit

17  Ms. Kassenoff did abide by the contract, and there were some

18  positive interactions, and Charley still wanted to leave.

19     Q      Okay.  Thank you.

20          MR. WIEDERKEHR:  Nothing further, Judge.

21          THE COURT:  Okay.  Ms. Most?

22  CROSS EXAMINATION BY

23  MS. MOST:

24     Q      Do you believe that demonstrating emotion has a

25  derogatory effect on the children?

C. White/The Court/Cross

1              MR. WIEDERKEHR:  Objection.

2              THE COURT:  That's a little broad, Ms. Most.

3       Rephrase.

4       Q    When you have witnessed Ms. Kassenoff crying, which

5       she does frequently --

6              MR. WIEDERKEHR:  Objection.  Move to strike that

7       characterization.

8              THE COURT:  That's sustained.  Rephrase.

9       Q    In your experience with the girls, has the mother's

10      emotions had any effect on them --

11             MR. WIEDERKEHR:  Objection.

12      Q    -- that you could witness/that you have witnessed?

13             THE COURT:  Let's rephrase that.

14             Ms. White, after Ms. Kassenoff was told by

15      Charley that she wanted to leave, and she became upset,

16      which is an emotion you said was understandable because

17      her daughter wanted to leave, at some point did that cross

18      over to a demonstration or display of emotion that you

19      thought was not appropriate with the children present?

20             MS. WHITE:  My issue with what happened at the

21      end of that visit was less about display of emotion on

22      that particular day, and more about the words coming out

23      of her mouth.  She actually was able to stop crying before

24      she rejoined the children.  However, she was clearly still

25      very agitated, and it came through in her demeanor, how

C. White/The Court/Cross

 1          she spoke, and what she said.

 2                  THE COURT:  What did she say that you deemed

 3          inappropriate as a therapeutic supervisor?

 4                  MS. WHITE:  "If you don't want to spend time

 5          with me anymore, then you can just leave now."  And "Have

 6          a nice life."  Or, "Well, you will see; if you decide to

 7          leave, you will just have less and less time with me."

 8          Honestly, there was a lot going on the last 20 minutes of

 9          that visit, so I don't even have it all.  Yes, those

10          things off the top of my head I definitely remember.  That

11          was not appropriate.

12                  THE COURT:  Okay.  So you said not on this

13          occasion, it wasn't the emotional issue that was a

14          problem.  On any of the other visits you had within the

15          last -- and I'm really focused on when we extended the

16          visit from one hour to four hours to get a larger block of

17          time to see how those interactions went; did you observe

18          there to be inappropriate emotional reactions from the

19          mother during the visit?

20                  MS. WHITE:  I'm really hesitant to characterize

21          anyone's emotions as inappropriate.  However, I will say

22          that there have been times that the mother has become

23          emotional and cried during visits, that the children were

24          visibly uncomfortable, that Charley and/or one of the

25          other kids said directly, "Please stop, we're here to have

C. White/The Court/Cross

1    a good time;" where, you know, the kids tried to, like,

2    comfort their mother in a sort of backwards kind of way.

3            THE COURT:  What does that mean, in a backwards

4    kind of way?

5            MS. WHITE:  Meaning generally we would want to

6    see a mother comforting a child, not the other way around.

7            THE COURT:  So you indicated in the response to

8    a question from Mr. Dimopoulos that maybe the four-hour

9    period of time in the house is difficult for you to

10   provide therapeutic supervision, because there are too

11   many moving parts.  And you indicated if you went to your

12   office, it might be easier to manage.  Is there another

13   alternative other than your office that you think would

14   be -- would work in terms of facilitating Ms. Kassenoff's

15   interaction with her children and her access to the

16   children?

17           MS. WHITE:  I don't know.  I have to think about

18   that.  It's an issue because -- and not just with me

19   having better control over the interactions and

20   Ms. Kassenoff's behavior, but also just, with this last

21   visit I couldn't get Charley to stay in the house.  That's

22   an issue.  If one of the kids goes and runs off and I'm

23   with the other kids, it's a problem.  And clearly if they

24   want to run off, they will.  So I just don't feel like I

25   can -- like I have 100 percent ability to keep things safe

C. White/The Court/Cross

1      and under control in that environment.

2                 THE COURT:  So when Charley left, she left the

3      house, but she remained on the grounds, as far as you

4      know?

5                 MS. WHITE:  I couldn't see her anymore.  She

6      went out to the driveway.  I was with the other girls and

7      Ms. Kassenoff.  I couldn't see.  Presumably she was on the

8      grounds, but I couldn't see her.  She had gone towards the

9      driveway.  There are trees in the way.  I don't know.

10                THE COURT:  That was a concern for you?

11                MS. WHITE:  That was a concern.  I did not want

12     her out there in the first place.  And she was wearing

13     flip flops, and it was 50 and raining this past Sunday.

14                THE COURT:  And I missed a part of what you

15     said.  Did the other two children leave the house as well

16     at some point?

17                MS. WHITE:  So yeah, minutes later they also

18     left, and I had to run and grab my stuff.  And I had asked

19     them not to go out, to wait for me.  So they also left,

20     and I had to go run into another room and grab my stuff

21     before I could go out to join them.

22                THE COURT:  When that happened, was

23     Ms. Kassenoff upstairs, or had she changed her location in

24     the house?

