1

1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF WESTCHESTER - CIVIL TERM - PART DFE
2  --------------------------------------------x
   ALLAN KASSENOFF,
3                              Plaintiff,

4           -against-                    Index#58217/2019

5  CATHERINE KASSENOFF,
                              Defendant.
6  --------------------------------------------x
   CONFERENCE
7
                         Westchester County Courthouse
8                        111 Dr. M.L.K., Jr. Blvd.
                         White Plains, New York 10601
9                             June 19, 2019

10

11 B E F O R E:

       HONORABLE DAVID F. EVERETT,
12              Supreme Court Justice

13 A P P E A R A N C E S:

14     MANIATIS & DIMOPOULOS, PC
       Attorneys for Plaintiff
15     73 Main Street
       Tuckahoe, New York 10707
16          BY:  GUS DIMOPOULOS, ESQ.

17     LIEBERMAN & LEBOVIT
       Attorneys for Defendant
18     334 Underhill Avenue - Suite 4A
       Yorktown Heights, New York 10598
19          BY:  MITCHELL P. LIEBERMAN, ESQ.

20

21                           Nicole Ameneiros
                             Senior Court Reporter
22

23

24

25

Proceedings                                    2

1          THE CLERK:  No. 3 on the calendar, Kassenoff versus

2     Kassenoff, Index No. 58217 of 2019.  State your appearance

3     for the record.

4          MR. DIMOPOULOS:  Good afternoon, your Honor.  Gus

5     Dimopoulos, Maniatis & Dimopoulos, on behalf of the

6     plaintiff, Allan Kassenoff, who's in the hallway.

7          MS. MOST:  Good afternoon, your Honor.  Carol Most,

8     attorney for the children.

9          MR. LIEBERMAN:  Good afternoon, Judge.  Mitch

10    Lieberman, Lieberman & Lebovit, with our associate Cali

11    Lieberman on behalf of Mrs. Kassenoff, who's outside.

12          THE COURT:  Okay.  So where are we?  There was an

13    issue about the --

14          MR. DIMOPOULOS:  Your Honor --

15          THE COURT:  There was an issue about the

16    supervisor.

17          MR. DIMOPOULOS:  Yeah, Ms. Kassenoff wanted to add

18    another party to the order.  We have no issue with it.  We

19    just wanted to get an amended order.

20          The second thing that we thought was prudent, if

21    you'll recall, your Honor, when we were here doing this we

22    had -- I'll never forget her first name, Lily, but I forget

23    her last.

24          THE COURT:  Cousin Lily.

25          MR. DIMOPOULOS:  Cousin Lily was here and you spoke

Proceedings                                         3

1    to her and advised her of her role.  For subsequent people I

2    want something in the order very simply that says whoever is

3    going to be doing this is going to be advised of the terms

4    of the court order and acknowledge them and that we should

5    update -- amend the order accordingly.  That was the only

6    reason I sought your Honor's attention.  And then --

7           THE COURT:  I see Mr. Lieberman is ahead of the

8    game and he's already working on it.

9           MS. MOST:  No, no, no.  He's just taking notes.

10          MR. LIEBERMAN:  No, no.

11          THE COURT:  Okay.

12          MR. LIEBERMAN:  There's not actually much that he

13   said so far that I've agreed with, so go ahead.

14          THE COURT:  Go ahead.

15          MR. DIMOPOULOS:  That you have agreed with?

16          MR. LIEBERMAN:  Right.

17          MR. DIMOPOULOS:  Or have not agreed with?

18          MR. LIEBERMAN:  There is not much you have said

19   that I agreed with.

20          MR. DIMOPOULOS:  Then it's just a regular day for

21   you and I so we're good.

22          Okay.  The second issue that I need addressed

23   before it becomes a real issue is the order required the

24   parties to begin searching for a full-time live-in nanny to

25   replace the current nanny.

Proceedings                                                4

1              THE COURT:  Right.

2              MR. DIMOPOULOS:  The reason being, the current

3      nanny is not a live-in.  She has a son.  She has to leave at

4      a certain time.

5              THE COURT:  So I think the term of art is au pair.

6              MR. DIMOPOULOS:  You know, I'm confused too.  I

7      think au pair means they have to come from another country

8      and they have to be here for a limited period under a

9      contract so none of these people are actually au pairs, they

10     are nannies, but.

11             MR. LIEBERMAN:  They can come from Kansas too.

12             MR. DIMOPOULOS:  They can?

13             MS. MOST:  Actually --

14             MR. DIMOPOULOS:  Again he doesn't agree with me.

15             THE COURT:  Like you said, another country.

16             MR. DIMOPOULOS:  So the problem that's arisen here

17     is that my client began to do searches and find candidates

18     and send them over to his wife for her consideration.  She

19     now has a term that doesn't exist in the order that I find

20     to be ridiculous.

21             THE COURT:  What's the term?

22             MR. DIMOPOULOS:  The person has to be a native

23     French speaker.

24             MR. LIEBERMAN:  That's not what she said.

25             THE COURT:  What did she say?

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 5 of 38

Proceedings                                                    5

1        MR. LIEBERMAN: We discussed it here. We were

2  pretty open about it.

3        So what happened is we were told by Mister, not

4  directly, I was with you, that it was his understanding that

5  the nanny would not be -- would not be able to do full-time.

6        THE COURT: That's the nanny. We know that.

7        MR. LIEBERMAN: The current. Well, that turns out

8  we were wrong. That's Orale (ph). Turns out when she

9  speaks to Orale her son is leaving for college at the end of

10  the summer. She has indicated to my client that she is fine

11  becoming a full-time nanny, that way the kids wouldn't be

12  introduced to someone new. The concern was two-fold --

13        THE COURT: French speaking?

14        MR. LIEBERMAN: Yes.

15        THE COURT: Lilly --

16        MR. DIMOPOULOS: You have to speak French to work

17  in the Kassenoff house.

18        MR. LIEBERMAN: There's no question about that.

19  This is what they have done for years so that their children

20  are bilingual. She's from Nova Scotia.