25                MS. WHITE:  She followed them outside.

C. White/The Court/Cross

1          THE COURT:  Does anyone have any other questions
2      they would like to ask Ms. White before we let her go?
3          MR. DIMOPOULOS:  I have one or two, Your Honor.
4          THE COURT:  Go ahead.
5  CROSS EXAMINATION BY
6  MR. DIMOPOULOS:
7      Q    Ms. White, during the transitions is Mr. Kassenoff
8  cooperative and encouraging for the children to go on the
9  visits?
10     A    Yes.
11     Q    Has he ever in your opinion interfered with any of
12 the visits?
13     A    Not in my presence.
14     Q    Has he listened to all of your directives concerning
15 the visits?
16     A    He has.
17         MR. DIMOPOULOS:  Nothing further, Your Honor.
18     Just one thing, and I don't know that we need to belabor
19     the point, but my client has all of the text messages he
20     exchanged with Charley that Ms. White testified about.  I
21     think those are somewhat probative.
22         THE COURT:  We can discuss it afterwards.  I
23     just want to let the witness go.
24         Mr. Wiederkehr, do you have anymore questions
25     for Ms. White?

C. White/The Court/Cross

```
 1                    MR. WIEDERKEHR:  I just wanted to ask one thing
 2         as a follow-up to Mr. Dimopoulos.
 3    CROSS EXAMINATION BY
 4    MR. WIEDERKEHR:
 5         Q    Ms. White, do you recall when Ms. Kassenoff requested
 6    that Mr. Kassenoff step away from his vehicle to try to
 7    encourage the child to participate in the access when she would
 8    not get out of the car?
 9         A    Yes.
10         Q    Isn't it a fact that Mr. Kassenoff refused to step
11    away?
12         A    That was her request, not mine.
13         Q    Isn't it a fact that he refused to step away?
14         A    He did refuse to step away.
15                    MS. MOST:  Can I follow that up, Your Honor?
16                    THE COURT:  Yes.
17                    MS. MOST:  In the report it says that she did
18         not think it was -- Ms. White did not think it was an
19         appropriate way of handling the situation.
20    CROSS EXAMINATION BY
21    MS. MOST:
22         Q    What were your thoughts on that, Ms. White?
23         A    From my understanding, in the first place,
24    Ms. Kassenoff was not supposed to be outside of the house
25    during the transitions.  That was number one.  Number two, she
```

Proceedings

1     was incredibly emotional and not in a state that I would have

2     wanted to bring her over to try to talk to anyone anyway.  It

3     was my job to try to encourage the kids to join in general.

4     When I have visits where a child is reluctant to join, I don't

5     bring the parent that they're reluctant to be around to come

6     with me to try convince them to join.  It's not appropriate.

7     It would not have -- yeah.  There are many, many reasons, and

8     many ways that could have gone badly.  I was not going to try

9     that.

10          THE COURT:  Anything else?  All right, thank you

11     very much for joining us on such short notice, Ms. White.

12     I appreciate it.

13          MS. WHITE:  Have a good day, everyone.

14          THE COURT:  Okay.  I do want to see the text

15     messages that were transmitted by Charley and her father

16     during the visit on May 30.  So could you send those to

17     the Court as well as to Mr. Wiederkehr and Ms. Most, so

18     everybody has a copy of those?

19          I am going to give the parties an opportunity to

20     state their -- I'm going to reserve decision on this in

21     terms of what I want to do.  I want to read the -- listen

22     to the audio again and read the text messages.  But I will

23     hear arguments at this point on whether or not we should

24     grant the request for a protective order and/or modify the

25     visitation.

Proceedings

1          So Mr. Dimopoulos, we will start with you as the

2     representative of the plaintiff.

3          MR. WIEDERKEHR:  Your Honor, may I call my

4     client?

5          THE COURT:  Absolutely.  Why don't we take a

6     five-minute break so you can talk to your clients, and we

7     will come back.  Ms. Kassenoff, call your attorney.

8          MR. WIEDERKEHR:  Catherine, I will call you

9     momentarily.

10          THE COURT:  Take ten minutes to speak with her.

11          (Whereupon a recess was taken at this time.)

12          MR. WIEDERKEHR:  If Your Honor doesn't mind, if

13     I could start, I have an application, please.

14          THE COURT:  Go ahead.

15          MR. WIEDERKEHR:  I will try to be brief.  It

16     appears this supervised visitation has been in place for

17     quite some time.  And there have been competing and

18     combating allegations of fault in why it's succeeding and

19     why it remains in place.  But it appears to me in my short

20     time on the file that, rather than treat the symptoms,

21     perhaps we could treat the disease.  And my application is

22     that we transition from this current therapeutic,

23     supervised environment to an actual therapeutic

24     environment, because it appears even from just today's

25     testimony that the children are coming to this process

Proceedings

 1      with a perspective that they are disinterested in engaging

 2      in this supervised visitation.  I think there are probably

 3      a whole host of reasons why, which are not necessarily

 4      critical to get into.  But the mere fact that my client's

 5      overt attempt to put a day in place that she thought the

 6      children would embrace was received as some attempt at

 7      bribery, I think is quite illuminating.

 8              And in my opinion, and I'm asking the Court to

 9      adopt this, it's time perhaps for this -- rather than

10      continue in this mode, I am suggesting that a transition

11      to a more therapeutic environment, in which Ms. Kassenoff

12      has the opportunity to be in front of a professional with

13      one child at a time -- unless the professional suggestion

14      is that there be more than one child at a time -- to

15      provide both mother and daughter a safe and appropriate

16      environment to address these issues at its core, and try

17      to permit some semblance of moving forward.