21        MR. DIMOPOULOS: They don't speak French there,

22  but, okay, go ahead.

23        MR. LIEBERMAN: Really?

24        MS. MOST: Actually, the children do speak French.

25        MR. DIMOPOULOS: The children do but I don't think

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 6 of 38

Proceedings                                                          6

1    --

2              MR. LIEBERMAN:  And she's Canadian and she speaks

3    French.

4              MS. MOST:  Nova Scotia they don't speak French.

5         •    MR. LIEBERMAN:  Okay, guys.

6              MR. DIMOPOULOS:  Anyway.

7              THE COURT:  Let's cut to the chase.

8              MR. LIEBERMAN:  Part of Canada.  She speaks French.

9    She's Canadian originally.  They've always done this.  This

10   is not a new wrench.  So we discussed this.  I think we

11   discussed a lot the last time we were here, and it was

12   discussed that the person we were going to select would need

13   to be able to speak French with the children.  That's not a

14   new issue.  So, anyhow, what happens as they're going

15   through these people, she's -- Orale is in the house and she

16   has a discussion with Orale.  Orale says, whoa, whoa, whoa,

17   I don't want to leave.  I could become full-time.  I could

18   stay here and it's not an issue.

19             MR. DIMOPOULOS:  Live-in?

20             MR. LIEBERMAN:  Live-in.

21             MR. DIMOPOULOS:  Oh, okay.  This is news to me.

22   She --

23             MR. LIEBERMAN:  No, it's not news.  That's what I

24   wrote to you and you wrote me back.

25             MR. DIMOPOULOS:  That's not true.

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 7 of 38

Proceedings                                    7

1           THE COURT:  What are the kids' names and ages

2    again?

3           MR. DIMOPOULOS:  The children are Ali who's 10.

4           THE COURT:  Right, okay.

5           MR. DIMOPOULOS:  Charley.

6           MS. MOST:  Charley.

7           MR. DIMOPOULOS:  We're just going with Charley.

8    We're not doing real names.  And Jo Jo who's eight.  Charley

9    who's eight and Jo Jo who's five.  Ali I'm not sure she

10   turned 10 or she's nine.  I think she turned 10.  Actually,

11   hold on.  Let me just get this.

12          THE COURT:  You think it's 10, 7 and 5?

13          MR. LIEBERMAN:  Yes.

14          MR. DIMOPOULOS:  Okay.  If that -- Mitch, I

15   apologize, if you sent this to me last night I didn't read

16   my email from last night --

17          MR. LIEBERMAN:  And you responded pretty quick.

18          MR. DIMOPOULOS:  Not to that one.  To the other

19   one.

20          MR. LIEBERMAN:  I'm kidding.

21          MR. DIMOPOULOS:  If she's willing to be a live-in

22   nanny then I'll go discuss that with him because --

23          MR. LIEBERMAN:  And I think I have another person

24   for you also that I think he'll be okay with on the

25   supervisor issue.

Proceedings                    8

1          On the supervisor issue, this order -- these are

2     two practicing lawyers. My client is special counsel to the

3     governor. We don't need this order. She doesn't need this

4     order. And they don't need this order floating around

5     because this is an interim order without findings. When you

6     read this order you might draw certain conclusions that the

7     Court has not drawn, that no fact finder has drawn. So if

8     instead we want to say whoever the person is, because

9     they're not supervisors, whoever the person is who's

10     required to be there when she's there will be apprised of

11     their obligations, I have no problem. And I know Carol is

12     going to hate me for this, but that's tough, I have no

13     problem with Carol generating an email to those people or

14     having a conversation with them saying, do you understand

15     this is it and getting a written response and then we're

16     good to go.

17          MR. DIMOPOULOS: That's all I asked for.

18          THE COURT: Let me hear Ms. Most.

19          MS. MOST: I'm fine to do it. Of course, I'm

20     leaving tomorrow --

21          THE COURT: Right.

22          MS. MOST: -- for two weeks, but, you know, if you

23     get me the phone call -- the phone numbers I'll call them

24     tomorrow morning first thing.

25          MR. DIMOPOULOS: You can also do it by email.

Proceedings                              9

1          MS. MOST: I have no --

2          MR. DIMOPOULOS: You don't want the email floating

3    around, the order.

4          THE COURT: We're on the record so it's --

5          MS. MOST: I want everybody to be on the same page

6    with what I'm going to tell them.

7          MR. LIEBERMAN: Okay. So we'll take a second call

8    and we'll write out what you're going to tell them.

9          MS. MOST: That's fine. We don't need a second

10   call.

11         THE COURT: Let's bring in the parties.

12         MS. MOST: I have a couple other issues while we're

13   here.

14         THE COURT: Yes.

15         MS. MOST: In speaking to the father today, the

16   parties called Child Mind, and, apparently, there was such

17   discordance on the telephone between the parties they have

18   been told that they're not willing to take their matter, so.

19         MR. LIEBERMAN: That's actually not what Child Mind

20   said. That may be the father's interpretation.

21         THE COURT: What did Child Mind say?

22         MR. LIEBERMAN: Child Mind said, we've reviewed

23   your matter, we've reviewed the intake and we're making the

24   following two recommendations for you. They don't take

25   every case that comes in. They referred this out.

Proceedings                              10

1          THE COURT:  So what were the recommendations?

2          MR. LIEBERMAN:  There's two recommendations.

3    They've called both people.  I believe they've already had

4    one call today and they're trying to pin down who they're

5    going to go to.

6          MR. DIMOPOULOS:  I've never professed to be an

7    expert in Child Mind, but to me, in further investigation

8    and further talking to people who know Child Mind, that's

9    them saying we're not interested.  Regardless of the

10   interpretation, it doesn't matter.  It's unfortunate

11   because, as Mr. Lieberman explained to me and as my partner

12   explained, Child Mind is the number one place, but it is

13   what it is.  They recommended I think a doctor -- Dr. Alan

14   Ravitz in the city, who we're fine with, and then another

15   institute Ackerman, that we are not.