18              If a child is coming to this process with the

19      bias -- and I don't necessarily look to ascribe

20      negativity, but there is clearly a bias that is being

21      brought to the table -- the question is why and how does

22      that get rooted out so that they may proceed productively

23      and beneficially.  There was a time when the children

24      communicated their love and affection and desire to be

25      with their mother, and somehow, somewhere that changed.

Proceedings

1              I don't think it's necessary to ascribe blame.

2       It's not an issue of fault.  It's an issue of reality.

3       And I do believe, and I have spoken with my client, that

4       in order to get the most productive progress, that perhaps

5       it's time for a more focused mental health provider to

6       direct and oversee and facilitate this process.

7              And I think that while Ms. White had a

8       particular role and function, given her testimony today,

9       it's clear that it's limited.  And that's not intended as

10      a criticism.  It's just a reality.  Perhaps if there was

11      an adolescent psychologist or reunification psychologist

12      on something like that, they might be in a better position

13      to explore these issues and provide both mother and

14      children the guidance and assistance and insight that

15      would be beneficial to improve this.  Because I can

16      imagine that the Court prefers to not to be micromanaging

17      these types of situations.  And I'm certain my client

18      prefers not to be in a situation where she is defending

19      her maternal role.  And I thought it might be better

20      served for everyone to inject a professional who can

21      assist and provide guidance in making these situations

22      better for everyone.

23              THE COURT:  Mr. Dimopoulos?

24              MR. DIMOPOULOS:  I will address Mr. Wiederkehr's

25      application first, but then I would also like to address

Proceedings

1    the Court on my application.  I'm running out of battery,
2    give me one second.
3            Your Honor, since June of 2019 this Court has
4    been trying to fashion arrangements to facilitate
5    Ms. Kassenoff's relationship with these children.  At
6    first this was just a third-party supervisor.  It was a
7    robust access schedule.  That didn't work.  Then it was
8    therapeutic supervision with zoom calls that were
9    recorded, and that's not working.
10           The zoom calls, which aren't being addressed,
11   which I watch every single one of, and I'm going to submit
12   some to Your Honor with my updated materials to
13   Dr. Abrams, are an absolute, unadulterated disaster.  And
14   the therapeutic supervisors that do these calls are, quite
15   frankly, not doing a good job.  But they have thrown their
16   hands up anyway and are not doing them anymore, so I don't
17   think that's a problem.  Quite frankly, the children
18   terminate the calls on their own.  They don't want to be
19   interrogated, questioned, told things that are hurtful.
20           Ms. White, I think, did her best to convey to
21   this Court what the problems are in a very judicious way
22   and with a great degree of diplomacy.  The fact of the
23   matter is Ms. White says the children are disinterested.
24   But they're not disinterested; they're scared.  Your Honor
25   will review the text messages the children send them.

Proceedings

1    They say things like, "Mom is going crazy.  Please come

2    pick up us.  Come now.  Come now."  It's not working

3    either.

4         Now, what Mr. Wiederkehr's application is is

5    let's take one child and put them in an environment with

6    their mother with a professional, and he said a

7    professional who is better able to manage the situation.

8    Ms. White is a professional.  She is a therapeutic

9    supervisor.  We all looked at her resume and thought she

10   was highly, highly qualified.  She can't control the

11   situation.  What makes us think putting one child with a

12   mother who is behaving this way in that environment is

13   going to make any level of difference?

14        The fact of the matter is Ms. Kassenoff needs to

15   change her behavior.  It is not this therapeutic

16   arrangement versus that one, two hours versus four hours.

17   No matter what the requirement this Court places, she

18   fails.  And she fails because she doesn't understand that

19   it's not treating the symptoms of the disease.  The

20   disease is her mental illness.  She doesn't understand

21   that what she is doing is wrong.  I am not saying this to

22   attack her.  I'm saying this almost to justify what she is

23   doing.  If one doesn't understand that their actions are

24   hurtful, then by doing them, they're not trying to hurt.

25   She just doesn't understand.  She is unable to process.

Proceedings

1              When, and I'm going to talk about my -- segue

2       into my application, Your Honor.  When she posts on

3       Facebook and puts your name, Your Honor, or puts

4       Ms. Most's name, or Ms. Ratner's name, what she thinks she

5       is doing is shedding light on a tremendous dark conspiracy

6       that is ripping her from her children.  She doesn't

7       believe that she has done anything wrong ever in this

8       proceeding.  We have seen it time and time again.

9              She doesn't believe that posting a video of

10      Mr. Kassenoff and his engagements with the children on

11      Facebook is wrong.  She is saying, "How dare Ms. Most not

12      address this?"  She thinks she is shedding light.  She

13      wants to go to news outlets.  Her Facebook posts ask that

14      people come to the courthouse on June 16 to write the

15      conspiracy.  She writes letters to his employer, e-mails

16      to outside counsel.

17             Again, we can change the situation as many times

18      as this Court is willing to do it.  But the problem is, if

19      she doesn't understand that she is single-handedly

20      destroying her relationship with the children and hurting

21      them in the process, then no matter what we do, no matter

22      what this Court does in its supreme wisdom, it's not going

23      to have an effect.

24             The children have had it.  They're opening up to

25      their attorney and their father about what they have

Proceedings

1          endured.  The forensic process will go on.  I think
2          between now and then the wisest thing to do is, for a
3          temporary period of time, halt all access, because no
4          matter what we do, it's going to go on.  I think we take a
5          pause and we reach out -- wait for Dr. Abrams, who
6          incidentally understands this case and Ms. Kassenoff
7          better than anyone, from his testimony and his report, and
8          see what he advises to do.