16         MS. MOST:  Ackerman I'm not fine with.

17         MR. DIMOPOULOS:  We're not fine with at all.

18         MS. MOST:  Yeah.

19         THE COURT:  They have to go down to the city?

20         MR. DIMOPOULOS:  You know, Dr. Ravitz is --

21         MS. MOST:  He's well-known.

22         MR. DIMOPOULOS:  He's a --

23         THE COURT:  So let's use him.

24         MR. DIMOPOULOS:  Yeah, it will be inconvenient,

25   but.

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 11 of 38

Proceedings                                    11

1          MR. LIEBERMAN:  Are you using Ravitz for anything

2     else right now?

3          MR. DIMOPOULOS:  I've never used Ravitz, nor do I

4     currently use him for anything else.

5          MR. LIEBERMAN:  You?

6          MS. MOST:  Nor I.  I've heard about him though.

7          MR. LIEBERMAN:  I don't know the man, never heard

8     of the name before.  I don't do very much custody law just

9     every day.

10          THE COURT:  Before you --

11          MR. LIEBERMAN:  But we'll use him.

12          THE COURT:  Let's just get them in.

13          MR. DIMOPOULOS:  Can I just get two minutes to

14     speak to my client about the new development with the nanny?

15          MR. LIEBERMAN:  If we could have a second call.

16     Could we leave our stuff?

17          THE COURT:  Yes, absolutely.

18          (Recess taken.)

19          THE COURT:  So we have the parties here.  Mr. &

20     Mrs. Kassenoff are present.

21          All right.  So do you want to put on record what we

22     discussed?

23          MR. DIMOPOULOS:  Yes, your Honor.

24          THE COURT:  Everyone else can sit down.

25          MR. DIMOPOULOS:  Mr. Lieberman has a Microsoft Word

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 12 of 38

Proceedings                                    12

1      version of the order that we were working on --

2                  MR. LIEBERMAN:  Actually, it was signed.

3                  MR. DIMOPOULOS:  Right.  That ultimately got

4      signed.  He's going to email me a copy of that.  If he wants

5      to do it himself, that's fine, otherwise --

6                  THE COURT:  I think we should try to do it right

7      now.

8                  MR. DIMOPOULOS:  I am happy to do it now, to add a

9      few names on, to add a provision, that Ms. Most is going to

10     reach out to each of these supervisors to apprise them of

11     the terms of their assignment under the order, you know.

12                 And on the issue of the nanny that we discussed,

13     Mr. Lieberman advises the current nanny, Orale (ph), is

14     willing to become a live-in nanny.  We don't have, as it was

15     explained to me, we don't yet have the terms in terms of

16     hours, days, compensation.  So what I was going to recommend

17     so that -- because I think the parties are -- should each

18     have a meeting, discussion with her and then come to some

19     confirmation in writing as to when she's going to begin,

20     which should be forthwith, and what the hours are, days are,

21     terms of compensation and then we can perhaps have a

22     conference call with your Honor on Monday and avoid that

23     issue altogether.  But I think we're going to need a little

24     more time.

25                 THE COURT:  Okay.

Proceedings                                           13

1           MR. LIEBERMAN:  So, before we get there, because I

2      don't think we need to amend this order, I think what we're

3      doing is actually a lot of back and forth if you want to add

4      that provision.  We could add people on.  Whether we make a

5      record, whether it be here or in writing between --

6           MR. DIMOPOULOS:  That's --

7           MR. LIEBERMAN:  And have Ms. Most apprise the

8      people, I have the judge so-ordering this transcript, that

9      she will apprise the people of the terms.

10          However, I want to alert everyone because I just

11     told Gus, and I know Carol is aware, my client has in fact

12     inserted intensive therapy with a PhD.  Things are going

13     really, really well she said, four or five visits.  We

14     anticipate speaking with that doctor within the next couple

15     of days.  I'm waiting for a -- I think she has one more

16     visit and then we're anticipating a letter to be generated

17     and for it to be sent to Ms. Most and counsel for

18     consideration about lifting the need for this.  If we can't

19     get that consent, I am going to want to come back here

20     pretty quickly --

21          THE COURT:  That's fine.

22          MR. LIEBERMAN:  -- anyhow so I'm not that concerned

23     what we do in the very short run.

24          In terms of Orale, they should both meet with her

25     together so if there's ever been a he-said, she-said case,

Proceedings                                        14

1     this is it. If they're both in the same room they might

2     still do that, but at least Orale will know what both of

3     them said to her and what her understanding is and either

4     she'll be willing to do this or she won't.  Until then, we

5     do have additional folks who we would like to have available

6     as potential supervisors.

7          THE COURT:  You want to put their names on the

8     record?

9          MR. LIEBERMAN:  Sure.

10         MR. DIMOPOULOS:  Before you do that --

11         MR. LIEBERMAN:  Yeah.

12         MR. DIMOPOULOS:  -- my client has no objection.

13     Again, under the provision that now you have about 13 phone

14     calls to make.

15         MS. MOST:  Okay.  So someone has to get me all

16     those names and numbers.

17         MR. DIMOPOULOS:  Right.  If you could put that on

18     the record.

19         MR. LIEBERMAN:  Okay.  So, in addition, Meredith

20     Grant was the person we provided the name that's been agreed

21     to already, and then Odile, O-D-I-L-E, Grisard

22     G-R-I-S-A-R-D.  I am so sorry because these don't get

23     easier.  Cynthia -- well, this one does -- DeMonte,

24     D-E-M-O-N-T-E; Diane C-I-V-I-D-A-N-E-S; Heleno, H-E-L-E-N-O,

25     Hofer, H-O-F-E-R; Jacinda Economas, J-A-C-I-N-D-A,

Proceedings                                           15

1    E-C-O-N-O-M-A-S, and Ewa, E-W-A, Wojcik, W-O-J-C-I-K.  Those

2    persons are acceptable.  My client will provide to Ms. Most

3    their contact information so that Ms. Most can advise him.

4              We have a specific provision actually in the order

5    that details what the obligations of these nonparties are.