9                    I, quite frankly, don't see why you take an
10         environment of three children in a house with a supervisor
11         that is not going well, and then you focus the spotlight
12         on one child and put them in a room so that she can do
13         that one-on-one.  So I don't see it.

14                   The e-mail to the children, I mean, this is on
15         top of so many violations of this Court's order concerning
16         contact.  The beauty of it now is that Allie is reporting
17         to her father when her mother tries to reach out to her,
18         this e-mail and her efforts to contact them.  There has
19         never been serious repercussions for her violations of the
20         Court order.  I'm not saying the Court hasn't addressed
21         those things time and time again and reminded her it's a
22         violation.  I understand the frustration; what's more to
23         do?  But the children read this stuff.  It's hurtful.  And
24         until she is at some level held accountable for her
25         violations of the Court order, I think it doesn't really

Proceedings

1    become real to her.  She thinks she can just act with

2    impunity.  I think that's one of the problems, she is just

3    never held accountable.

4           In closing, Your Honor, I think this Court has

5    issued an order two weeks ago, two and a half weeks ago,

6    that there is to be no contact with his employer and there

7    is to be no posting on social media denigrating

8    Mr. Kassenoff or anyone else.  Those orders have been not

9    violated, they have been -- she has thumbed her nose at

10    them.  The posts on Facebook are almost every day.  I sent

11    them all to the Court.  I'm sure the Court will look at

12    them.  It's embarrassing.  The children know about them.

13    They are told about them from third parties.  They see

14    themselves in some instances.  She posts them and then she

15    takes them down.  I'm sure her attorney tells her to take

16    them down, but she cannot control herself.  That's the

17    point.  She is told not to do something.  She does it.

18    She takes it down.  She does it again.

19           This Court, I believe, needs to act swiftly and

20    issue an order imposing a sanction on her.  I don't care

21    if it's a $100 fine or $25, but until she sees that there

22    are repercussions, she is not going to stop.

23           Very importantly, Your Honor, my client said

24    that he recently is increasingly concerned for the

25    children, for himself.  The threats she sends to Ms. Most,

Proceedings

1      and I'm sure she is too graceful to mention them -- but

2      the threats to Mr. Kassenoff, the threats to me, are

3      constant.  They're every few days.  "You will be held

4      accountable for what you're doing.  You're going to this.

5      You're going to that."

6              There needs to be an order of protection.  My

7      client should not have to endure the constant threats from

8      her.  A simple order that says any contact with him that

9      is not through what is already a Court order, that they

10     use the Talking Parents app solely to discuss the kids,

11     that went out the door maybe 300 e-mails ago.  She

12     continues to e-mail him on a near daily basis, sometimes

13     ten, 15 times a day.

14             So there needs to be a Court order that there is

15     an order of protection that can be enforced by my client

16     if she contacts him, an order of protection for the

17     children -- also because again, there are orders from this

18     Court from here to Timbuktu saying that she can't contact

19     them, but all I can do is come to the Court looking for

20     contempt.  If there were a criminal order of protection

21     that any communication with the children that is going to

22     be acted upon -- not to punish her; I don't want her to

23     violate it, but if there is a criminal order of protection

24     prohibiting this, it's actionable; it has consequences.

25             And the last thing I want to ask Your Honor is

Proceedings

1      that Ms. Kassenoff has a key to the marital residence.  My

2      client has asked her to deliver that key.

3                 MR. KASSENOFF:  I haven't.

4                 MR. DIMOPOULOS:  Sorry, he hasn't asked her to

5      deliver the key.  But he is asking now that she deliver

6      the key to the marital residence, for obvious reasons.

7                 And the last point is that I'm going to be, by

8      the end of this week, Your Honor, submitting a few updated

9      videos and things that I'd like for the Court to consider

10     that we sent to Dr. Abrams.  So thank you, Your Honor.  I

11     will submit the text messages to the Court for its

12     consideration.  Thank you.

13                THE COURT:  Ms. Most?

14                MS. MOST:  Yes, Your Honor.  At this point the

15     children have to be protected.  They have to be protected

16     from the behavior that their mother is doing.  They are

17     not disinterested.  They would like to have a mother, but

18     they don't -- they can't handle the conduct that's

19     happening right now.  The children see the posts, they see

20     all the posts, and in particular Allie and Charley.  They

21     respond to the posts.

22                THE COURT:  How do they see all the posts?

23                MS. MOST:  I actually saw one of the zoom

24     videos, where Allie accused her mom of posting that she is

25     homeless, and her mother says, "I didn't say that."  Allie

Proceedings

1   said, "Hold on one minute," she got off the zoom video,

2   she went to check, and she came back and reported the

3   video is there -- "the Facebook post is there today.  It

4   says you're homeless."  So Allie was very upset about

5   that.

6           So the children are seeing them.  They're

7   hearing them from their friends, whose parents are talking

8   about it.  So the children are being affected by these

9   Facebook posts, and it is a daily effect.  The children

10  are afraid, Judge.  They are afraid.  I can't disclose to

11  you what Jojo described to me, but I can tell you that

12  Jojo did tell me that she was afraid that she has seen her

13  mother drive by the house, and that was upsetting to her.

14          MS. KASSENOFF:  I --

15          THE COURT:  Ms. Kassenoff, one person at a time.

16          MS. KASSENOFF:  Your Honor, she is testifying.

17          THE COURT:  You need to mute yourself.  You have

18  an attorney that's speaking on your behalf.