6    She can advise them of that, make sure they're willing.  I

7    don't need it in writing.  If you want it in writing, that's

8    fine.  However you folks want to do it.  Because, again,

9    maybe I'm just guardedly optimistic, I don't see this going

10   on much more than a week or two anyhow.  But, if it does, at

11   least we have a good list of people and a vehicle in place

12   for everyone to be assured that they know what their

13   obligations are.

14              THE COURT:  Just so --

15              MR. DIMOPOULOS:  And to be clear, your Honor, I had

16   no objection to Mr. Lieberman's placing that on the record,

17   providing your Honor so-order the transcript.  We don't have

18   to go through the process of amending the order.

19              THE COURT:  Just so it's clear, I don't know

20   because I don't have it in front of me, the specifics of the

21   order, but I know what I told --

22              MR. LIEBERMAN:  We have a copy right here, Judge.

23              MR. DIMOPOULOS:  Lily, cousin Lily.

24              THE COURT:  I know I explained to cousin Lily in

25   detail that the children were never to be out of her

FILED: WESTCHESTER COUNTY CLERK 06/26/2019 12:01 PM
INDEX NO. 58217/2019
NYSCEF DOC. NO. 94
Case 7:22-cv-02162-KMK Document 39-4 Filed 09/15/22 Page 16 of 38
RECEIVED NYSCEF: 06/26/2019

Proceedings                                    16

1    presence when Mrs. Kassenoff was there and that's to

2    continue.  Is that in the order?

3              MR. LIEBERMAN:  No.  What was in the order and that

4    is agreed to is on the bottom of page three as follows:

5              Ordered:  The parties shall adhere to the attached

6    children's bill of rights and the above-referenced persons

7    who will be with the defendant during her access shall

8    observe and enforce the same.  The foregoing persons shall

9    be obligated to immediately notify the AFC in the event of a

10   perceived violation of this order or the attached children's

11   bill of rights.

12             THE COURT:  All right.  Since --

13             MR. LIEBERMAN:  If I could have one more second,

14   Judge.

15             THE COURT:  Yes.

16             MR. LIEBERMAN:  Because I think what you said may

17   actually appear otherwise, which is why we put it in the

18   terms of this order.  I don't want to misspeak.  If I could.

19             Page three on the top of the page, I just read the

20   bottom of that page, ordered that:

21             Pending further order of the Court, the defendant

22   shall have any one or more of the following people present

23   during all times of her access time with the girls and she

24   shall notify the plaintiff of the person or persons to be

25   present for each such access period.

Proceedings                                    17

1           So that does in fact indicate what your Honor

2    indicated, and we have no problem with Ms. Most advising the

3    parties, these nonparties rather, of the first decretal

4    paragraph and of the last decretal paragraph on page three.

5           THE COURT:  All right.  Since this record will be

6    so-ordered, I just want to make it very clear that,

7    Ms. Most, please be sure to communicate to each of the

8    people on the risks of supervising visits that the children

9    are not to be alone in the presence of Mrs. Kassenoff --

10          MS. MOST:  Okay.

11          THE COURT:  -- during the period of time that they

12   are supervising the visits.

13          MS. MOST:  Okay.

14          MR. DIMOPOULOS:  Your Honor, if I --

15          THE COURT:  For any period of time whatsoever.

16   Yes?

17          MR. DIMOPOULOS:  If that concludes that part of our

18   discussion, I'd like to just bring up one brief thing just

19   for clarification.  Do we need to say anything more --

20          MS. MOST:  Dr. Ravitz.

21          MR. DIMOPOULOS:  Yeah, so we're transitioning,

22   okay, so we can cut there for --

23          THE COURT:  Just so it's clear, when I say any --

24   at any time I mean even for a few minutes.  It has to be --

25          MS. MOST:  I get it.

Proceedings                                    18

1            THE COURT:  It has to be constant.

2            MR. DIMOPOULOS:  All right.  The next issue I just

3    want to bring up, I don't think it's going to be an issue,

4    but those are famous last words, my client has made an

5    appointment to treat with a Dr. Tracy Markowitz as his

6    psychologist.  She is a PsyD versus a PhD, same degree, same

7    license, but, you know, PsyD's focus a little more on

8    clinical practice versus research.  I just wanted to get

9    Mr. Lieberman's consent on a PsyD versus a PhD.

10            MR. LIEBERMAN:  If I could just have a moment.

11            THE COURT:  Sure.

12            MR. LIEBERMAN:  I think counsel is asking -- I've

13    never consented to a PsyD to do anything in a custody case

14    so if I could just have a second.

15            THE COURT:  Sure.

16            MR. LIEBERMAN:  No, Judge, we did this before.  Top

17    of page four, quote, ordered that each party shall

18    immediately commence psychotherapeutic services with a

19    therapist of at least a PhD or MD qualification.

20            THE COURT:  So it's -- PsyD is a PhD, no?

21            MR. LIEBERMAN:  No, no.

22            MR. DIMOPOULOS:  Your Honor, I've researched the

23    issue.  I didn't come here unprepared, so.  Just give me a

24    second.

25            THE COURT:  It's not a doctorate level.

Proceedings                                    19

1              MR. DIMOPOULOS: Of course it is.

2              MS. MOST: It is a doctorate.

3              MR. DIMOPOULOS: Of course it is.

4              MR. LIEBERMAN: It's not -- we used pretty specific

5       -- at least a PhD level. You can't get a PhD on the same

6       credits that you can get PsyD.

7              MR. DIMOPOULOS: Your Honor, a PsyD --

8              MR. LIEBERMAN: Is less credits.

9              MR. DIMOPOULOS: -- a PsyD or a Doctor of

10      Psychology degree is an alternate degree that focuses on the

11      clinical and applied aspects of psychology. A PsyD's study

12      revolves around prepared -- anyway. And that's -- here's

13      the -- allpsychologyschools.com.

14             MR. LIEBERMAN: What are we reading from? We just

15      found something on the internet?

16             THE COURT: Let me ask you this, this is --

17             MR. DIMOPOULOS: He asked if it was the same

18      degree.