19          MS. KASSENOFF:  I'm not sitting with him, Your

20  Honor.

21          THE COURT:  You can text him and tell him what

22  you want to say.

23          MS. KASSENOFF:  Judge, that's not true, and she

24  is testifying.

25          THE COURT:  She is relating to me and making her

Proceedings

1      argument.

2              MS. KASSENOFF:  I'm sorry, but it's filled with

3      lies.  None of this is true.  I'd like to be able to

4      address the Court.

5              THE COURT:  Well, I have copies of the Facebook

6      posts.

7              MS. KASSENOFF:  Judge, the comments about being

8      homeless were made about a year ago.  They were about my

9      situation a year ago.  Not my current situation, but my

10     situation when I was homeless a year ago.  Those are

11     truthful posts.

12             THE COURT:  Okay.  But we also directed you to

13     take them down a year ago.  Because I remember it

14     specifically; it was almost a year to the day.

15             MS. KASSENOFF:  Judge, they were not directed to

16     to be taken down.  Number two, they address my situation

17     about being homeless.  I don't know why Ms. Most is

18     showing these posts to the children.  Your question is how

19     are the children seeing it.  She didn't answer that

20     question.  And I believe the father is showing them the

21     posts, or that Ms. Most is showing them the posts.  They

22     don't have Facebook accounts, Judge.

23             MS. MOST:  Your Honor, I have never shown the

24     children a post, and I don't believe they're coming from

25     their father.  The children have told me that they are

Proceedings

1    being told about it by their friends, who hear their

2    parents talking.  But Allie actually went onto the

3    Facebook and responded on a zoom video.

4              MS. KASSENOFF:  How does she have access to

5    Facebook, Ms. Most?

6              MS. MOST:  I have no idea.  You were on that

7    zoom video.

8              THE COURT:  All right, everybody needs to stop.

9    Ms. Kassenoff, you need to mute.  Ms. Most, you can finish

10   your argument.

11             MS. MOST:  So the girls need to be protected.

12   They are afraid.  They are afraid.

13             MS. KASSENOFF:  Of what?

14             MS. MOST:  They are afraid of their mother's

15   conduct.  You can order them to go on a visit, Your Honor,

16   but I'm not sure that they will go.  I don't believe they

17   will.  Not that they want to say to you that they wouldn't

18   follow your directions, because they are girls that are

19   really very obedient little girls.  If you told them they

20   had to, they probably would; but I don't think that you're

21   comfortable doing that.  I'm certainly not going to say to

22   them that we're going to pull them out of a car so they

23   can go on their visit.

24             THE COURT:  Nobody is pulling children out of

25   the car.

Proceedings

```
 1              MS. MOST:  Of course not.  So these girls don't
 2      want to go anymore.  They are not comfortable, and --
 3              THE COURT:  I get your point.  Somebody address
 4      to me why -- Ms. Kassenoff, you're not muted.
 5              THE COURT:  -- why Mr. Wiederkehr's idea of
 6      therapeutic therapy between Ms. Kassenoff and the girls
 7      wouldn't go toward repairing their relationship.
 8              MS. MOST:  Your Honor, if I could speak to that?
 9              THE COURT:  Yes.
10              MS. MOST:  First of all, I don't think you're
11      going to get the girls to go, number one.  But I think for
12      me the better response would be to have Dr. Abrams
13      complete his report and then tell us what we should be
14      doing.  Because I think to have the girls sit with a
15      therapist one-on-one with their mother is not something
16      they will be comfortable doing.  I don't think they're --
17      they would be willing to do it.
18              THE COURT:  Okay.
19              MS. MOST:  And unfortunately, Judge, they
20      believe that what their mother is telling them -- that her
21      interactions with them are not honest.  They think she is
22      dishonest.  So having them sit with her while she explains
23      why her -- "I said I was homeless a year ago, but the post
24      is there now, but it refers to a year ago," is not
25      something --
```

Proceedings

```
 1              THE COURT:  This is the problem as I see it:  I
 2      have an obligation to act in the best interest of the
 3      children.  And while -- the Court made findings a year ago
 4      after a ten-day hearing, and the Court believes, based
 5      upon the evidence deduced during that hearing, that
 6      Ms. Kassenoff does have a mental illness that's impacting
 7      her interactions with the children, okay.  And I
 8      understand the children are reacting to that.
 9              The children -- and there is still an obligation
10      to try to fashion a remedy where the children can talk
11      with their mother, because the children need to understand
12      as well at some point, as they get older, that some of the
13      behavior they're observing from their mother -- and I
14      understand Ms. Kassenoff denies that she has a mental
15      illness -- stems from a mental illness.
16              And so how do we go about getting the children
17      to understand it, if it isn't in a therapeutic -- a
18      therapeutic supervisor is different from a therapist.  So
19      maybe during that process, when you're with a therapist
20      and the mother can express what she is feeling, which is
21      the loss of time with her children whom she loves, and the
22      children can express their feelings about how they believe
23      their mother is being dishonest, whereas the mother
24      believes she is telling the truth -- at what point do we
25      try to address that underlying issue?  And what would your
```

Proceedings

1     recommended remedy be?

2              MS. MOST:  I am waiting for Dr. Abrams's report.

3              MR. DIMOPOULOS:  Can I address that?

4              THE COURT:  I'm speaking to Ms. Most right now.

5     Everybody will have a chance.  Ms. Kassenoff, your

6     attorney will speak on your behalf to talk about it.