19             THE COURT: This is supposed to be therapeutic for

20      Mr. Kassenoff; is that correct?

21             MR. DIMOPOULOS: Yes.

22             THE COURT: It's not something about which we're

23      going to be taking testimony.

24             MR. DIMOPOULOS: No, it says psychotherapeutic

25      service.

Proceedings                                          20

1          MR. LIEBERMAN: No, no, no. What it says is, in a

2   consent order where we were very careful and we've been held

3   to the letter of every single letter in this order, what it

4   says, is a therapist of at least a PhD or MD qualification.

5   It's my understanding, from having had this issue and having

6   had PsyD's on the stand and PhD's on the stand, that there

7   are more credits and more resident hours that are involved

8   in getting a PhD doctorate than getting a PsyD.

9          THE COURT: So let me ask you this, Mr. Lieberman,

10  I can understand if you were taking that stance as to

11  someone who's doing a forensic evaluation, but if this is

12  supposed to be therapeutic and this is a person who

13  Mr. Kassenoff can benefit from, I don't know what the

14  objection is. I understand --

15          MR. LIEBERMAN: The objection is --

16          THE COURT: I can modify the order but --

17          MR. LIEBERMAN: Here's the objection, you were

18  provided with an ex parte application with video that made

19  my client out to be this monster. Elephants don't marry

20  giraffes, Judge, not here, not anywhere, okay. We didn't

21  give you our treasure troll. We didn't bring out all of

22  this. We'll be happy to share it. I don't think it moves

23  us forward, it would be shared with the forensic evaluator.

24  But the screaming and the yelling, it's not just my client.

25  The cursing at the child, taking the child's clothes out

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 21 of 38

Proceedings

1   after she puts her clothes away because she didn't do it

2   quick enough and throwing them on the floor and telling her,

3   with profanity, that she has to do it again within a time

4   limit --

5          THE COURT:  Let's assume --

6          MR. LIEBERMAN:  -- who saw that --

7          THE COURT:  Hold on.  Let's assume that to be

8   accurate.

9          MR. LIEBERMAN:  Okay.  Well, we were all real

10   concerned whether my client was in with a PhD or MD and we

11   have the same concerns.  If you want, I'll come in tomorrow

12   with an order to show cause ex parte with our video and I

13   assure you you will have the same concerns.

14          THE COURT:  But here's the thing, if she were to

15   have -- there is -- I was not aware of the specific

16   provision PhD -- PhD PsyD, that's not a grave concern to me.

17   It's who could do the most benefit.  If you were to come in

18   and tell me that your client would get the most benefit out

19   of seeing a PsyD I would have no issue with that.

20          MR. LIEBERMAN:  That's not what I have heard.

21          MR. DIMOPOULOS:  Your Honor --

22          MR. LIEBERMAN:  I heard this is the person he

23   found --

24          MR. DIMOPOULOS:  Your Honor, my client called six

25   therapists, had conversations with them.  He had a

Proceedings                                    22

1    connection with this person, okay, didn't even cross his

2    mind, you know, it would be an issue.  I raised it knowing

3    that it might be an issue because of a nuance, and I just

4    ask you modify the order, your Honor.  It's --

5                MR. LIEBERMAN:  Wait a second.

6                MR. DIMOPOULOS:   -- academic.

7                MR. LIEBERMAN:  No, no, no.  This is a consent

8    order where we crafted this language.  I challenge the Court

9    to find this language in another order that's currently

10   before it.  We did this for this case for a reason.  If

11   you're going to rule against us, I got it.  I'm letting you

12   know now that a PsyD does not have the credentials for the

13   issues that we believe are present.  If they believe that's

14   the case, they want to take the risk, we're not going to

15   file contempt on that, but I'm telling everybody right now

16   I'm certainly going to look for an adverse inference when we

17   get to trial and we find out that the PsyD wasn't qualified

18   and therefore he hasn't moved through the therapeutic

19   process the way he could have and should have.  That's on

20   them.  As far as we're concerned, he's in violation of an

21   order, not seeking contempt, not seeking enforcement, I have

22   a court order.  Those are his choices.  They're both

23   lawyers.  They know what they're doing.

24                MR. DIMOPOULOS:  Your Honor, again, I'm going to

25   the appellate division tomorrow, I'm filing an order to show

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 23 of 38

Proceedings

23

1   cause tomorrow, I'm -- I don't want to put myself -- can you

2   please, he's looking to get some therapeutic services

3   required by the order.   There is a nuance in degrees.

4   They're both doctors.   I really don't think there is a

5   problem here for your Honor to just modify the order and

6   have him go to a PsyD, I really don't.

7         MR. LIEBERMAN:   If you do modify a consent order

8   under these circumstances, without even having anything

9   before you in sworn form, there will be an objection and we

10  will not consent to it.   If they want to take this risk and

11  they believe it's the same, that's on them.

12        MR. DIMOPOULOS:   I'll swear --

13        MR. LIEBERMAN:   I think the proper way to do this

14  would have been to say, hey, Mitch, before we get there

15  today, my client is thinking of going in with this person,

16  allow us to check this person out, maybe she's a PsyD but

17  she's got a very good reputation and we'll be comfortable

18  with it, but to give me a name of someone on the face of

19  things who is not qualified and say, oh, it's a nuance, it's

20  not a nuance, it's a consent order.

21        THE COURT:   Why don't we -- we're going to keep the

22  -- as stated on the record, to this point, the order will

23  remain in place as I had -- as was initially signed and

24  so-ordered with the modification in addition to the names

25  and other terms that I dictated into the record and it will

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 24 of 38

1    be so-ordered.  As to the PsyD, do you want to -- I think

2    maybe we can avoid conflict if Mr. Lieberman has an

3    opportunity to look into this.  I mean, listen --

4         MR. LIEBERMAN:  She may be great.  Just get me her

5    CV, let me find out who she is.  I've never heard of her.

6         THE COURT:  By the way, I'm not saying I might not

7    modify the order in any event, but I would much prefer we

8    could do this by consent to avoid problems.