7              MS. MOST:  Your Honor, I had just this

8     discussion this morning with Dr. Adler, because she was

9     telling me about how the girls are doing.  Charlotte in

10    the last week has had a very hard time.  While she has

11    discussed with me some things going on, she was

12    uncomfortable discussing them with Dr. Adler.

13             However, Jojo opened up, Jojo actually sent the

14    e-mail that they received.  And I said to Dr. Adler, "You

15    know, it seems to me the girls have to know that their

16    mother is mentally ill and that some of her conduct stems

17    from that illness.  How do we do that?"  And --

18             MS. KASSENOFF:  This is ridiculous.

19             MS. MOST:  -- her response to me was that that

20    has to be handled in such a very sensitive way.  She

21    certainly didn't feel that Jojo was old enough to

22    understand.

23             THE COURT:  I said age appropriate.  Jojo is

24    seven.

25             MS. MOST:  Right.

Proceedings

1          THE COURT:  But you're getting to the point
2    where -- isn't Allie going to be 12 in July?
3          MS. MOST:  Yes.
4          THE COURT:  And Charlotte is ten or 11 now.
5          MS. MOST:  She will be 11.
6          THE COURT:  They're old enough to sense, you
7    know --
8          MS. MOST:  Judge, they get something is wrong.
9    They get it.  They understand that part, but it's not --
10          THE COURT:  At some point we need to address
11    that.  I'm not saying right this second, but people need
12    to start thinking about this.  I'm not rejecting out of
13    hand Mr. Wiederkehr's suggestion.  So I'm engaging counsel
14    in this discussion.  We're not going to get Dr. Abrams's
15    report.  He has to meet with Ms. Kassenoff, which has to
16    be rescheduled; I thought it was later this week.  And
17    Ms. Kassenoff and the children need to go.  And so it's
18    going to be 30 to 45 days at least, right?  I forget.
19          MR. WIEDERKEHR:  Judge, I want to say I think it
20    would make appropriate sense for this therapist
21    professional that I'm suggesting to work in concert with
22    Dr. Adler, as compared to in a vacuum.
23          THE COURT:  All the children have therapists.
24    It would have to be -- I'm not going to do something
25    that's going to be detrimental to the children.  But I

Proceedings

1      think if there is an underlying issue, and some of the

2      children are getting to the ages where it's appropriate,

3      they have to be given the skills too, and the

4      understanding and --

5              MR. WIEDERKEHR:  Judge, I'm not adopting the

6      narrative of mental illness.

7              THE COURT:  I understand your client denies it.

8              MR. WIEDERKEHR:  I'm simply saying,

9      notwithstanding that, I'm trying to present a viable path.

10     And I can assure the Court that I could recite chapter and

11     verse of criticisms of Mr. Kassenoff, and the Court would

12     accept some and probably reject others.

13             THE COURT:  I have heard ten days of testimony

14     and a year of at least 30-plus conferences, both sides.

15             MR. WIEDERKEHR:  I respect that.

16             THE COURT:  Now I'm concerned about the

17     children.  You're new to the table, Mr. Wiederkehr.

18             MR. WIEDERKEHR:  That's why I'm not muddying the

19     transcript with this.

20             THE COURT:  You're trying to stay -- I get it.

21     I appreciate it.  Go ahead.

22             MS. MOST:  If I could just finish:  What

23     Dr. Adler actually wanted was to have a discussion with

24     Dr. McGuffog to decide on how that should be handled.  And

25     I'd like to wait to hear from them.

Proceedings

```
 1              THE COURT:  Of course.  That's what I'm saying.
 2     I'm just thinking about it.
 3              Mr. Dimopoulos?
 4              MR. DIMOPOULOS:  Judge, it's pretty remarkable
 5     to me that Dr. Abrams, when he testified before you in
 6     July, is almost saying exactly what Your Honor is
 7     considering right now.  He said -- I remember like it was
 8     yesterday, because he used the word "titration," and I
 9     thought that was interesting.  He recommended what
10     Mr. Wiederkehr is recommending, that the therapy happen in
11     a controlled environment, shorter periods of time, and
12     titrate into something more.
13              The problem is that key to that recommendation
14     was this very specific therapy; I remember the word
15     "dialectical."
16              THE COURT:  Dialectical behavioral therapy.
17              MR. DIMOPOULOS:  DBT, you're right.  It was
18     something recommended and specific to the personality
19     disorder with which he diagnosed Ms. Kassenoff.  And the
20     idea --
21              MS. KASSENOFF:  He didn't diagnose me with that,
22     Mr. Dimopoulos.  There is no diagnosis of mental illness.
23              THE COURT:  Ms. Kassenoff --
24              MS. KASSENOFF:  Judge, I'm sorry.  This has
25     really gotten out of hand.  I don't have a diagnosis, and
```

Proceedings

1      I don't know why we are saying that.  This is not a

2      situation where there is a history of mental illness.  I

3      have a job.  I have been working as a productive member of

4      society for my entire adult life.  I don't appreciate or

5      understand that characterization.  There have been no

6      findings.  We actually brought forward my therapist and

7      other therapists to testify that I don't have a mental

8      illness.  I don't understand that characterization at all.

9              THE COURT:  I want to ask you a question.  Can

10     you stop?  Did you continue the therapy in the last year?

11             MS. KASSENOFF:  Judge, I have been with the same

12     therapist for two years.  I have never had a history of

13     mental illness, and I have never been on medication for

14     mental illness.