9         MR. LIEBERMAN:  Thank you, Judge.

10        THE COURT:  Why don't we do this, do you want to do

11   this rather than have everybody come in at all kinds of

12   times and expenses, do you want to do this by letter

13   agreement?

14        MR. LIEBERMAN:  Sure.  Why don't you get me a CV by

15   Friday and by Tuesday if there's a problem I'll let Gus

16   know.

17        MR. DIMOPOULOS:  Okay.

18        MR. LIEBERMAN:  If there's not a problem, I'll let

19   Gus know.

20        MR. DIMOPOULOS:  Okay.

21        THE COURT:  I would appreciate it, Mr. Lieberman,

22   if you would be liberal in doing this, because, you know

23   what, if it's a question -- there's no doubt in my mind that

24   if this was a forensic I would view it that it should be a

25   PhD or an MD.  On the other hand, what's therapeutic for one

1    of the individuals and one of the individuals thinks that

2    the PsyD would certainly be better than a PhD --

3        MR. LIEBERMAN:  For us, Judge, it's actually -- I

4    don't understand that.  If he's going to feel comfortable

5    talking to somebody and not feel comfortable talking to

6    somebody that we think he should talk to then the whole

7    purpose of this is defeated.  So I'm approaching this with

8    the point of view as long as somebody doesn't tell me she's

9    horrible or something that would disqualify --

10        THE COURT:  I wouldn't --

11        MR. LIEBERMAN:  I'm not a doctor.  I'm a lawyer,

12    you know.  Or what was the Star Trek, I'm a doctor, Jim, no,

13    I'm just a lawyer, I'm not a doctor.  I'm not about to make

14    a call for who Mr. Kassenoff should be seeing.  I just want

15    to make sure the person --

16        THE COURT:  All right.

17        MR. LIEBERMAN:  -- is qualified --

18        THE COURT:  So let's say --

19        MR. LIEBERMAN:  -- in accordance with the order,

20    that's all.

21        THE COURT:  So you'll get it to Mr. Lieberman by

22    Friday?

23        MR. DIMOPOULOS:  Yes.  And the final thing --

24        THE COURT:  When will you get it to him by?

25        MR. DIMOPOULOS:  We will call Dr. Markowitz -- I

Proceedings                                          26

1    mean, I don't know how long it's going to take her to send a

2    CV.  We'll endeavor to get it done by Friday.

3            THE COURT:  Okay.

4            MR. DIMOPOULOS:  Just when you leave here --

5            THE COURT:  That's fine.  By Friday.  And then by

6    next Wednesday you'll --

7            MR. LIEBERMAN:  I'll have it by Tuesday.

8            MR. DIMOPOULOS:  Okay.

9            THE COURT:  There will be a letter by Mr. Lieberman

10   either saying yea or nay and --

11           MR. DIMOPOULOS:  And the final thing I want to

12   address with your Honor, I don't expect your Honor to have

13   to get involved in it at this point, but I just need to make

14   a record of it because it's starting to be a problem, okay.

15   My client has access time with the children.  Ms. Kassenoff

16   has access time with the children.  Each party is free,

17   under the terms of the order, to exercise their parenting

18   time as they wish.

19           THE COURT:  Correct.

20           MR. DIMOPOULOS:  My client is getting consistent

21   emails from Mrs. Kassenoff directing him on what to do with

22   his parenting time, where to go, how to do it, and the

23   emails are starting to get concerning, okay.  I would like

24   -- we walked out --

25           THE COURT:  Concerning how?

Proceedings                                                27

1          MR. DIMOPOULOS:  She's trying to control everything

2     that he does during his parenting time, and my advice to him

3     --

4          MR. LIEBERMAN:  Why don't you give those emails to

5     the, Judge.

6          MR. DIMOPOULOS:  Sure.

7          MR. LIEBERMAN:  Because what it is, Judge, you have

8     three kids who are pretty heavily scheduled --

9          THE COURT:  Hold on.  Are they scheduling issues or

10    --

11         MR. DIMOPOULOS:  No, it's not just scheduling.

12    Family Wizard is to be implemented to put up the schedule,

13    okay.  Already the kids are being enrolled in programs

14    without my client's consent.  At this particular point in

15    time -- it just happened with soccer, okay -- what I am

16    asking, okay, what I'm not even asking, what I'm putting on

17    the record is that she is not to interfere with my client's

18    parenting time.  He knows what to do.  Provided the schedule

19    is there, he will handle his parenting time his way and she

20    will handle her parenting time her way.  The emails are

21    getting more and more acrimonious.  They're getting more and

22    more bossy, and they're getting more and more controlling

23    and it's a problem, it's a problem.

24         MR. LIEBERMAN:  I've read the emails.  I don't

25    think anybody is being bossy or controlling.  When we were

Proceedings                                                28

1     here last time there was a concern expressed on

2     Mr. Kassenoff's behalf that he didn't know their schedule

3     because that hadn't been his role in the family.  Nobody's

4     faulting him.  That's the way things got delegated.  My

5     client did all of that, violin lessons, from soccer, to

6     camp, to everything.  She scheduled everything.  So what has

7     now happened is he's unaware of their historic schedules,

8     he's unaware that Charley -- Charlotte got invited to join

9     the soccer team quite some time ago, it's because she works

10    so hard and did so well it was a natural evolution of where

11    she was going with her soccer program.  If they were

12    together this would have happened, so.  She was registered

13    for the program.  They were registered for camp.  The notion

14    is that I'm going to put the kids in little league soccer

15    and you're going to put the kids in little league baseball

16    because we both can do what we want on our time and ignore

17    what the kids want to do...  so what my client thought she

18    was doing was the right thing, by continuing the same

19    activities and the anticipated activities for the children

20    that they've always been in.  If we need to, in the interim

21    time, implement a parent coordinator for better

22    communication, seems a little silly, these two people do

23    talk and we're not talking about anything extraordinary,

24    we're talking about she made the travel soccer program

25    because she's really, really good, we're talking about camp,

Proceedings                                29

1      we're talking about violin.