15             THE COURT:  So Ms. Kassenoff, this is the issue:

16     I told this to you before, and I wrote it in my decision,

17     and I have observed it.  And what we have seen here is

18     you're not supposed to communicate with the girls

19     unsupervised.  In my order that was very clear.  And you

20     have done that.  You were not supposed to leave the house

21     during transitions, drop-offs and pickups.

22             MS. KASSENOFF:  It's all my fault, Judge.

23             THE COURT:  I'm not saying it's your fault.

24     Either there is an underlying issue, or you're just

25     blatantly disregarding the Court order.

Proceedings

1          MS. KASSENOFF:  Judge, I'm trying so hard.

2          THE COURT:  I don't believe you are blatantly

3     disobeying the Court orders.  But there has been evidence

4     in Court conferences of you not following my orders.  I

5     want you to have a relationship with your children.

6          MS. KASSENOFF:  Judge, I appreciate that.  I

7     just want to say it's a long time to be in compliance with

8     these orders.  They are draconian.  It's very hard.  I

9     have done everything I can.  I think you heard from the

10     therapeutic supervisor that I am trying very, very hard.

11          And we did not discuss what -- all the months

12     and months and months of visits I had up to this point,

13     where I believe the children were speaking the truth; and

14     I believe at this point they're not.  I believe they are

15     under the thumb of the AFC and their father.  I have no

16     ability to talk to them.  I'm not texting or e-mailing

17     them.  I had one e-mail with them that you saw.  That's

18     it.

19          And so we have a situation where these children

20     for one year have been pleading for help from every adult

21     on this phonecall, and no one helps them.  But we don't

22     discuss that, Judge.  We don't discuss the plaintiff's

23     conduct and what leads up to their pleas for help.  We

24     don't discuss the assault.  We don't discuss any of that.

25     So now we're in a situation where Ms. Most is standing up

Proceedings

1      and saying, "Oh, suddenly the girls have a voice."  That's

2      not true.  Suddenly the girls have been manipulated.  This

3      is an alienation that I raised in my May 10th and 11th

4      letters.  I foresaw this issue.

5              I know my children very well, and I'm very

6      concerned by what's happening in the father's home.  We

7      don't know.  We just see the tip of the iceberg.  There is

8      a recording where Allie is discussing how her father has

9      told her that he is going to have to work at a gas station

10     because the mother -- I am allegedly making him lose his

11     job, Judge.  These are the kinds of --

12             THE COURT:  Well, if Mr. Kassenoff in fact said

13     that, Mr. Kassenoff is under the same restriction that you

14     have, which is -- and again, maybe I need to reiterate

15     this:  Nobody is to discuss the litigation with the

16     children.  That includes you and that includes

17     Mr. Kassenoff.  That includes any third party they

18     interact with.  Nobody, period.

19             MS. KASSENOFF:  Judge, I just want to say I

20     really have tried, and I'm willing to do anything to see

21     my children.  And I really agree with Mr. Wiederkehr's

22     proposal.  I want to also have a normalized relationship

23     with them.  I was their caretaker for their entire lives.

24     Suddenly I have this mental illness?  It doesn't really

25     make sense.  How is it for 11 years everything was okay,

Proceedings

1    and suddenly, when Mr. Kassenoff decides he wants to

2    divorce, I suddenly have this mental illness?  Judge, it

3    doesn't add up.

4         THE COURT:  I don't think it was okay,

5    Ms. Kassenoff.  I saw the videos about what transpired in

6    the house during the hearing.

7         MS. KASSENOFF:  A lot of those deal with the

8    domestic violence of the plaintiff.  I was dealing with it

9    on a day-in-day-out basis.

10        THE COURT:  Okay, stop.

11        Anybody else have anything else they want to

12   say?  I'm going to get the text messages.  Mr. Wiederkehr,

13   is there anything you want to send to me for consideration

14   that hasn't already been sent to me?

15        MR. WIEDERKEHR:  If I could respectfully just

16   ask if I could confer with my client, and if there is, I

17   will send it on notice to everyone, obviously.

18        THE COURT:  That's fine.

19        MR. DIMOPOULOS:  Just a final point, Your

20   Honor --

21        MR. WIEDERKEHR:  Sorry, Mr. Dimopoulos.

22        Timing, Judge?  Other than as soon as possible?

23        THE COURT:  As soon as possible.  Send it to me

24   by mid afternoon tomorrow.  If anyone wants to comment or

25   object to it or make a statement, they can respond to it.

Proceedings

1     I will get the transcript, and I want to think about and

2     review it before I issue something.

3               MR. DIMOPOULOS:  Thank you.

4               MR. WIEDERKEHR:  Thank you, Your Honor.

5               THE COURT:  That goes for anybody else.  If

6     there is anything -- Ms. Kassenoff, while I have you here,

7     I will state that there's no posting on Facebook.  We were

8     here a year ago with posts, and I had a protective order

9     at that time.  You are certainly free to post about

10    yourself, but your children are seeing it and the children

11    are hearing about it.  If they're not seeing it, they're

12    hearing about it.  And that's not appropriate and good for

13    their health.  I have an order, and you need to follow it.

14              MS. KASSENOFF:  Your Honor, I did follow your

15    order.

16              THE COURT:  Okay.

17              MS. KASSENOFF:  I have not -- look, I think your

18    order does address very specifically the children and the

19    plaintiff.  I will say that I also think I have First

20    Amendment rights.  We know that; there are cases on this.

21    We are going to be moving to vacate the order because it

22    is overbroad.  And I am --

23              THE COURT:  You can absolutely move to vacate

24    the order if you choose to.  Having researched the issue

25    of First Amendment rights, when they come into play

Proceedings

1    involving the best interests of the children -- and there

2    is case law on it, you're absolutely correct, and I have

3    read the case law.  The order, in my opinion, is perfectly

4    acceptable, especially when children are learning of it.