2              We want to talk about issues, okay, you can't let

3      Ali go to school and then have her locked out of the house

4      when it's your day and have the neighbor call my client

5      yesterday and say, you know, Ali's locked out of the house,

6      she doesn't have a key.  I didn't come in here to complain,

7      Judge, but if we want to get into serious issues, my view of

8      this is it's going to take a couple of weeks for these

9      people to sort things out and learn how to co-parent within

10     this nesting arrangement.

11             MR. DIMOPOULOS:  I don't disagree.

12             MR. LIEBERMAN:  Otherwise, otherwise, what was my

13     client supposed to do?  Because her next call to me is do I

14     run home and get the key?  I said, no, it's not your time.

15             MR. DIMOPOULOS:  As I -- I don't necessarily

16     disagree with everything Mr. Lieberman said, unlike him

17     disagreeing with everything I said, but here's the actual

18     email.  As Jo Jo's mom, I would like your assurance that

19     she's getting to her activity on time with a responsible

20     adult per the court order.  If you can't assure me of that

21     then I will raise it with my lawyer.  This is two days after

22     the ink is dry.  He knows what he's doing.  He's been a dad

23     for as long as she's been a mom, okay.  Let him do his

24     thing, let her do her thing.  I'm bringing this to the

25     Court's attention to head this off.  This isn't something

Proceedings                                             30

1    that requires Court intervention, but I need to raise it

2    because if it gets worse it --

3         MR. LIEBERMAN:  It's not going to get worse.  My

4    client is going to do what has historically been done for

5    the children.  Hopefully, continue what these children have

6    historically enjoyed, soccer, enjoyed violin, enjoyed going

7    to camp.  If he wants to be the one to say we're going to

8    stop doing what we have historically done, what we agreed to

9    do four weeks ago before this fiasco blew up, there's going

10   to be a real serious problem.

11        MR. DIMOPOULOS:  Your Honor, your Honor, that's not

12   fair.

13        MS. MOST:  It isn't fair.

14        THE COURT:  Hold on.

15        MS. MOST:  Because --

16        THE COURT:  Ms. Most, hold on.

17        MR. LIEBERMAN:  Isn't fair?

18        THE COURT:  Hold on, hold on.

19        MR. LIEBERMAN:  If not, raise this with me.

20        THE COURT:  One second, please.

21        MR. LIEBERMAN:  How do you know it's not fair --

22        THE COURT:  Let me, let me.  All right.  First of

23   all, if one party, one parent is going to make plans for a

24   child that falls out on the time that the other parent has

25   with the child they have to get the agreement of the other

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 31 of 38

Proceedings

31

1    parent which should not be unreasonably withheld.

2              MR. LIEBERMAN:  Agreed.

3              THE COURT:  All right.

4              MR. LIEBERMAN:  What about things that were put in

5    place before we got here?

6              MS. MOST:  There should be discussion -- there

7    should be no sign-ups for anything unless the parties talk

8    about it.

9              THE COURT:  I agree 100 percent.  Well, if it falls

10   out within the timeframe that one parent has that child, for

11   example, a violin lesson, if it falls out during

12   Mrs. Kassenoff's time, that's fine, but if it falls out

13   during Mr. Kassenoff's time, he has to be consulted and

14   agree to it.  It's very --

15             MR. LIEBERMAN:  Can we talk about that?  The kids

16   have been in violin lessons forever.  Are we now going to

17   say if a violin lesson is on his time he doesn't want it the

18   kid gets pulled?

19             THE COURT:  This is what I said, it shall not be

20   unreasonably withheld.  I think we're all attorneys here.

21             MR. LIEBERMAN:  So when my --

22             MR. DIMOPOULOS:  This is all --

23             MR. LIEBERMAN:  Excuse me.  What my client was

24   writing was that this was an event that she understood that

25   Jo Jo was going to be in, that she understood everyone knew

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 32 of 38

1  about, and that if he was going to have a problem with it,

2  okay, I'll bring it to my lawyer. Frankly, that's what I

3  told her to do.

4          THE COURT: Okay.

5          MR. LIEBERMAN: That's what I would do if, God

6  forbid, I was in this situation and I couldn't work it out.

7          MR. DIMOPOULOS: I think the point is made, okay, I

8  will not tolerate interference with my client's parenting

9  time. That's all I want to say.

10         THE COURT: That's fine. I think we're all in

11 agreement with that.

12         MS. MOST: So --

13         THE COURT: But again, but again, if it's something

14 that was already in place for a long period of time, I don't

15 think Mr. Kassenoff wants to be the bad guy and say, no, you

16 can't go to these lessons that you've been going to all the

17 time just because --

18         MR. DIMOPOULOS: Right.

19         THE COURT: -- it now falls on my time. The

20 question is not unreasonably withhold --

21         MR. DIMOPOULOS: That never --

22         THE COURT: Mr. Lieberman, Mr. Lieberman.

23         MR. DIMOPOULOS: Here's the thing, that's not even

24 the issue. We're not even disputing what's going on. What

25 we're saying is stop emailing him repeatedly on his

Case 7:22-cv-02162-KMK   Document 39-4   Filed 09/15/22   Page 33 of 38

Proceedings                                    33

1    parenting time, asking him questions about what he's doing,

2    where he's doing it, how he's doing it, how he's getting

3    there. He's a very, very responsible adult, he can handle

4    it.

5          MR. LIEBERMAN: Judge, the only other email that

6    came was when the neighbor called and said Ali was locked

7    out. She sent an email, do you know Ali is locked out? Do

8    you know you have to give her a key in the morning? It's

9    not that she is controlling. He's never had this role

10   before.

11         THE COURT: I understand, but still, let's use some

12   discretion here.

13         MS. MOST: Judge, the last thing is --

14         THE COURT: Yes.

15         MS. MOST: -- do the parties agree to go to

16   Dr. Ravitz? I don't know where that -- where we are with

17   that.