5    It goes to children's rights and the husband's rights.

6    You should feel free to appeal.  Post anything you want

7    other than this litigation that impacts your children or

8    their father.  That's it.

9            COURT ATTORNEY REFEREE:  Judge, I reviewed the

10    transcript after which -- this is the May 2020 or the

11    March 2020 order.

12            THE COURT:  I said it back then, yes.

13            COURT ATTORNEY REFEREE:  Right.  If you read the

14    transcript, Judge, Jill Spielberg consented to the entry

15    of that order.  Therefore, Ms. Kassenoff does not have a

16    right of appeal.  She must move to vacate her consent.

17    There is no right of appeal to a consent order.  That is a

18    consent order.  The fact that Ms. Spielberg is not her

19    attorney doesn't make a difference.

20            THE COURT:  If she wants to move to vacate it,

21    move to vacate it.  Go ahead.

22            COURT ATTORNEY REFEREE:  She can't move to

23    vacate it yet.  She has to move to vacate her consent to

24    the order.

25            THE COURT:  Okay.

Proceedings

```
 1          MS. KASSENOFF:  I don't know if Referee Ratner
 2     realizes there is a more recent order, and it does deal
 3     with --
 4          THE COURT:  No.  The more recent order that
 5     arose out of that conference didn't get signed, because it
 6     got lost in the pandemic.
 7          MR. WIEDERKEHR:  Judge, I will review the
 8     transcript.  I will address these issues.  I know my
 9     client's concerns, and I will proceed accordingly.
10          THE COURT:  Very good.  Thank you.
11          COURT ATTORNEY REFEREE:  Judge, one other thing.
12     I have a trial ready conference scheduled for June 16 at
13     11:30.  Do you see any reason that should not proceed and
14     that the trial ready order cannot issue, even though we're
15     awaiting Dr. Abrams's report?
16          THE COURT:  The doctor's report is not going to
17     stop that.  There is a deposition schedule this week.
18          MR. WIEDERKEHR:  Not G&T.  It was
19     Mr. Kassenoff's continued deposition.
20          THE COURT:  Right.
21          MR. WIEDERKEHR:  Which -- I just texted counsel
22     while we were doing this.  This obviously was a bit of a
23     surprise appearance, and it's kind of impacting my ability
24     to proceed tomorrow.  So I asked if perhaps the 9th was
25     available for Mr. Kassenoff and counsel.
```

Proceedings

1                MR. DIMOPOULOS:  Judge Koba --

2                MR. WIEDERKEHR:  Mr. Dimopoulos is not available

3       on the 9th.

4                MR. DIMOPOULOS:  Judge Koba, I am involved in

5       matters every single day, twice a day, often, from here

6       until July 11.  There is no way.  I have had this

7       deposition in my books for a month, and that's saying

8       nothing of Mr. Kassenoff's schedule.  Mr. Wiederkehr has

9       had the documents from GT for the better part of seven

10      days, and under no circumstances will we consent.

11               MR. WIEDERKEHR:  Let's not mischaracterize how

12      long I have had the documents.  That's okay, counsel; it's

13      perfectly fine.  If there is a lack of courtesy

14      forthcoming, it will be understood.

15               THE COURT:  The deposition will proceed

16      tomorrow.  Mr. Dimopoulos is on trial before me on the

17      9th, so he is not available.

18               MR. WIEDERKEHR:  Not a problem, Judge.

19               COURT ATTORNEY REFEREE:  So the trial ready

20      conference will proceed on the 16th at 11:30 a.m.

21               MR. DIMOPOULOS:  Thank you.

22               THE COURT:  All we have left is the deposition,

23      Dr. Abrams's report -- he will send his report, and then

24      all you would have from that would be any post-deposition

25      demands that they can get done.  When is the thing

Proceedings

1     scheduled?  Tomorrow?

2               MR. WIEDERKEHR:  The deposition is tomorrow.

3               MR. DIMOPOULOS:  We will have any

4     post-deposition demands prior to the 16th?

5               THE COURT:  Yeah, I would push it out.  I would

6     give them ten days to write their post-deposition demands.

7     Ten days to respond.  Push it out to the end of the month.

8               COURT ATTORNEY REFEREE:  June 30?

9               THE COURT:  Yes.

10              COURT ATTORNEY REFEREE:  June 29?

11              MS. MOST:  Either day is good for me.

12              MR. WIEDERKEHR:  Whatever works for the referee.

13              MR. DIMOPOULOS:  Is June 29 at 11:00 possible?

14              COURT ATTORNEY REFEREE:  Sure, or 2:00.

15              MR. DIMOPOULOS:  I will take the 11:00, please.

16              COURT ATTORNEY REFEREE:  Mr. Wiederkehr?

17              MR. WIEDERKEHR:  That will work.  Thank you.

18              COURT ATTORNEY REFEREE:  June 29 at 11:00.

19              (Continued on next page to include jurat.)

20

21

22

23

24

25

Proceedings

1                   THE COURT:  Thank you.

2                *      *      *      *      *      *

3      It is hereby certified that the foregoing is a true and

4      accurate transcript of the proceedings in the matter of

5      ALLAN KASSENOFF against CATHERINE KASSENOFF, Index No.

6      58217/2019.

7

8

9      _____

10     JACQUELINE NISHI-BROACH
       Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25