18         MR. DIMOPOULOS: We consent.

19         MR. LIEBERMAN: Just so we're clear, Judge, there's

20   a question being posed like we're in the way of it. The

21   parties just got -- the parties just got an email yesterday,

22   I believe, about these two -- or the day before about the

23   two recommendations, and I think yesterday the parties

24   agreed to start interviewing, it might have even before

25   this --

Proceedings                                    34

1          MR. DIMOPOULOS: We're just confirming. We're not

2     saying --

3          MR. LIEBERMAN: So I understand the plaintiff has

4     objected to one of the two.

5          MR. DIMOPOULOS: Correct.

6          MR. LIEBERMAN: Okay. We just found that out

7     eight minutes ago when I was standing here that they

8     objected to one of the two. This isn't even 24 hours old.

9     I will speak to my client about the other doctor. I've told

10    her and she's already reached out to her husband to say

11    let's have a joint call. I don't know why this is an issue

12    before you. Everything is being posed like we're in the

13    way. We're not in the way. My client is doing what she's

14    supposed to do.

15         MR. DIMOPOULOS: We need matters confirmed, that's

16    all.

17         THE COURT: All right.

18         MR. LIEBERMAN: In fact, my client today suggested

19    a 9:30 call with the doctor and has still yet to get a

20    responsive email about that.

21         Judge, in terms of the soccer, just so we can clear

22    it up, it was -- it was a continuation. She's been in

23    soccer all year. My client did sign her up in June for the

24    travel team. She just thought that since they had been --

25    had her in and she got invited that everybody would be on

Case 7:22-cv-02162-KMK    Document 39-4    Filed 09/15/22    Page 35 of 38

Proceedings                                    35

1    the same page.  It wasn't done to deprive your client of

2    time with his daughter.  It was done because there was a

3    common belief that this is what she wants to do.

4         MR. DIMOPOULOS:  You know my client's response,

5    what he said to me which I thought was brilliant?  He said,

6    Catherine, this is the new normal, so let's just not -- this

7    isn't -- these parties are going through a divorce.

8         MR. LIEBERMAN:  Okay.  But can the kid be on the

9    soccer team?

10        THE COURT:  One at a time.  Let's address the one

11   -- let's do one issue at a time.  Soccer team, okay.

12        MR. DIMOPOULOS:  No idea what days it is, no idea

13   what the commitment is, no idea how many times a week, no

14   idea.

15        MR. LIEBERMAN:  It's all in the email he objected

16   to.

17        MR. DIMOPOULOS:  It is not.  It is not.

18        THE COURT:  Hold on.  Let's adhere -- let's do it

19   right now.  What are the dates so your client --

20   Mr. Lieberman?

21        MR. LIEBERMAN:  Did you send me that email with the

22   attachment?

23        From what the email says, it's Mondays and

24   Thursdays from 4:45 to 6 p.m. at Harbor Island.  Games are

25   Sunday afternoons.  WISL full schedule will be confirmed by

Proceedings        36

1    mid August.

2        MR. DIMOPOULOS:  Did you say Mondays and what?

3        MR. LIEBERMAN:  Wednesdays -- Thursdays.

4        THE COURT:  We're talking about the fall?

5        MR. LIEBERMAN:  This is -- you practice for the

6    summer and you start your games in August and you go through

7    it.  It's soccer.

8        MR. DIMOPOULOS:  When does it start?  August?

9    August what?

10       MR. LIEBERMAN:  No, no, no, no, no, no.  That's

11   when the full schedule comes out.  When's the first

12   practice, Catherine?  September?

13       This is not interfering with anyone's summer plans,

14   this is for September, but you had to register now.

15       THE COURT:  I don't think Mr. Kassenoff wants to

16   stand in the way of his daughter's soccer lesson, soccer

17   practice.

18       MR. DIMOPOULOS:  Let's just say this in a very

19   non-adversarial way, we need to know -- have we begun using

20   Family Wizard?

21       MR. KASSENOFF:  A little bit.

22       MR. DIMOPOULOS:  A little bit.  Okay.

23       What I think we need to do is, now that we have

24   this new activity, we need to set a date that everybody has

25   to be updated on Family Wizard so my client knows what's

Proceedings                                37

1    going on, including the soccer traveling and all this stuff.

2    You know, it's a process where everyone is going to trip

3    over their own shoelaces.

4         THE COURT: Here's what we're going to do, we're

5    going to give each side an opportunity to upload it to --

6    Family Wizard it's called?

7         MS. MOST: Yes.

8         THE COURT: Family Wizard. We'll set a date that

9    it has to be uploaded and then we'll do a week later for

10    objections. How's that?

11        MR. DIMOPOULOS: Correct. That will be perfect.

12        THE COURT: Pick a date that each side has to --

13    each party has to upload the plans for the girls and then

14    within a week --

15        MR. LIEBERMAN: By next Wednesday.

16        THE COURT: Fine.

17        MR. DIMOPOULOS: We'll have responses by that

18    Friday.

19        THE COURT: All right. Is that enough time for

20    everybody?

21        All right. So --

22        MR. LIEBERMAN: And I just sent counsel the soccer

23    email again that was sent to his client by my client.

24        THE COURT: All right. So I'm not going to update

25    -- the order doesn't need to be updated --

1          MR. LIEBERMAN:  No.

2          THE COURT:  -- with the sub-limitation that's in

3     the record and that's in the order and I'm going to so-order

4     the transcript.

5          MR. LIEBERMAN:  Thank you, Judge.

6          THE COURT:  Just so we're clear -- excuse me,

7     Ms. Most.

8          MS. MOST:  Yes.

9          THE COURT:  Next Wednesday everything's uploaded to

10    Family Wizard, by Friday any objections, and let's do it --

11    you can upload any letters of objection to the e-filing and

12    just drop off a hard copy with the Court so we have it.

13         MR. LIEBERMAN:  Thank you for your time again,

14    Judge.

15         THE COURT:  Very well.  And good luck to everybody.

16    SO-ORDERED BY

17    HON. DAVID F. EVERETT

18

19                  *              *              *

20

21    THIS IS TO CERTIFY THAT THE ABOVE TRANSCRIPT IS A TRUE AND

22    ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

23

24    ----------------------------------------X

25         Nicole Ameneiros
           Senior Court Reporter